SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

-----------------------------------------------------------------X

DANNY COLON,                                                    :

                          Plaintiff,                           :       **SUMMONS**

          -against-                                            :       Index No. 307698 /12

THE CITY OF NEW YORK;                                          :       Venue: Bronx County
THE NEW YORK CITY HOUSING AUTHORITY;                                   (Jury Trial Demanded)
JAMES THEIS, a former detective employed                       :
by the New York City Police Department,
MICHAEL CODELLA (aka "Rambo"), a former                        :
detective with the New York City Housing
Authority Police Department, and JOHN DOE                      :
Nos. 1 through 5 (whose identities are currently
unknown but who are known to have been                         :
detectives and supervisors with the New York City
or the New York City Housing Authority                         :
Police Departments), as individuals and in their
official capacities,                                           :

                          Defendants.                          :       *100 CHURCH ST (4FL)*
                                                                       *NY NY*
-----------------------------------------------------------------X

12 SEP 19 PM 2: 37  COUNTY CLERK BRONX COUNTY  RECEIVED

To the above-named defendants:

     YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a
copy of your answer, or if the complaint is not served with this summons, to serve a notice of
appearance, on the plaintiff's attorney within twenty (20) days after service of this summons,
exclusive of the day of service (or within thirty [30] days after service is complete if this
summons is not personally delivered to you within the State of New York).  In the case of your
failure to appear or answer, judgment will be taken against you by default for the relief demanded
in the complaint

     The basis of the venue designated is Bronx County because it is where the cause of action
arose and because of Plaintiff's designation.

DATED:     New York, New York
           September 19, 2012

BY: JOEL B. RUDIN, ESQ. (JR 5645)
200 West 57th Street, Suite 900
New York, New York 10019
(212) 752-7600
Email: jbrudin@aol.com

*ATTORNEY FOR THE PLAINTIFF*

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
------------------------------------------------------------------X

DANNY COLON,                                              :

                Plaintiff,                    :     **COMPLAINT**

        -against-                             :     Index No. _____

THE CITY OF NEW YORK;                                     :
THE NEW YORK CITY HOUSING AUTHORITY;
JAMES THEIS, a former detective employed                  :     **Jury Trial Demanded**
by the New York City Police Department,
MICHAEL CODELLA (aka "Rambo"), a former                   :
detective with the New York City Housing
Authority Police Department, and JOHN DOE                 :
Nos. 1 through 5 (whose identities are currently
unknown but who are known to have been                    :
detectives and supervisors with the New York City
or the New York City Housing Authority                    :
Police Departments), as individuals and in their
official capacities,                                      :

            Defendants.                   :

------------------------------------------------------------------X

    Plaintiff DANNY COLON ("Plaintiff"), by his attorneys, the LAW OFFICES OF JOEL

B. RUDIN, complaining of the Defendants, respectfully alleges, upon information and belief, as

follows:

### NATURE OF ACTION

    1.     This is a civil action, pursuant to 42 U.S.C. §1983 and 1988, and New York State

law, seeking monetary damages for Plaintiff, DANNY COLON, due to his malicious

prosecution, wrongful conviction, and nearly 20-year imprisonment – all caused by the pervasive

misconduct of New York City police detectives and the Manhattan District Attorney's office.

2.      Police detectives, under pressure to "close" a drug-related double homicide that was committed on December 8, 1989, coerced a heroin addict fearful of going to prison to falsely accuse plaintiff of complicity in the crime.  They *knew* his story was false, yet they initiated plaintiff's criminal prosecution based upon it anyway.  Later, they withheld information from the District Attorney's Office which discredited the addict as well as a second key "cooperating" witness who testified against plaintiff at his murder trial.

3.      Plaintiff's unlawful conviction also was caused by the misconduct of an overzealous assistant district attorney who was assigned to his case ["the assigned ADA"].  In violation of Plaintiff's constitutional right to due process of law and a fair trial, the assigned ADA knowingly presented false testimony by key witnesses, and improperly vouched for the "truthfulness" of their testimony as an unsworn "witness," when she knew they were testifying untruthfully and she was simultaneously withholding from Plaintiff evidence and information she was constitutionally required to disclose which would have impeached their credibility and made an acquittal highly probable.

4.      On November 19, 2009, over the strenuous opposition of the Manhattan District Attorney's Office, the New York Court of Appeals vacated Plaintiff's conviction as unconstitutionally obtained, and ordered a new trial.  Ultimately, on June 29, 2011, the D.A.'s office, admitting it had no evidence with which to prove its case, finally agreed to dismiss the indictment.  Plaintiff served nearly 17 years in prison following his conviction in this case.

5.      This lawsuit seeks to hold liable the individual police detectives responsible for Plaintiff's false prosecution, as well as the municipal defendants: the CITY OF NEW YORK ("The City") and the NEW YORK CITY HOUSING AUTHORITY ("NYCHA").  These

municipal entities are liable under the federal civil rights statute, 42 U.S.C. § 1983, and *Monell v.*

*Dept. of Social* Services, 436 U.S. 658 (1978), because their unlawful policies, customs, or

practices, and/or their deliberate indifference to the unlawful customs or practices of their

employees, were a substantial cause of Plaintiff's constitutional injuries.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

6.      This action arises under 42 U.S.C. §§ 1983 and 1988, and under the

common law of the State of New York.

7.      Venue is proper in this County because it is where the cause of action arose

and because of Plaintiff's designation.

8.      On September 23, 2011, Plaintiff served upon Defendant City of New York

timely notice of the present claims pursuant to New York General Municipal Law § 50-e.

9.      This action has been commenced within one year and 90 days of the accrual of

Plaintiff's State causes of action.

10.     Plaintiff has duly complied with all of the conditions precedent to the

commencement of this action.

## THE PARTIES

11.     Plaintiff, DANNY COLON, is a citizen and resident of the State of New York.

12.     Defendant, the CITY OF NEW YORK ("Defendant City"), is a municipal

corporation existing by virtue of the laws of the State of New York.  The New York City Police

Department ("NYPD") is an agency of the City of New York, which is liable for its torts and

those committed by its employees within the scope of their employment.

13.     Defendant, the NYCHA, is a municipal corporation existing by virtue of the laws

3

of the State of New York. At all relevant times prior to 1995, the NYCHA maintained its own police force whose principal function was to enforce criminal and administrative laws and rules in and about properties and buildings owned or operated by the NYCHA.

14.     Defendant, JAMES THEIS, is a retired detective who was employed by the NYPD. At all times relevant to this Complaint, he acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and the City of New York, and within the scope of his employment. He is sued in his individual and his official capacities.

15.     Defendant, MICHAEL CODELLA (aka "Rambo"), is a retired police officer who was employed by NYCHA. He also was assigned, during periods relevant to this Complaint, to a joint State-Federal narcotics task force. In connection with his duties, from time to time he worked under the supervision of NYPD personnel and as an agent of the City of New York. At all times relevant to this Complaint, he acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and the City of New York, and within the scope of his employment. He is sued in his individual and his official capacities.

16.     Defendants JOHN DOE Nos. 1 through 5 were detectives and/or supervisors employed by the NYPD or the NYCHA. At all times relevant to this Complaint, they acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and the City of New York, and within the scope of their employment. They are sued in their individual and their official capacities.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.     The Crime, The Initial Investigation, and Plaintiff's Arrest

17.     On December 8, 1989, near the corner of East 4th Street and the FDR service road

4

in Manhattan, a group of men allegedly driving by in a van opened fire on two occupied parked cars, killing two men, Orlando Martin and Frank Morales, and severely wounding two others, Pedro Mejia and Rafael Garcia ("the FDR murders").

18.     The brutal incident was widely covered in the news media, and rumors quickly spread in the neighborhood that Wilbur and Billy Hernandez ("the Hernandez brothers"), Willie Perez, and Johnny "Moose" Vargas, all known to be violence-prone drug dealers, were responsible.

19.     Defendant THEIS, then assigned to the Ninth Precinct Homicide Squad, was placed in charge of the investigation.

20.     THEIS and other detectives immediately suspected that the shooting was drug-related, as all of the victims except Morales were known drug dealers.  THEIS suspected that the mastermind was one of the most powerful drug lords in Manhattan, Daniel Core (aka "Danny Green Eyes").

21.     Core was a ruthless killer whom police believed controlled the drug trade in the Lower East Side of Manhattan and in much of Spanish Harlem.

22.     Core employed scores of workers, operated numerous drug "spots," and earned millions of dollars in illicit profits.

23.     Defendant CODELLA was assigned to the Lower East Side and was hoping to "take down" Core.

24.     As he wrote in his book, "Alphaville," CODELLA would illegally search and beat up suspects, plant evidence on them, coerce false confessions from them, take money from them, and lie about it to judges, prosecutors, defense lawyers, and Internal Affairs investigators.

5

25.   For example, CODELLA admitted that he would force drug dealers and junkies to manufacture false robbery complaints when the Police Department wanted to increase robbery arrests.

26.   CODELLA wrote in his book:

> I'd rewritten the *Patrol Guide* in order to suit my own needs. I'd lied to bosses, friends, and district attorneys, told IAB [Internal Affairs Bureau] to go fuck themselves, and taught people I worked with to do the same. I'd committed my own crimes to ensure that arrests were made and bad guys went to jail.

27.   CODELLA admitted coercing a confession out of a suspected rapist by stomping on his head, kicking his ribs, choking him until he passed out, kneeing him in the mouth until "[b]lood surged through his teeth," and, winking to his partner, taking the suspect to the bathroom, putting a gun to his head, cocking the hammer, and saying, "Either your confession, or your brains, will be all over that paper in five minutes."

28.   CODELLA acknowledged being the subject of nearly two dozen Internal Affairs and other misconduct complaints. Notwithstanding its awareness of the extraordinary number of serious complaints made against him, NYCHA continually promoted CODELLA, allowed him to train and supervise other officers, and recommended him for assignment to the Joint State-Federal Narcotics Task Force.

29.   Defendant THEIS gained the cooperation of the two survivors of the FDR shooting, Rafael Garcia and Pedro Mejia Diaz, both drug dealers.

30.   Garcia and Mejia Diaz identified Necio Fonseca, Willie Perez, and Wilbur Hernandez – all close associates of Core's – as participants in the FDR murders.

6

31.     In addition, Mejia Diaz reported that Billy Hernandez and Willie Perez had called him at the hospital and threatened him.

32.     On or about January 11, 1990, THEIS arrested Fonseca and Perez and swore out a felony complaint charging them with the FDR murders.

33.     On or about January 19, 1990, Defendant THEIS spoke with a witness who was a family member of Fonseca's.

34.     This family member told THEIS that Johnny "Moose" Vargas had admitted to her that he was a participant in the FDR murders, that there had been a total of four perpetrators, and that the other three included Wilbur Hernandez, Willie Perez, and either "Little Danny" or "Pretty Eddie."

35.     THEIS knew that "Little Danny" was an associate of Core's known named Danny DeJesus, while "Pretty Eddie" was a local drug dealer named Eddie Santiago.

36.     THEIS credited the perpetrator's statement to the woman.

37.     Indeed, on the basis of the perpetrator's statement to the woman, THEIS caused the charges against Fonseca to be dismissed and for Fonseca to be released from custody.

38.     On March 12, 1990, Anibal Vera, a drug addict and dealer, was arrested in a drug sweep in the Lower East Side and charged with misdemeanor possession of crack cocaine.

39.     Vera was on probation for armed robbery.

40.     Vera was deeply afraid of going to prison for violating his probation, and tried to cooperate with police, but they told him his information was not useful.

41.     Vera then told police that, in exchange for his release from custody, he could provide them with information about the FDR shootings.

42.     Interviewed next by defendant THEIS, Vera provided information about the murders that was readily available on the street, and did not identify Plaintiff as a participant.

43.     Based upon Vera's statements and other information, THEIS believed that the murders had been orchestrated or committed by Daniel Core.

44.     However, THEIS arranged for Vera to be released so that he could function as a confidential informant.

45.     Later in March, Fonseca, Garcia, and Mejia – all of whom had cooperated with THEIS in his investigation -- were murdered.

46.     Theis and/or the assigned ADA then interviewed two individuals who also were relatives of Fonseca.

47.     The two relatives said they knew "Moose" and the others who had been involved in the FDR murders.  The names they provided of the perpetrators did not include Plaintiff.

48.     Thereafter, THEIS met with Vera on numerous occasions to question him about his knowledge of the FDR murders and other crimes.

49.     Vera did not state on any of these occasions that Plaintiff was one of the perpetrators.

50.     THEIS threatened Vera that, unless Vera provided additional information that THEIS found to be useful, Vera would be prosecuted for the FDR murders or other crimes, or would have his probation violated, and he would be sent to prison.

51.     Finally, in or about August, 1990, Vera named Plaintiff and an associate of plaintiff's named Anthony Ortiz as participants in the FDR shooting.

52.     Vera claimed, in substance, that both Plaintiff and Ortiz admitted to him that they

8

were participants in the murders, along with Wilbur Hernandez and Willie Perez.

53.     It was the announced policy of the NYPD, and THEIS had been trained, to take notes and prepare reports, known as DD5s, of all relevant interviews with witnesses who claimed knowledge of serious crimes that were under investigation.

54.     Nevertheless, THEIS kept no notes, and prepared no report, of any of his many interviews with Vera in which Vera either denied personal knowledge of who committed the FDR shootings, failed to name Plaintiff, or made other statements that were inconsistent with his eventual testimony.

55.     THEIS arranged with the assigned ADA to enter into an agreement with Vera under which Vera's criminal charge of crack cocaine possession would be reduced to the non-criminal offense of disorderly conduct and he would avoid going to prison for his probation violation.

56.     On or about August 12, 1990, defendant CODELLA arrested Ortiz on federal narcotics charges.

57.     CODELLA told Ortiz, in words or in substance, that he should cooperate with the police and become an informant, or else he would soon be arrested for a murder that CODELLA acknowledged Ortiz was not responsible for.

58.     CODELLA had learned from THEIS or others in the NYPD that Ortiz was going to be charged with a murder they knew or believed he had not committed.

59.     CODELLA had agreed with THEIS and others in the NYPD and in the NYCHA Police  Department to use the threat of such prosecution as leverage to coerce Ortiz to become an informant and/or a witness for them.

9

60.     When Ortiz refused to become an informant or cooperating witness, he remained in federal custody.  CODELLA had a duty to report to supervisors and/or the District Attorney's Office that innocent men were about to be prosecuted for murder, but never did so.

61.     On or about October 12, 1990, Defendant THEIS took custody of Ortiz and formally arrested him for the FDR murders.  Plaintiff was arrested soon thereafter.

62.     During the arrest processing, notwithstanding Vera's statement implicating Plaintiff and Ortiz, THEIS told Ortiz, in words or in substance, that THEIS knew who the real murderers were, that THEIS knew Ortiz was not one of them, and that Ortiz should save himself by cooperating.

63.     THEIS showed Ortiz photos of various individuals, including Plaintiff, and tried to get Ortiz to falsely implicate Plaintiff.

64.     When Ortiz refused to cooperate, THEIS brought him to court to be arraigned on an indictment containing the murder charges.

65.     The grand jury that indicted Plaintiff and Ortiz for the FDR murders had no evidence that either of them was involved in the crime except for the testimony of Vera.

66.     Evidence was withheld from the grand jury that negated probable cause to believe that Plaintiff was criminal responsible for the FDR murders, including, but not limited to, the following:

        a.    The statements from various witnesses, whom THEIS and the assigned ADA credited, that there were no more than four participants in the murders, that three of them were Wilbur Hernandez, Willie Perez, and Johnny "Moose" Vargas, and that Vera's testimony that both Anthony Ortiz and Plaintiff also were involved as perpetrators was not true;

        b.    That Necio Fonseca also had been identified by the two survivors of the

incident as a participant and arrested and charged with the murders;

c.  That one of the perpetrators, Johnny "Moose" Vargas, had made a statement against his penal interest, which THEIS and the assigned ADA credited, that the fourth participant was either "Little Danny" or "Pretty Eddie," neither of whom was Plaintiff;

d.  That Vera had made numerous statements to THEIS, while he was a cooperating individual, in which Vera failed to identify Plaintiff as one of the participants in the shooting even though it was in his interest to do so;

e.  That when Vera finally accused Plaintiff and Anthony Ortiz, he had a motive to lie because his efforts to cooperate as a narcotics informant had been unsuccessful and THEIS had threatened him that, unless he provided useful information, he would go to prison;

f.  That Vera was a heroin and crack addict who desperately feared going through drug withdrawal if he remained in or went to jail; and

g.  That Vera was still using and selling drugs while he was "cooperating," yet he was not arrested for such activities.

67.  In addition to the above, the assigned ADA deliberately misled the grand jury concerning Vera's cooperation and the reliability of his present story. Knowing that Vera "cooperated" for several months before he finally identified Plaintiff as being involved in the crime, she nevertheless introduced Vera's testimony in such a way as to make it appear that he had consistently implicated Plaintiff in the crime, even before he was arrested, because he was a good citizen.

**B.   Vera Nearly Implodes As A Witness And Is Secretly Saved by the ADA**

68.  Following Plaintiff's arraignment, the trial of the case was delayed for nearly three years. During this period, the case nearly fell apart, in the following ways, because of Vera's criminal behavior.

69.  *First*, Vera was continually violating the conditions of his probation by using and

11

selling drugs, changing his residence without notice or permission, failing to attend drug

counseling programs, and failing to report when required to his probation officer. The assigned

ADA confirmed for the Probation Department, when it informed her that it was considering

violating Vera for failure to comply with his conditions of probation, that he was a key witness

for her Office, and as a result, his probation was not violated.

70.     *Second*, Vera, while housed at a mid-town hotel by the District Attorney's Office

as a "protected" witness, was found in possession of a firearm, which subjected him to potential

federal criminal prosecution as a "felon in possession" and which violated the terms of his

probation.

71.     Also found in his room was a large bag of white powder which most likely was

heroin or cocaine.

72.     Because of Vera's status as a cooperating witness, the police and the assigned

ADA conducted no meaningful investigation of the incident, kept minimal records of it, did not

notify federal authorities, Vera's probation officer, or the court supervising Vera's probation, and

never disclosed the incident to Plaintiff or his attorney.

73.     *Third*, Vera was arrested twice, once for possession of narcotics, then for a B-

felony sale, and he was charged with violating his probation.

74.     On the B felony, Vera faced a potential sentence of 12 ½ to 25 years in prison,

consecutive to any sentence he received for violating his existing probation for robbery.

75.     Vera was prosecuted on the two narcotics arrests by the Office of Special

Narcotics Prosecutor, an essentially independent office from the Manhattan District Attorney.

76.     Nevertheless, the assigned ADA handling Plaintiff's homicide prosecution

arranged, in place of the Special Narcotics ADA, to handle Vera's initial arraignment on his felony indictment in the State Supreme Court.

77.     In an off-the-record conversation at the judge's bench, the assigned ADA told the judge that Vera was cooperating with her in a homicide prosecution.

78.     During the same off-the-record conversation at the bench, the assigned ADA offered Vera a plea bargain that would cover all of Vera's open cases in exchange for a guilty plea to a reduced charge and a sentence not to exceed 2 ½ to 5 years in prison. Vera did not immediately accept the offer.

79.     Thereafter, on one or more occasions, the assigned ADA provided a status report to the assigned Special Narcotics prosecutor confirming that Vera was still cooperating with her prosecution and was an essential witness. As a result, the Special Narcotics prosecutor kept open the plea bargain offer even though Vera had rejected it and had stated he would contest the charges against him at a trial.

80.     *Fourth*, Vera "jumped bail" as his scheduled trial on his narcotics sale case was about to begin.

81.     Two months later, Defendant THEIS arrested him and brought him back to court.

82.     The assigned ADA again told the Special Narcotics ADA that Vera continued to be an essential witness in her murder prosecution of Plaintiff.

83.     As a result of this additional intervention by the assigned ADA on Vera's behalf, the Narcotics ADA made him an even better plea offer than before: he could have the same 2 ½ to 5 year deal, except now it would also cover his potential prosecution for bail-jumping.

84.     This time, Vera accepted the deal, pleaded guilty, and received the agreed-upon

sentence.

85.     *Fifth*, Vera threatened to refuse to testify unless the D.A.'s Office provided assistance in relocating his grandparents, who had raised him, to a more desirable public housing project.

86.     The assigned ADA agreed to assist Vera's grandparents and thereafter the District Attorney's relocation office did assist in their relocation.

C.      **Core Is Recruited To Buttress The Prosecution's Crumbling Case**

87.     In September 1990, Daniel Core was arrested for the murders of the two survivors of the FDR shooting, Pedro Mejia and Rafael Garcia.  (The murders had made it impossible for the authorities to prosecute Wilbur Hernandez and resulted in Willie Perez, despite being charged with the double murder, receiving a plea to simple gun possession and a sentence of 1-to-3 years.)  Core faced 25 years to life in prison for each killing, with the possibility of consecutive sentencing.

88.     In or about July, 1991, Core also was charged by federal authorities with operating a Continuing Criminal Enterprise, and faced up to life in prison on that charge as well.

89.     Assigned to the joint state-federal narcotics task force, defendant CODELLA participated in the investigation of Core.

90.     Core decided to cooperate with the federal and state authorities in order to obtain leniency for himself.

91.     Aware that Plaintiff and Ortiz already were indicted for the FDR murders, Core conveniently claimed that each of them had confessed his involvement in the murders to him.

92.     The "details" of the shooting that Core claimed Plaintiff and Ortiz had

14

confessed to him were details that Core knew independently from various other sources,

including Wilbur Hernandez and the other actual participants, except Core expanded the number

of perpetrators from the four that every other witness had described to five, in order to implicate

both Plaintiff and Anthony Ortiz.

93.     Core denied that he had approved, arranged, was responsible for, or had prior

knowledge of, the FDR murders.

94.     However, Core acknowledged the following:

    a.    Others involved in the shooting, including "Moose" (Johnny Vargas),
Willie Perez, and Wilbur Hernandez, had been involved with him in other
murders and violent incidents and in large-scale drug dealing;

    b.    Shortly before the FDR murders, he and his close associate, Necio
Fonseca, had been arrested together in the Bronx and indicted for gun
possession;

    c.    Core previously had been involved in a shootout directed at Orlando
Martin, the intended victim of the FDR shooting;

    d.    Core's close associate in murders and drug dealing, Wilbur Hernandez,
wanted to kill Orlando Martin because he believed Martin intended to kill
him;

    e.    Within a half hour of the FDR shooting, confederates of Core notified him
of it in Florida and he immediately returned to New York;

    f.    Upon his return he met right away with Wilbur Hernandez and was
informed of what had occurred;

    g.    Hernandez told Core (consistent with Johnny "Moose" Vargas's statement
to others) that four people committed the murders, including Hernandez,
Perez, Vargas, and one other person;

    h.    The weapons used in the FDR shooting belonged to Core;

    i.    Core's confederate Wilbur Hernandez had murdered Necio Fonseca in the
belief that he was cooperating with the authorities; and

j.    Core then accepted a $50,000 contract to arrange for, and in fact carried out, the assassination of Mejia and Garcia, the two survivors of the FDR shooting, in the belief that they were cooperating with the authorities.

95.    Core further acknowledged having personally committed or ordered a total of 14 murders, having controlled 200-300 "workers" in his heroin distribution organization, and having grossed up to $140,000 per day from it.

96.    Under his cooperation agreement with the State and Federal authorities, Core agreed to plead guilty to State and Federal charges, in exchange for a promise that he would not be prosecuted for the additional murders and other criminal activities he had admitted, that the authorities would recommend a sentencing reduction due to his cooperation, and that he would receive concurrent time, to be served in a federal institution.

97.    However, the agreement included a provision that, if Core provided any untruthful testimony or otherwise violated the agreement, the agreement would be terminated and he would be subject to prosecution for all the crimes he had admitted committing, including the dozen or so uncharged homicides.

98.    Defendant CODELLA knew, from his own sources and investigation, that Core's denial of any prior involvement in the FDR shootings was false.

99.    CODELLA wrote in his book that the FDR murders were with "[Danny Green] Eyes's approval."[1]

100.    Core's denial of such a significant fact blatantly violated his cooperation agreement and subjected him to prosecution for all the murders and other crimes he had admitted

---

[1]In his book, CODELLA changed certain names. He changed Core's name from "Danny Green Eyes" to "Davey Blue Eyes."

16

committing.

101.   Defendant CODELLA also knew, according to CODELLA's book, that Core, before his homicide arrest in 1990, had put out a "contract" on CODELLA's life.

102.   Furthermore, CODELLA knew and believed, according to CODELLA's book, that Core had "killed dozens of people," not "just" the 14 or so he admitted to prosecutors as part of his cooperation.

D.   **Plaintiff's Imprisonment In The Bronx**

103.   Following his arrest in October 1990, Plaintiff was held at Rikers Island in the Bronx.

104.   He remained there for most of the period through late 1993, when he was convicted at trial and sent upstate to serve his sentence in prison.

E.   **The Trial Proceedings**

105.   The only two trial witnesses to identify Plaintiff as a participant in the charged murders were Vera and Core.

106.   Vera denied any conceivable motive, interest or bias that might cause him to lie.

107.   He flatly denied that, apart from the one-time benefit he had received in 1990 in connection with his probation violation, he had received, or would receive, any promise, benefit, or consideration.

108.   Vera testified he had received "no breaks, no nothing."

109.   Vera specifically denied that the assigned ADA had "anything to do" with the 2 ½ to 5 year sentence he had received pursuant to his plea bargain with the Office of Special Narcotics Prosecutor.

110.   Vera testified that he did not believe the assigned ADA even knew about his arrests in the cases that were resolved by that plea bargain.

111.   The assigned ADA, in her summation, then vouched, as an "unsworn" witness, for the truthfulness of Vera's testimony.

112.   She stated to the jury that "*we* had nothing to do with the plea he ultimately took with a two and a half to five year sentence" (emphasis added).

113.   Vera, she said, is "not going to benefit any more from this, telling you what he knows."

114.   She argued that Vera was credible because he had been a "very good friend" of Plaintiff's and had no reason to implicate Plaintiff or Ortiz "if it's not true."

115.   She further vouched for Vera's credibility by arguing that he was motivated to testify because one of the two deceased victims, Frankie Morales, had not been in the drug trade and had not been an intended victim and "Mr. Vera told you he felt bad about that, *he really did*" (emphasis added).

116.   Vera's testimony denying any conceivable motive to lie and that the assigned ADA had "anything to do" with his favorable plea bargain, and the ADA's representations to the jury vouching for this testimony, were false. As alleged above in ¶¶ 68-86, the assigned ADA:

   a.   Personally offered Vera in court the favorable plea bargain he ultimately accepted;

   b.   Repeatedly interceded with the court, the Special Narcotics Prosecutor, and the Probation Department on his behalf;

   c.   Did not investigate and took no action against Vera, and violated her obligation to report to the probation department and federal authorities, Vera's possession as a

18

convicted felon of a gun in his hotel room; and

d.   Agreed to Vera's demand that her Office assist in arranging the relocation of

Vera's grandparents, without which he was threatening to refuse to testify, and in

fact did assist in their relocation.

117.   The assigned ADA did not correct Vera's false testimony or the ADA's own false

arguments, nor did she disclose any of the information that would have revealed the falsity of the

testimony and arguments.

118.   While the ADA did disclose that Vera had not initially named Plaintiff (or

Anthony Ortiz) as participants in the FDR shooting, she did not disclose any records containing

the dates of the interviews with THEIS or herself, Vera's specific, prior inconsistent statements

or claims of a lack of recollection, or the specific statements themselves, which prevented the

defense from effectively impeaching his credibility.

119.   As for the second witness, Core, the ADA put in evidence the terms of Core's

formal cooperation agreement, including a provision that, if any of his testimony was untruthful,

the agreement would be "null and void" and he would be subject to prosecution and sentencing

for all the horrific crimes he had admitted.

120.   The ADA used this provision to vouch for the truthfulness of his testimony since

the agreement had not been voided.

121.   Meanwhile, she argued that there was "no proof" that Core had been involved in

the FDR murders and that his denial of such responsibility was truthful.  She denied even that

Core had ever been a suspect in the FDR murders.

122.   However, neither the assigned ADA, nor any of the other defendants, disclosed to

Plaintiff, the court, or the jury that Core's testimony and the assigned ADA's arguments to the jury were not truthful in at least the following respects:

    a.    THEIS initially considered Core a suspect;

    b.    Contrary to Core's denial, he had approved or directed the FDR murders, a fact that undercut his entire story about how he had learned about the incident and Plaintiff's alleged involvement;

    c.    Core was responsible for "dozens" of murders, not "just" 12 to 14; and

    d.    He had not disclosed all his other crimes to the jury, as he was known not only to have committed these additional murders but also had put out a "contract" for the murder of defendant CODELLA.

123.    In a further improper argument amounting to vouching for the People's case and "testifying" as an unsworn "witness," the assigned ADA told the jury that "we guaranteed, we made sure" that Vera and Core had been kept separate and had no opportunity to conform their testimony to the other, and that was "incredible proof of the truth of what they're saying."

124.    Finally, the assigned ADA "testified" as an unsworn "witness" that one of the alternative suspects to Plaintiff and Colon, Necio Fonseca, had not been indicted because "he didn't do it, and the law enforcement officials realized he didn't do it so he wasn't indicted." Of course, the witnesses who did say Fonseca "did it" – the two original survivors of the shooting – had been assassinated by the People's present witness, Core.

125.    At the same time, the ADA did not disclose her knowledge, as set forth above in ¶¶ 46-47, that two witnesses had provided her with the identities of the actual shooters, that Plaintiff was not one of them, and that there were only four participants in the incident.

126.    This prevented the defense from investigating the information and presenting evidence to the jury in support of its position that others, besides Plaintiff and Anthony Ortiz, had committed the crime.

127.    After five days of deliberations, Plaintiff and Ortiz were convicted of the two murders, and each received total sentences of 50 years to life in prison.

F.    Post-Trial Proceedings And The Overturning of Plaintiff's Conviction

128.    Plaintiff's and Anthony Ortiz's convictions were affirmed on appeal.  *People v. Colon and Ortiz*, 238 A.D.2d 213 (1st Dept. 1997).

129.    On November 20, 2003, Plaintiff, through a new attorney, moved to vacate his conviction on the basis of new information, recently obtained from Anibal Vera, that Vera had received benefits in connection with his testimony that were not disclosed at trial.

130.    Vera had been located and interviewed in the Bronx.  He provided an affidavit recanting his testimony implicating Plaintiff and Ortiz in the murders, and recounting the benefits he had received.

131.    An evidentiary hearing was held, at which the assigned ADA and THEIS, both of whom were now retired from their City employment, testified.

132.    The District Attorney's Office vigorously opposed the motion for a new trial, denying that the ADA had done anything wrong.

133.    In a decision dated October 17, 2005, the court, while finding that the ADA should have turned over certain information, refused to overturn the convictions.

134.    Plaintiff and Ortiz requested permission from a justice of the Appellate Division to appeal.  The People vigorously opposed such permission.

135.   Had permission been denied, that would have been the end of the legal process and Plaintiff would have spent the rest of his life in prison. However, permission was granted.

136.   The District Attorney's Office, denying that the assigned ADA had done anything wrong and thereby ratifying her conduct, opposed Plaintiff's appeal. On October 28, 2008, the Appellate Division, while finding that the Office had erred in withholding certain information, denied the appeal because, in its view, the withholding did not affect the outcome of the trial.

137.   Now Plaintiff and Ortiz sought permission to appeal from a judge of the New York Court of Appeals. Once more, the D.A.'s Office denied any wrongdoing, thereby again ratifying the misconduct, and opposed further appeal, seeking to keep Plaintiff in prison for the rest of his life. But, once again, permission was granted.

138.   In their merits brief, the D.A.'s Office still again denied that the assigned ADA had done anything wrong in failing to disclose information and presenting evidence and argument that misled the defense and the jury, and argued that Plaintiff's conviction should be undisturbed.

139.   However, on November 19, 2009, the Court of Appeals unanimously rejected the D.A.'s position, reversed the Appellate Division's decision, vacated Plaintiff's and Ortiz' convictions, and granted them a new trial.

140.   Quoting its earlier decision, *People v. Steadman*, 82 N.Y.2d 1, 7 (1993), the Court noted prosecutors' obligation to "'deal fairly with the accused and be candid with the courts.'" It went on: "This duty requires prosecutors not only to disclose exculpatory or impeaching evidence but also to correct the knowingly false or mistaken material testimony of a prosecution witness." (A copy of the decision, *People v. Colon*, 13 N.Y.3d 43 (2009), is annexed as Ex. A and

incorporated by reference.)

141.    The Court then held that the prosecutor had personally elicited untrue testimony from Vera – that he had received no additional benefits and that she had no involvement with his 1992 case – and had "failed to correct Vera's misleading testimony and, in addition, compounded these errors by repeating and emphasizing the misinformation during summation."

142.    The Court stressed: "[I]t is important that witnesses provide truthful testimony when questioned about the receipt of such benefits, and the People must be vigilant to avoid misleading the court or jury.  Rather than correct the inaccurate testimony, the prosecutor here exacerbated the problem during her closing comments."

143.    Agreeing with plaintiff's *Brady* arguments, the Court also held that the prosecutor should have disclosed (a) her notes of the two witness statements naming other suspects, (b) the discovery of the gun in Vera's hotel room, and (c) Vera's receipt of relocation benefits.

144.    With the case now before the State Supreme Court in Manhattan for a new trial, the D.A.'s Office, claiming an intention to retry Plaintiff, successfully opposed Plaintiff's release on bail.

145.    However, on March 29, 2010, the court, noting the weakness of the People's case, set $25,000 bail.

146.    Shortly thereafter, his family posted the bail, and Plaintiff was released.

147.    Thereafter, prosecutors acknowledged that both Vera and Core now denied any memory of Plaintiff's alleged confession of involvement in the FDR shooting.

148.    On June 29, 2011, the Manhattan D.A.'s Office acknowledged it lacked evidence

with which to re-try Plaintiff.

149.   The Office agreed to the dismissal of all charges against Plaintiff (and Ortiz).

150.   It had taken the Manhattan District Attorney's Office more than 19 months to dismiss an indictment even though it knew, for most of this period, that it had *no* supporting evidence.

**K.**   **Plaintiff's Damages and Injuries**

151.   Plaintiff's injuries and damages include, but are not limited to:

    (a)   His loss of liberty attributable to his prosecution and conviction for the FDR homicides;

    (b)   Physical injuries and pain as the result of prison assaults by other inmates;

    (c)   Past and future mental and emotional distress due to his wrongful prosecution and conviction on murder charges and his wrongful imprisonment;

    (d)   The loss of the services, society, companionship, and consortium of his family members and friends; and

    (e)   The loss of employment income, and diminution of future earning ability, due to his prosecution and imprisonment, in an amount to be determined by an economic expert.

## FIRST CAUSE OF ACTION
### Malicious Prosecution Under State Law
### (All Individual Defendants)

152.    Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 151 of this Complaint.

153.    By virtue of the foregoing, the Individual Defendants, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued, and/or caused the initiation or continuation of, criminal proceedings against Plaintiff.

154.    The criminal proceedings terminated in Plaintiff's favor.

155.    There was no probable cause for the commencement or the continuation of the criminal proceedings.

156.    The Defendants acted with actual malice.

## SECOND CAUSE OF ACTION

### Intentional Infliction of Emotional Distress Under State Law
### (All Individual Defendants)

157.    Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 156 of this Complaint.

158.    Defendants engaged in a continuous pattern of extreme and outrageous conduct directed at Plaintiff.

159.    Defendants engaged in that pattern of conduct with an intention to cause, or in reckless disregard of the substantial probability that it would cause, Plaintiff severe emotional distress.

160.    Specifically, defendants, individually, in concert with, conspiring with, and/or

25

aiding and abetting one another and other persons for whose acts they are liable, coerced one or more witnesses into making false statements to be used against Plaintiff, knowingly initiated or caused the initiation and continuation of false and unfounded criminal charges against Plaintiff while lacking probable cause to do so, and deliberately suppressed *Brady*, *Giglio*, and *Rosario* material they knew they were required by law to disclose to the District Attorney for disclosure to Plaintiff.

161    Plaintiff suffered severe emotional distress as a result of, and that was proximately caused by, the Defendants' aforementioned actions.

162.   By virtue of the foregoing, Plaintiff suffered the damages identified in ¶ 151.

### THIRD CAUSE OF ACTION

**42 U.S.C. §1983; Denial Of Due Process And A Fair Trial
Under the Fifth, Sixth and Fourteenth Amendments;
Malicious Prosecution and Deprivation of Liberty
Under the Fourth and Fourteenth Amendments;
(All Individual Defendants)**

163.   Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 162 as if fully set forth herein.

164.   By virtue of the foregoing, the Individual Defendants, with actual malice and in bad faith, initiated and continued, caused the initiation and continuation of, conspired to cause the initiation and continuation of, and/or violated their duty to intervene to prevent the initiation or continuation of, criminal proceedings against Plaintiff for which there was no probable cause, and thereby caused Plaintiff to be deprived of his liberty. Such proceedings ultimately were terminated in Plaintiff's favor.

165.    The Individual Defendants knew that such criminal proceedings were wholly or substantially based on false (or almost certainly false) testimony that Defendant THEIS had coerced from Anibal Vera, a totally unreliable and desperate drug addict, with the intention that such testimony would be used in criminal proceedings to deny Plaintiff his constitutional right to due process and a fair trial.

166.    Additionally, the Individual Defendants knowingly and wrongfully withheld from the Manhattan District Attorney's Office, either permanently or for a substantial period of time, and therefore from the court and the defense, exculpatory or impeachment evidence that was material to the decision whether to initiate Plaintiff's prosecution, to the outcome of grand jury proceedings, and to the outcome of the trial within the meaning of *Brady v. Maryland,* 373 U.S. 83 (1963), and its progeny.

167.    The aforesaid conduct, which the Individual Defendants committed, or conspired to commit, in aid of each other and/or others named and unnamed, or which they wilfully aided and abetted, operated to deprive Plaintiff of his rights under the Constitution and the Laws of the United States:

(a)     Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution;

(b)     Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

(c)     To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963), *Giglio v. United States,*

27

405 U.S. 150 (1972), *People v. Vilardi*, 76 N.Y.2d 67 (1990), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

168.    The foregoing violations of Plaintiff's federal constitutional rights by the Defendants and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Plaintiff's criminal prosecution, his loss of liberty and detention without bail, his wrongful conviction, his subsequent imprisonment, and his other injuries and damages.

169.    The foregoing violations of Plaintiff's rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of the Individual Defendants' employment and authority.

170.    The Individual Defendants committed the foregoing violations of Plaintiff's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Plaintiff's constitutional rights or to the effect of such misconduct upon Plaintiff's constitutional rights.

171.    By reason of the foregoing, the Individual Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

### FOURTH CAUSE OF ACTION

#### *Monell*/42 U.S.C. § 1983:  Claim Against Defendant City of New York For The Actions Of The NYPD

172.    Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 171.

173.    The foregoing violations of Plaintiff's federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant City, amounting to deliberate indifference to the constitutional rights of persons, including

Plaintiff, who are investigated, arrested, or prosecuted for alleged criminal activities.

174.    Prior to Plaintiff's arrest, policymaking officials at the NYPD, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting and convicting innocent people, and to the right of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

(a)    The use of excessive promises of rewards and unduly coercive interrogation techniques with vulnerable potential witnesses, including drug users and addicts, drug dealers, and/or individuals fearing prosecution and imprisonment for their own criminal behavior;

(b)    The determination of probable cause to make an arrest and the avoidance of arrests and prosecutions based upon evidence that is inherently unreliable, coerced, or otherwise manufactured; and

(c)    The continuing duty of police investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material evidence or information ("*Brady* material") favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identification or other prosecution witness is unreliable or lacks general credibility, evidence that a prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witnesses has a motive, bias or interest affecting his credibility or has been pressured or coerced, so that the District Attorney could comply with his constitutional obligation to disclose such information to the defense under *Brady*.[2]

---

[2]Counsel for the undersigned has deposed numerous police officers and detectives in other lawsuits concerning their training and their knowledge of *Brady* disclosure requirements as of the mid- to late-1990s. Virtually all such witnesses have testified that they received no *Brady* training and had no idea what "*Brady*" is or means. Similarly, such witnesses have testified that they received no training to record exculpatory or impeachment information in their reports, to disclose such information to prosecutors, or to follow up exculpatory leads. They testified that they received no training in the interrogation or evaluation of accomplice or "cooperating" witnesses in order to avoid unduly influencing their stories or testimony, determine their credibility, and assess whether their statements made out probable cause to arrest or prosecute. Relevant excerpts of several of these depositions are annexed as Exh. F. *See* Deposition of

175.    The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or

customs (including the failure to properly instruct, train, supervise and/or discipline employees with

regard thereto) were implemented or tolerated by policymaking officials for the Defendant City of

New York, including but not limited to, the New York City Police Commissioner, who knew (or

should have known):

        a)    to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

        b)    that such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

        c)    that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal

---

Homicide Det. Vincent Gerecitano, at p. 43 ("The *Brady* Rule, I don't know what that is."); *id.* at p. 311 ("no training that I could think of" regarding making a record that a newly-"cooperating" witness was going through drug withdrawal, explaining: "I could see somewhere down the road having a conversation with the district attorney saying what the fuck did you put that down for, how do you feel this is relevant, the guy is giving you information and you're knocking him out of the water."); Deposition of Det. Jose R. Hernandez, at pp. 33-34, 36 ("never heard of" *Brady* and cannot recall any training about how to evaluate witness credibility); Deposition of NYPD Inspector Paul Amundson, at p. 107 (received no *Brady* training); Deposition of Internal Affairs Det. Kelly Wirth, at pp. 26-31 (possibly received a "couple hours" of general training about dealing with confidential informants, but recalls no training about how to evaluate the credibility of such witnesses); Deposition of Capt. Robert Boyce, at pp. 20-22, 35-36 (never heard of "*Brady v. Maryland*," received no training concerning documenting or disclosing to defense counsel exculpatory or impeachment evidence, and cannot recall any training about how to evaluate the credibility of cooperators or informants); Deposition of Det.-Sgt. Michael McWilliams, at pp. 28-29, 35-36, 37-38 ("I don't know what *Brady v. Maryland* is" and received no *Brady* training); Deposition of Det. Daniel Toohey, at pp. 145-46 (does not know what "*Brady* material" is and recalls no such training; training regarding interrogating accomplice or criminally-involved witnesses was to "[s]peak to them"; no training to bring evidence favoring the suspect to the prosecutor's attention).

suspects or defendants and cause them constitutional injury.

176.    The aforementioned policymaking officials had notice of the existence of a custom

or practice of such constitutional violations and of the need for meaningful training, supervision and

discipline to prevent them, and their policy of deliberate indifference to such constitutional violations

is revealed, by numerous circumstances, including but not limited to the following:

a)    credible allegations, many substantiated by judicial decisions finding, that NYPD officers had wrongfully withheld material evidence or knowingly given false or misleading testimony, none of which resulted in discipline for the officers involved (*see* Exh. B appended hereto and incorporated herein by reference, listing a sample of such decisions);

b)    civil lawsuits, some of which resulted in substantial civil settlements, credibly alleging that police had falsified, exaggerated, or withheld material evidence, or conducted searches or arrests without probable cause, none of which resulted in discipline for the officers involved (*see* Exh. C appended hereto and incorporated herein by reference, listing some of those lawsuits);

c)    the Mollen Commission investigation, hearings, and report in or about 1992-1994 finding that misconduct by police in manufacturing false evidence and making arrests based upon coercion, undue promises, outright lies, and other dishonest tactics was pervasive in the New York City Police Department and that the Police Department had been indifferent to such practices (*see* excerpts of the report annexed as Exh. D);

d)    numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under *Brady* as well as the probable cause requirement of the Fourth Amendment;

e)    judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their *Brady* obligations and for failing to adopt adequate *Brady* disclosure policies, *see Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then Magistrate Shira A. Scheindlin), and putting the NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their obligations to provide truthful testimony and to disclose evidence that favors criminal defendants under *Brady*, *see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992),

and *Carter v. Harrison, supra*;

f)     a formal report in 1992 of the New York City Comptroller's Office (Exh. E) criticizing the NYPD and the New York City Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action; and

g)     the inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers and the powerful incentives they have to close cases and to obtain arrests and convictions.

177.     Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates), has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses, the initiation of criminal prosecutions, and the disclosure of *Brady* material.

178.     The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constitutes a City policymaker for whom the City is liable, with respect to compliance by NYPD employees with the above-mentioned constitutional requirements.

179.     During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to Plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

180.     The aforesaid policies, procedures, regulations, practices and/or customs of Defendant City and the NYPD were collectively and individually a substantial factor in bringing about the

aforesaid violations by the Individual Police Defendants of Plaintiff's rights under the Constitution and laws of the United States.

181.   By virtue of the foregoing, Defendant City of New York is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his constitutional injuries.

### FIFTH CAUSE OF ACTION

#### *Monell*/42 U.S.C. § 1983:  Claim Against The NYCHA<br>For Actions Of The Housing Police

182.   Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 181 of the Complaint.

183.   The foregoing violations of Plaintiff's federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant NYCHA, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, who were investigated, arrested, or prosecuted for alleged criminal activities.

184.   Prior to Plaintiff's arrest, policymaking officials at the NYCHA, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting and convicting innocent people, and to the right of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

     (a)    The use of excessive promises of rewards and unduly coercive interrogation techniques with vulnerable potential witnesses, including drug users and addicts, drug dealers, and/or individuals fearing prosecution and imprisonment for their own criminal behavior;

     (b)    The determination of probable cause to make an arrest and the avoidance of arrests and prosecutions based upon falsely manufactured or unreliable

"evidence"; and

(c)    The continuing duty of police investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material evidence or information (*"Brady* material") favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identifying or prosecution witness is unreliable or lacks general credibility, evidence that a prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witnesses has a motive, bias or interest affecting his credibility or has been pressured or coerced, so that the District Attorney could comply with his constitutional obligation to disclose such information to the defense under *Brady*.

185.    The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant NYCHA, including but not limited to, the NYCHA Police Commissioner, who knew (or should have known):

a)    to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b)    that such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

c)    that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

186.    The aforementioned policymaking officials had notice of the existence of such constitutional violations and of the need for meaningful training, supervision and discipline to prevent them, and their policy of deliberate indifference to such constitutional violations was revealed, by numerous circumstances, including but not limited to the following:

a)   credible allegations, many substantiated by judicial decisions finding, that NYPD and NYCHA officers had wrongfully withheld material evidence or knowingly given false or misleading testimony, none of which resulted in discipline for the officers involved (*see* Exh. A appended hereto and incorporated herein by reference, listing some of those decisions);

b)   civil lawsuits, some of which resulted in substantial civil settlements, credibly alleging that police had falsified, exaggerated, or withheld material evidence, or conducted searches or arrests without probable cause, none of which resulted in discipline for the officers involved (*see* Exh. B appended hereto and incorporated herein by reference, listing some of those lawsuits);

c)   the Mollen Commission investigation, hearings, and report in or about 1992-1994 finding that misconduct by police in manufacturing false evidence and making arrests based upon coercion, undue promises, outright lies, and other dishonest tactics was pervasive in New York City and that local police departments had been indifferent to such practices;

d)   numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under *Brady* as well as the probable cause requirement of the Fourth Amendment;

e)   judicial decisions directly criticizing police in New York City for failing to train and supervise officers in their *Brady* obligations and for failing to adopt adequate *Brady* disclosure policies, *see Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then Magistrate Shira A. Scheindlin), and putting New York City police departments on notice that they could be held liable for their failure to adequately train police officers and investigators regarding their obligations to provide truthful testimony and to disclose evidence that favors criminal defendants under *Brady, see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Carter v. Harrison, supra*;

f)   formal reports of the N.Y.C. Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the N.Y.C. Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action; and

g)   the inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers and the powerful incentives they have to close cases and to obtain arrests and convictions.

187.    In addition, NYCHA policymakers showed their approval, willingness to tolerate, ratification of, and/or deliberate indifference to the kinds of constitutional violations referred to in ¶¶ 186-189 by failing to adequately investigate the dozens of misconduct complaints that had been made against defendant CODELLA and his colleagues in the Housing police, failing to discipline CODELLA and his colleagues for any such misconduct, and utilizing CODELLA to train or supervise other NYCHA police officers while continually promoting him, despite their awareness of his illegal practices and the dozens of misconduct complaints that had been made against him.

188.    Under the principles of municipal liability for federal civil rights violations, the NYCHA's Police Commissioner (or his authorized delegates), had final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses, the initiation of criminal prosecutions, and the disclosure of *Brady* material.

189.    The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a policymaker for whom the NYCHA is liable, with respect to compliance by NYCHA employees with the above-mentioned constitutional requirements.

190.    During all times material to this Complaint, the NYCHA Police Commissioner owed a duty to the public at large and to Plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

191.    The aforesaid policies, procedures, regulations, practices and/or customs of NYCHA

36

were collectively and individually a substantial factor in bringing about the aforesaid violations by the Individual Police Defendants of Plaintiff's rights under the Constitution and laws of the United States.

192.    By virtue of the foregoing, Defendant NYCHA is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his constitutional injuries.

## SIXTH CAUSE OF ACTION

### *Monell*/42 U.S.C. § 1983 Claim Against Defendant City Of New York For Actions Of The New York County District Attorney's Office

193.    Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 151 as if fully set forth herein.

194.    Prior to, at the time of, and subsequent to Plaintiff's criminal prosecution, including during the period that the New York County District Attorney's Office was opposing Plaintiff's efforts to overturn his unconstitutionally-obtained conviction and causing the continuation of his constitutional injuries, the New York County District Attorney, as the manager and chief administrator of the New York County District Attorney's Office, a New York City agency, maintained a policy, custom or practice of deliberate indifference to violations by his employees of the constitutional right to due process and a fair trial guaranteed to all criminal suspects and defendants under the Constitution and laws of the United States and the State of New York.

195.    Such violations included the knowing, reckless, or negligent use of false or misleading evidence and argument in the grand jury and at trial and the failure to correct such false or misleading evidence and argument, as well as the deliberate, reckless, or negligent withholding of exculpatory and impeachment evidence favorable to the defense and required to be disclosed as

"*Brady* material" by the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. *See Brady v. Maryland*, 373 U.S. 83 (1963).

196.    Prosecutors in New York County (and NYPD detectives working with them on criminal investigations and prosecutions) were permitted and in fact instructed by their Offices to refrain from making any record of false or inconsistent out-of-court statements of prospective prosecution witnesses, or information bearing upon their potential motives to lie, in order to avoid creating "*Rosario* material" that would have to be disclosed to the defense under State law, even though this policy also predictably resulted in prosecutors ultimately not disclosing the same information as *Brady* material.

197.    New York County prosecutors were permitted to make informal promises, or to provide informal inducements, to "cooperating" witnesses, without recording them or disclosing them to the defense.

198.    The D.A.'s Office permitted ADAs to present false or misleading testimony and argument denying their witnesses' motives to lie, to fail to correct such false or misleading testimony and argument, and to improperly vouch for the credibility of such witnesses through the prosecutors' own arguments and unsworn "testimony" during their summations.

199.    The D.A.'s Office permitted ADAs to maintain the "deniability" of impeachment information that they were required to disclose by deliberately avoiding acquiring direct or actual knowledge of it, and then presenting false or misleading testimony and argument that was contradicted by the undisclosed information. In the unlikely event that the defense was able to uncover and expose the information, the prosecutors would then argue that they were not guilty of personal misconduct because they lacked actual knowledge of the information, and the Office would

38

not discipline them.

200.    The D.A.'s Office further allowed prosecutors, in violation of their *Brady* disclosure obligations, to refrain from disclosing statements of uncalled witnesses which tended to favor the defense, including statements suggesting the defendant's innocence.

201.    Finally, the D.A.'s Office would deny to defend the aforementioned types of misconduct in order to defeat or delay defendants's efforts to expose it and to overturn their wrongful convictions. Policymaking officials at the D.A.'s Office would almost always defend such behavior when it was challenged, including on direct appeal and on collateral attack, thereby teaching all employees of the Office that such conduct would be tolerated or was even approved by the District Attorney and was consistent with the policies of the Office, and thereby causing additional such violations to occur.

202.    Pursuant to the aforementioned policies, customs, and/or practices of the New York County District Attorney's Office, the assigned ADA in Plaintiff's case consciously avoided gaining actual knowledge of information that would have impeached or contradicted the testimony of her witnesses at trial and that she was obligated to disclose under *Brady*, *Rosario*, and other rules and requirements; deliberately avoided recording the statements of witnesses, including Anibal Vera, that she knew would impeach their credibility for the purpose of preventing the defense from obtaining such information; deliberately, recklessly, or negligently failed to disclose information she did know about that she was required under *Brady* to disclose; knowingly, recklessly, or negligently presented witness testimony and her own arguments in the grand jury and at trial that she knew or should have known were false or misleading; knowingly, recklessly, or negligently failed to correct such false testimony and arguments; and, improperly vouched, including as an unsworn "witness," for the

credibility of witnesses she knew or should have known had given false or misleading testimony.

203.   Furthermore, pursuant to the aforementioned policies, customs, and/or practices of the New York County District Attorney's Office, when the assigned ADA's misconduct was revealed, the District Attorney's Office ratified and defended her behavior and argued that it was consistent with the Office's due process and fair trial obligations. The Office denied at every level – the State Supreme Court, the Appellate Division, and the Court of Appeals – that any misconduct had occurred at all.

204.   But this is not the only proof that the assigned ADA's misconduct was consistent with, and resulted from, the unlawful policies, customs or practices of the Office to encourage, tolerate, and/or acquiesce in such behavior. There were numerous other instances of similar misconduct, before Plaintiff's trial and during the period that the Office fought to save his wrongful conviction. In virtually all such instances, some of which are described below, others of which are known only to the District Attorney's Office and may be ascertained in discovery, the Office defended the misconduct when it was exposed, thereby revealing that the conduct was consistent with and caused by the policies of the Office.

205.   In *People v. Wallert*, 98 A.D.2d 47 (1st Dept. 1983), the Appellate Division found the prosecutor guilty of a "clear *Brady* violation," and of denying the defendant "a fair trial in violation of due process," based upon the prosecutor's argument in summation that the complainant in a sex crime case had no motive to lie when the prosecutor knew, but had concealed, that the complainant had consulted with a civil attorney and was waiting for the outcome of the trial before suing for monetary damages. The court reversed the conviction.

206.   In *People v. Novoa*, 70 N.Y.2d 490 (1987), the Court of Appeals unanimously

reversed the defendant's New York County murder conviction because "the prosecutor here breached a duty to disclose ... promises, to correct the witness's testimony that she was promised nothing, and to refrain from misstatements in summation." The prosecutor had elicited the witness's flat denial that "anyone had promised anything with respect to your pending case," and had then argued that she was a "forthright woman" who had no reason to lie because "she wasn't promised anything, ladies and gentlemen." In fact, the witness's Special Narcotics prosecutor had promised to consider the totality of her cooperation, including in the homicide case.

207.   The *Novoa* Court emphatically rejected the District Attorney's position that the prosecutor did not mislead the jury because any promise of consideration had been made to the witness by a different prosecutor in the Office of Special Narcotics and any such promise was merely "contingent and insignificant." The "separateness of offices" could not excuse the prosecutor's apparent "disinclination" to find out the truth, the Court reasoned. The prosecutor, it concluded, was responsible for her "failure to reveal the promise in the first instance, her failure to correct [the witness's] misstatement that she had been promised nothing with respect to her pending case, and her own affirmative mischaracterization in the summation [which] constituted both a denial of defendants' rights and a breach of her own obligations as an officer of the court."

208.   In *People v. Conlan*, 146 A.D.2d 319 (1st Dept. 1989), the Appellate Division reversed another New York County murder conviction because of the prosecutor's "particularly disingenuous" denials that *she* had made any promise of consideration to a crucial prosecution witness, when the witness expected assistance with his own case based upon assurances of *another* assistant district attorney. The prosecutor "was certainly not warranted in disclaiming a deal simply because she had not personally made it," the court reasoned, continuing:

41

> Not only did she neglect to correct [the witness's] misleading statements relating to the existence of any promises, but she reaffirmed those statements by means of her own rebuttal, as well as by her ... summation .... However, the law is established that the failure of the prosecutor to correct a witness' erroneous impression that he had no reason to expect lenient treatment "constitutes 'error so fundamental, so substantial,' that a verdict of guilt will not be permitted to stand.

209.   In still another case of wilful blindness and misleading of the defense and the jury, *People v. Grice*, 188 A.D.2d 397 (1st Dept. 1992), the trial court vacated the defendant's conviction because the prosecutor "did not ascertain and disclose the full details of a cooperation agreement entered into by a material witness" in which his cooperation in Manhattan would likely benefit him in his own case in the Bronx. The People, denying any fault and somehow blaming the defense, appealed, but the Appellate Division affirmed the lower court's ruling. The court reasoned that it had been "incumbent upon the prosecutor herein to investigate and disclose [the] substantially beneficial plea promise" that had been made to the witness and that the defense was entitled to rely upon the prosecutor's misleading summation falsely minimizing the promise made to the witness.

210.   In *People v. Jones*, 70 N.Y.2d 547 (1987), the Court of Appeals reversed a first degree narcotics conviction due to the trial prosecutor's "total failure" to deliver interview notes with a key informant which would have revealed significant "discrepancies" in his trial testimony affecting his apparent honesty and overall credibility.

211.   In *People v. Marzed*, 161 Misc.2d 309 (Crim. Ct., New York Co. 1993), the court overturned a weapons conviction because the prosecutor had failed to disclose that the crucial prosecution witness, a police officer, was under investigation for perjury in another gun possession case. While the court made no finding that the trial prosecutor had actually known this information,

if he had not, it would have been because of the Office's indifference to its obligation to ensure that such information was disseminated to prosecutors handling cases in which the officer under investigation was a prosecution witness.

212.    Indeed, another court decision revealed that this was the Office's high-level policy. In *People v. Curry*, 164 Misc.2d 969 (Sup. Ct., New York Co. 1995), a Supreme Court justice overturned still another drug conviction, even though the defendant had pleaded guilty, because the District Attorney's Office had deliberately kept the prosecutor handling the case, and therefore the defense, in the dark about a corruption investigation of the arresting officer for stealing money -- exactly what the defendant claimed the officer had done in his case. The decision reveals that, on May 13, 1993, the People had misrepresented to the defense that it had no *Brady* material regarding the case, had then induced the defendant to plead guilty to a reduced charge, and after its failure to disclose the officer's corruption was revealed, defended the conviction. The court held: "In a case which will admittedly hinge on a credibility contest between the defendant and the officer, the withholding of the information at issue does not comport with due process."

213.    Notwithstanding the *Marzed* and *Curry* decisions, the Office's policy to withhold impeachment information continued. In *People v. Williams*, 7 N.Y.3d 15 (2006), a *Brady* violation occurred at a pretrial suppression hearing, conducted in 2002, when the assigned prosecutor was kept in the dark by others in the office about a perjury investigation of the only witness, a police officer, in a contemporaneous, similar, but unrelated case. When the assigned prosecutor learned the information, he still wrongfully withheld it. Disclosure was made only when the defense subpoenaed the witness to testify for the defendant at the trial. Although the Court of Appeals upheld the hearing judge's decision to allow the People to reopen the suppression hearing and rely on a different

witness, it condemned the prosecution's behavior: "There was no excuse for the People's failure to make the hearing judge aware of the perjury investigation of [the witness] – at the same time that the People were asking the hearing judge to rely on [the witness's] testimony to deny suppression. At best, the People now concede, they were guilty of a significant misjudgment."

214.    In *People v. Jackson*, 237 A.D.2d 179 (1st Dept. 1997), the Appellate Division, citing *Brady*, vacated a 1992 attempted murder conviction because of the prosecution's failure to turn over police reports that the defense had "specifically requested" which were "significantly at variance with the prosecution's evidence at trial and were clearly evidence that was favorable to the accused." The purported difficulties that the District Attorney's office had with obtaining the reports from the Internal Affairs Division of the Police Department were no excuse.

215.    In *People v. Gantt*, 13 A.D.3d 204 (1st Dept. 2004), the Appellate Division affirmed a lower court decision vacating the defendant's 2001 murder conviction due to the prosecution's failure to disclose the prior inconsistent statement of its main witness, a career criminal who had waited six years to come forward, which called into question his claim that he witnessed the shooting.

216.    In *People v. Sinha*, 84 A.D.3d 35 (1st Dept. 2011), *aff'd on other grounds,* ___ N.Y.3d ___ (2012), the Appellate Division reversed a 2007 bribery conviction in the interest of justice "because the prosecution failed to fulfill basic disclosure obligations that are essential to a fair trial," including withholding e-mails to a witness's mother containing extravagant promises of consideration if her son would cooperate and revealing benefits he already had received, as well as other information bearing upon the witness's motive to lie and criminal history.  The court wrote: "The trial court correctly characterized the tardy disclosure of the e-mails as 'inexcusable.' We add

that for the prosecution to fail in three distinct respects to fulfill its disclosure obligation is intolerable."

217.   Significantly, in the *Sinha* case, one of the ADAs who withheld the e-mail evidence was a bureau chief.

218.   In *People v. Ortiz*, 85 A.D.3d 588 (1st Dept. 2011), the Appellate Division, for the second time, reversed the defendant's conviction for criminal facilitation of murder.  The first conviction, after a full trial in 2002, had been reversed for pervasive misconduct by the prosecutor. *People v. Ortiz*, 33 A.D.2d 432 (1st Dept. 2006).  The second conviction was reversed because the prosecution had convinced the trial judge to deny the defense permission to use reports of the District Attorney's Office to contradict the crucial testimony of an assistant district attorney because it was unclear whether the same ADA had been the author of the reports.  However, two justices, in a concurring opinion, found that the conviction also should have been reversed for a *Brady* violation. The violation was the failure to disclose still another document which proved that the reports in question in fact had been authored by the same ADA-witness.

219.   During the periods preceding and following Plaintiff's conviction, there were additional unpublished findings by lower courts of *Brady* and related discovery violations, as well as credible allegations of such violations, known to the D.A.'s Office, which did not result in reversals of convictions on that specific basis.

220.   In many instances during the relevant time period, courts reversed convictions for what amounted to *Brady* violations, but only addressed the issue of whether the documents should have been disclosed under State law as *Rosario* material.  *See, e.g.*:

> *People v. Watkins*, 189 A.D.2d 623 (1st Dept. 1993) (drug conviction
> reversed for prosecutor's failure to disclose officer's notes containing

"important impeachment material");

*People v. Jackson*, 174 A.D.2d 552 (1st Dept. 1991) (conviction reversed in the interest of justice where prosecutor falsely represented at a conditional hearing that all *Rosario* material had been disclosed while not disclosing until after the witness had been deported his initial, three-page statement to police);

*People v. Green*, 140 A.D.2d 213 (1st Dept. 1988) (prosecutor failed to disclose handwritten police report and then misrepresented in summation that it confirmed the officer's testimony when in fact it contradicted it);

*People v. Quinones*, 139 A.D.2d 404 (1st Dept. 1988) ("incomprehensible" failure by prosecutor to disclose various police documents, including one that undercut possession of stolen property charge).

*See also*:

*People v. Thompson*, 71 N.Y.2d 918 (1988) (burglary and sodomy conviction reversed where prosecution sandbagged defense by holding back key document that undermined defense strategy);

*People v. Dixon*, 209 A.D.2d 274 (1st Dept. 1994) (1990 murder conviction reversed for prosecutor's inexcusable failure, despite "repeated defense requests," to disclose police notes);

*People v. West*, 185 A.D.2d 160 (1992) (failure to disclose police report plainly required to be disclosed under Court of Appeals' precedent);

*People v. Dennis*, 265 A.D.2d 271 (1st Dept. 1999) (reversing 1988 murder conviction because of prosecutor's failure to disclose and to preserve detective's handwritten notes which he used to refresh his recollection during his pretrial hearing testimony);

*People v. Jordan*, 207 A.D.2d 700 (1st Dept. 1994) (reversing 1991 drug conviction because prosecution "prejudiced" the defense by failing to disclose police notes relating "directly to the primary issues contested at trial"); and

*People v. Jennings*, 248 A.D.2d 265 (1st Dept. 1998) (reversing 1994 narcotics conviction where prosecutor inexcusably failed to disclose

a significant police report).

221.   In numerous other cases, convictions were reversed for misconduct by the prosecutor, as in Plaintiff's case, in improperly vouching for the credibility of the People's witnesses and thereby denying the defendant his constitutional right to a fair trial, for providing "testimony" in an unsworn manner during the prosecutor's summation, or for overall pervasive misconduct:

> *People v. Rivera*, 75 A.D.2d 544 (1st Dept. 1980) (prosecutor's summation was a "blatant appeal to prejudice" and to "inflame the passions of the jurors"; she persisted notwithstanding the court's rulings against her; murder conviction overturned even though the evidence was "overwhelming");

> *People v. Bolden*, 82 A.D.2d 757 (1st Dept. 1981) (manslaughter conviction reversed due to prosecutor's "improper conduct," including "vouching for the credibility of the People's witnesses");

> *People v. Dowdell*, 88 A.D.2d 239 (1st Dept. 1982) (pervasive summation misconduct, including vouching for the lack of motive to lie and honesty of the People's witnesses);

> *People v. Bendell*, 111 A.D.2d 878 (1st Dept. 1985) (bribery conviction reversed after the prosecutor repeatedly "became an unsworn witness for the prosecution and impermissibly placed his own veracity as an issue before the jury" during witness examinations and his summation) (reversed by New York State Court of Appeals for lack of prejudice, *see People v. Bendell*, 67 N.Y.2d 724 [1986]);

> *People v. Coates*, 137 A.D.2d 192 (1st Dept. 1988) (murder conviction reversed due to the prosecutor's "flagrant," "arrogant[]," and pervasive misconduct in misstating the evidence and continually violating the court's rulings);

> *People v. Hansen*, 141 A.D.2d 417 (1st Dept. 1988) (pervasive summation misconduct; "the prosecutor unfairly injected her own personal views and conveyed her own personal opinion of the case" and "vouched for the credibility of the witnesses");

> *People v. Blake*, 139 A.D.2d 110 (1st Dept. 1988) (murder conviction reversed due to "prosecutor's violation of the unsworn witness rule" which bolstered People's case on specific disputed issues);

*People v. Clemons*, 166 A.D.2d 363 (1st Dept. 1990) (robbery/assault conviction reversed due to summation misconduct of prosecutor, which including vouching for his witnesses);

*People v. Norton*, 164 A.D.2d 343 (1st Dept. 1990) (assault conviction reversed due to prosecutor's "exceptionally deplorable" summation misconduct in which he became an unsworn witness and argued "facts" not in evidence);

*People v. D'Alessandro*, 184 A.D.2d 114 (1st Dept. 1992) (summation misconduct, including vouching, "went beyond the limits of propriety" [but errors found harmless]);

*People v. Tolbert*, 198 A.D.2d 132 (1st Dept. 1993) (assault conviction reversed due to prosecutor's vouching for the complainant's truthfulness and other misconduct);

*People v. Bell*, 191 A.D.2d 361 (1st Dept. 1993) (robbery conviction reversed due to prosecutor's "repetitive and haranguing comments in summation, a practice repeatedly condemned by this court," as well as prosecutor's "vouching for the credibility of one of the police witnesses");

*People v. Nevedo*, 202 A.D.2d 183 (1st Dept. 1994) (1991 robbery conviction reversed due to prosecutor's inflammatory comments in summation; court finds it "frustrating and distressing to have to reverse the conviction of a defendant who the evidence shows is almost certainly guilty of very serious and violent crimes," causing the "utter waste" of the time of "judge, jurors, witnesses and court personnel, ... all because a prosecutor was overzealous in his quest for a conviction");

*People v. Collins*, 12 A.D.3d 33 (1st Dept. 2004) (2002 drug conviction reversed due to "catalogue of prosecutorial improprieties committed during summation" including vouching and arguing "facts" not in evidence);

*People v. Ortiz*, 33 A.D.3d 432 (1st Dept. 2006) (2002 murder conviction reversed due to prosecutor's pervasive misconduct on cross-examination and during summation including "repeatedly vouch[ing]");

*People v. Moye*, 52 A.D.3d 1 (1st Dept. 2008), *aff'd*, 12 N.Y.3d 743 (2009) (drug conviction reversed due to prosecutor's "egregious

48

violation of the unsworn witness" and vouching rules by reference to
his own pretrial conduct and credibility).

222.    Prior to Plaintiff's trial, the New York County D.A.'s Office also had a history of

withholding exculpatory information, as in Plaintiff's case, tending to demonstrate the defendants'

innocence.  In *People v. Lee Earl Johnson*, Ind. No. 657/74 (Sup. Ct., New York Co.), reported at

173 N.Y.L.J. 15 (5/22/75). Justice McQuillan decried as "misconduct ... [that] shocks the

conscience" the prosecutor's 14-month failure to disclose his interviews with two witnesses who

completely exculpated the defendant, and then off-handedly disclosing the witnesses when it was

too late for the defense to fully investigate their information.  Acquitting the defendant at a non-jury

trial, Justice McQuillan called the prosecutor's "explanation to the court for his nonfeasance ... sheer

hogwash," and admonished the District Attorney's Office as follows:

> The district attorney, as a quasi-judicial officer, seeks justice and not
> convictions.  Thus, a prosecutor's staff must combine a strong sense
> of fairness with a high degree of professional expertise.  Errors in
> judgment that are the product of inexperience or ineptness can be
> minimized by proper training and supervision.  Such measures,
> particularly effective oversight, could have avoided the overreaching
> that occurred in this case.  The district attorney and his bureau chiefs
> have an obligation to carefully train and closely supervise the work
> of the younger and less experienced staff members.  If this case
> reflects the kind of training and supervision done, then corrective
> measures are obviously promptly required.

223.    In *People v. Hunter*, 126 Misc.2d 13 (Sup. Ct., New York Co. 1984) (Atlas, J.S.C.),

the court dismissed an indictment for grand larceny because the prosecutor, in violation of the

defendant's Federal due process rights, had withheld from the defendant, during grand jury

proceedings, the statement of a witness that proved the defendant's absolute innocence. Similarly,

in *People v. Isla*, 96 A.D.2d 789 (1ˢᵗ Dept. 1983), the Appellate Division "admonish[ed]" the District

Attorney for misleading the grand jury by reporting the first half of the defendant's statement – that he had shot the alleged victim – without presenting the second half – that he had acted in self-defense. This deprived the defendant of his right to have the Grand Jury hear "the full story so that it could make an independent decision that probable cause existed to support an indictment."

224.   In *People v. Porter*, 128 A.D.2d 248 (1ˢᵗ Dept. 1987), a narcotics case, the Appellate Division directed a hearing into the materiality of a police report that supported the defense that the drugs were found in a third person's, not the defendant's, possession. The court concluded that the disclosure violation was, at a minimum, "regrettable," but if committed knowingly, represented a "disturbing error in judgment."

225.   In *People v. Davis*, 81 N.Y.2d 281 (1993), the Court of Appeals reversed a 1988 assault and robbery conviction where the prosecutor had knowingly misled the defense and the jury about information which, if accurately disclosed, would have supported the defense that the People's identification witness had misidentified another alleged perpetrator. The Court found "especially troublesome" the prosecutor's misleading summation discounting that any such misidentification had occurred.

226.   In *People v. Bermudez*, 25 Misc.3d 1226(A), 2009 WL 3823270 (Sup. Ct., New York Co. Nov. 9, 2009), the court overturned a false murder conviction obtained by the New York County D.A.'s Office in 1992 having close similarities to Plaintiff's case. The court found that the trial prosecutor had known, but had failed to reveal, that the key accomplice witness had indicated that an individual other than the defendant was the shooter, had failed to correct the witness's false testimony, and had made false summation arguments advocating the witness's credibility. Additionally, the prosecutor had "testified" in summation as an unsworn "witness" to explain why

the witness had not been charged as an accessory to the crime. Condemning the District Attorney's continued opposition to vacating the conviction after a wrongfully convicted man had spent nearly 18 years in prison, the court concluded: "The People's position that this court should uphold a conviction based [o]n materially false testimony is untenable in our system of justice ..."

227.     In *People v. Ennis*, 41 A.D.3d 271 (1st Dept. 2007), the Appellate Division held under *Brady* that the prosecutor at the 2001 trial should have disclosed an uncalled witness's statement that someone other than the defendant was the perpetrator of the shooting. While the Court of Appeals upheld the denial of a new trial, it, too, concluded that the prosecutor's failure to disclose the statement, made directly to him, "cannot be condoned." 11 N.Y.3d 403, 414 (2008).

228.     Upon information and belief, none of the prosecutors who were responsible for the misconduct that occurred in the aforementioned cases (¶¶ 196-218) were disciplined by the District Attorney's Office or referred for discipline by any outside body such as the Appellate Division's Disciplinary or Grievance Committees.[3]

---

[3]There is no record of any Manhattan prosecutor being publicly sanctioned by the Departmental Disciplinary Committee for any of the misconduct described above. The absence in New York prosecutors' offices of any disciplinary rules or procedures, or history of sanctioning prosecutors for misconduct during the time period at issue in this case, has been exhaustively documented. *See generally* Joel B. Rudin, The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies that Prove that Assumption Wrong, 80 Fordham L. Rev. 537 (2011). *See also* Final Report of the N.Y. State Assn's Task Force on Wrongful Convictions 19, 29-31 (2009), *available at* http://www.nysba.org/AM/Template.cfm?Section=News_Center&CONTENTID=31576&TEMPLATE=/CM/ContentDisplay.cfm (noting lack of discipline at New York D.A.s' Offices). The City of New York has settled a sizeable number of lawsuits containing allegations of unlawful D.A. policies and practices regarding *Brady* disclosure and related constitutional violations, including the failure to discipline or supervise prosecutors responsible for such violations. *See, e.g., Ramos v. City of New York*, Index No. 21770/93 (Bronx Co.) ($5 million); *Su v. City of New York*, 06-civ-687 (E.D.N.Y. 2006) ($3.5 million); *Walker v. City of New York*, 91-civ-2327 (S.D.N.Y. 1991) ($3.5 million); *Leka v. City of New York, et al.*, 04-civ-8784 (S.D.N.Y. 2004) ($3.1 million); *Hidalgo v. City of New York*, 06-civ-13118 (S.D.N.Y. 2006) ($2 million).

229.   Indeed, the New York County District Attorney, during all relevant times, had no employee handbook, manual, or other document setting forth any disciplinary process for such misconduct, or potential sanctions for them, nor was any such process made known to employees in some other manner as a deterrent to such misconduct.  The knowledge that there would be no personal consequence for violations of the due process and fair trial rights of criminal defendants encouraged prosecutors, including Plaintiff's prosecutor, to commit such violations.

230.   The District Attorney's policy, custom and/or practice of approval or ratification of, toleration or acquiescence in, or deliberate indifference to, violations of his Office's constitutional obligations foreseeably encouraged such violations to continue and was a substantial cause of the violations of Plaintiff's constitutional rights before and during his trial, his wrongful conviction, and the continuation thereafter of his wrongful imprisonment and prosecution.

231.   The foregoing violations of Plaintiff's federal constitutional rights and resultant injuries were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to prosecution by the New York County District Attorney's Office, namely:

(a)   the institution and implementation of plainly inadequate or unlawful policies, procedures, regulations, practices and/or customs concerning:

i.   the duty not to use false, misleading or unreliable evidence, testimony, statements or argument during grand jury, trial, and other criminal proceedings;

ii.   the continuing obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument, whenever such misconduct is discovered to have occurred;

iii.   the continuing duty to obtain, to preserve, and to make timely

disclosure to the appropriate parties, including the court and the defense, during criminal investigations and prosecutions, all material evidence or information favorable to a person suspected, accused or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching the credibility or undercutting the reliability of prosecution witnesses, and including verbal as well as recorded information; and

iv.    the duty to refrain from coercing or manufacturing false or inherently unreliable statements and testimony from witnesses;

(b)    the failure to adequately instruct, train, supervise, and discipline their employees with respect to such matters.

232.    The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City, including, but not limited to, the District Attorney of New York County and his delegates, who knew:

a)    to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b)    that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choice; and

c)    that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury.

233.    The aforementioned policymaking officials had the knowledge alleged in the preceding paragraph, based upon, among other circumstances:

a)    numerous credible allegations, many substantiated by judicial decisions, that police officers and ADAs had violated their *Brady* and related disclosure

53

obligations, had presented or failed to correct false or misleading testimony and argument, and/or had improperly coerced false or inherently unreliable statements or testimony from witnesses;

b)   numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Divisions, discussing the difficult issues that regularly arise under the *Brady* rule and the failures of prosecutors in New York State, including in New York County, to comply with that rule;

c)   judicial decisions putting the New York County District Attorney on notice that the City could be held liable for its failure to adequately train, supervise, or discipline ADAs regarding their *Brady* and related due process obligations, *see, e.g., Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992); *Ramos v. City of New York*, 285 A.D.2d 284, 729 N.Y.S.2d 678, 692-96 (1st Dept. 2001);

d)   the inherent obviousness of the need to train, supervise and discipline ADAs in their aforementioned constitutional obligations to counteract the inherent pressure on prosecutors to obtain convictions.

234.   Despite this knowledge, the supervisory and policymaking officers and officials of the Defendant City perpetuated, or failed to take preventative or remedial measures to terminate, said policies, procedures, regulations, practices and/or customs, and did not effectively instruct, train, supervise or discipline their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, but instead ratified, sanctioned or tolerated the policies, procedures, regulations, practices and/or customs described above, with deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the City and the State of New York.

235.   The aforesaid policies, procedures, regulations, practices and/or customs of Defendant CITY were collectively and individually a substantial factor in bringing about the aforesaid violations of Plaintiff's rights under the Constitution and Laws of the United States and in causing his damages.

54

236.   Under the principles of municipal liability for federal civil rights violations, the District Attorney of New York County (or his authorized delegates) has final managerial responsibility for training, instructing, supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," to make timely disclosure of exculpatory or impeachment evidence to the defense, including post-trial, and to refrain from offering, and to correct,  false or misleading evidence, testimony, and argument during trial proceedings.

237.   The New York County District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to his Office's performance of its duties.

238.   The District Attorney of New York County at all relevant times was and is an elected officer of New York County, one of the constituent counties of Defendant CITY, the Office was and is funded out of the CITY's budget, and the Office was and is a New York City agency.

239.   Furthermore, the District Attorney was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2); and New York has provided by statute (N.Y. County Law §§ 53, 941) that the CITY's constituent counties (including New York County), and hence Defendant CITY itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his assistants.

240.   The District Attorney of New York County personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the

City is liable, with respect to the above-mentioned areas.

241.    During all times material to this Complaint, the CITY, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

242.    By virtue of the foregoing, Defendant CITY is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his resultant injuries.

## DAMAGES DEMAND

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a.   For compensatory damages of not less than $60 million;

b.   For punitive damages against the individual Defendants of $60 million;

c.   For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. §1988 and to the inherent powers of this Court;

d.   For pre-judgment interest as allowed by law; and

e.   For such other and further relief as this Court may deem just and proper.

LAW OFFICES OF JOEL B. RUDIN

BY   JOEL B. RUDIN, ESQ.
200 West 57th Street, Suite 900
New York, New York 10019
(212) 752-7600
Email: jbrudin@aol.com

*ATTORNEY FOR THE PLAINTIFF*

To:   Corporation Counsel of the City of New York
      All Defendants

Dated: New York, New York
       September 19, 2012

People v. Colon, 13 N.Y.3d 343 (2009)

918 N.E.2d 936, 890 N.Y.S.2d 424, 2009 N.Y. Slip Op. 08477

13 N.Y.3d 343
Court of Appeals of New York.

The PEOPLE of the State of New York, Respondent,
v.
Danny COLON, Appellant.
The People of the State of New York, Respondent,
v.
Anthony Ortiz, Appellant.

Nov. 19, 2009.

Synopsis

**Background:** Defendants were convicted by jury in the Supreme Court, New York County, Michael A. Corriero, J., of murder in the second degree. Following denial of motion to vacate judgments, defendants appealed. The Supreme Court, Appellate Division, 55 A.D.3d 444, 865 N.Y.S.2d 601, affirmed. Defendants appealed.

[**Holding:**] The Court of Appeals, Graffeo, J., held that prosecutor's failure to disclose full extent of assistance provided to prosecution witness warranted new trial.

Reversed.

Attorneys and Law Firms

***425 Law Offices of Joel B. Rudin, New York City (Joel B. Rudin of counsel), and Legal Aid Society, Criminal Appeals Bureau (Harold V. Ferguson, Jr., and Steven Banks of counsel), for appellants.

Robert M. Morgenthau, District Attorney, New York City (Patrick J. Hynes and Alan Gadlin of counsel), for respondent.

Law Office of Marc Fernich, New York City (Marc Fernich of counsel), Sercarz & Riopelle LLP (Maurice H. Sercarz of counsel), and Richard D. Willstatter, White Plains, for National Association of Criminal Defense Lawyers and another, amici curiae.

Weil, Gotshal & Manges LLP, New York City (Caitlin J. Halligan, Vernon S. Broderick, Eric S. Hochstadt and Cheri Veit of counsel), for Center on the Administration of Criminal Law at New York University School of Law, amicus curiae.

Opinion

*346 **937 OPINION OF THE COURT

GRAFFEO, J.

Shortly after midnight on December 8, 1989, the occupants of a van opened fire on two cars at a Manhattan intersection, killing two men and wounding two others. In the fall of 1990, defendants Danny Colon and Anthony Ortiz were arrested in connection with the shootings and charged with four counts each of second-degree murder, attempted second-degree murder and first-degree assault, as well as various weapons offenses.

At their joint trial in 1993, only two witnesses linked defendants to the crime. Anibal Vera, a childhood friend and former associate of Colon in a drug-dealing operation, testified that he was with defendants the day after the shootings. According to