Vera, Colon admitted that he was one of the shooters and that Ortiz also participated **938 ***426 in the crime. During his testimony, Vera acknowledged that he did not implicate *347 defendants until he was arrested in March 1990 on misdemeanor drug charges. As a result of his entering into a cooperation agreement with the District Attorney's office, he agreed to testify against Colon and Ortiz. In return, he was permitted to enter a guilty plea to disorderly conduct and avoided jail time for what would have been a probation violation. Vera claimed that this favorable plea deal was the "only benefit" he received in exchange for his testimony and that the prosecutor did not "have anything to do with the disposition" of his subsequent 1992 felony drug charges, for which he received a sentence of 2 ½ to 5 years upon his guilty plea.

The second witness, Daniel Core, testified that he spoke with Colon and Ortiz while they were incarcerated together and each admitted his role in the December 1989 shootings. Core recalled Colon describing the shootings as a drug-related ambush and that Colon had identified Wilbur Hernandez, Willie Perez and "Moose" as the other occupants in the van.[1] Core explained that at the time he reported this information to the authorities, he was facing life imprisonment for the March 1990 murders of the two survivors of the December 1989 attack, as well as federal drug conspiracy charges. He agreed to execute written cooperation agreements with state and federal prosecutors in the hope that, in exchange for his testimony against defendants, he would obtain substantially reduced sentences on his guilty pleas. Core also admitted at trial that he had been a drug dealer whose operations grossed up to $140,000 a day; that he was responsible for numerous murders in connection with his drug activities; and that he had previously lied to a grand jury in an unrelated case.

[1]    Hernandez and Moose were murdered in 1992 and were therefore never brought to trial. Perez pleaded guilty to third-degree criminal possession of a weapon.

During summation, the prosecutor repeated Vera's assertion that he had not received "any benefit" other than the favorable plea agreement resolving his 1990 misdemeanor drug case. The prosecutor also stressed that she had "nothing to do with the plea [Vera] ultimately took with a two and a half to five year sentence" in connection with his 1992 felony narcotics arrest.

The jury convicted defendants of two counts each of murder in the second degree, attempted murder in the second degree and assault in the first degree, and one count each of criminal use of a firearm in the first degree, criminal possession of a *348 weapon in the second degree and criminal possession of a weapon in the third degree. Defendants were sentenced to two consecutive prison terms of 25 years to life for the murder convictions, which were to run concurrently with the lesser sentences imposed for the other convictions. Their judgments were affirmed on direct appeal (see 238 A.D.2d 213, 656 N.Y.S.2d 259 [1st Dept.1997], lv. denied 90 N.Y.2d 862, 661 N.Y.S.2d 189, 683 N.E.2d 1063 [1997], 90 N.Y.2d 892, 662 N.Y.S.2d 435, 685 N.E.2d 216 [1997] ).

In 2003, Colon moved under CPL 440.10 to vacate the judgment, arguing that Vera had received additional benefits in exchange for his testimony and that the prosecutor had failed to correct Vera's false testimony. Ortiz later joined in the motion and Supreme Court conducted a hearing at which the prosecutor testified but Vera did not appear.

At the hearing, defendants established that the District Attorney's office had engaged in further activity on Vera's behalf **939 ***427 and that neither Vera nor the prosecutor revealed during the trial. Specifically, the prosecutor had assisted in the relocation of Vera's grandparents by contacting the New York City Housing Authority. Defendants also demonstrated that the prosecutor was involved with Vera's 1992 felony drug case on two occasions. First, the prosecutor appeared at a calendar call to tell Vera about a plea offer of 2 ½ to 5 years that had been authorized by the Office of the Special Narcotics Prosecutor. Second, approximately one month later, the prosecutor left a phone message with the narcotics prosecutor regarding Vera's status as a witness in defendants' murder trial.[2] Defendants also revealed that the prosecutor was aware that a gun had been recovered from Vera's hotel room prior to the murder trial and that Vera was never arrested or prosecuted for its possession.

[2]    Vera later absconded and was rearrested in March 1993, after which he pleaded guilty to criminal possession of a controlled substance in the fifth degree and received a prison term of 2 ½ to 5 years.

Furthermore, the District Attorney's office produced two handwritten notes by the trial prosecutor, dated March 28, 1990, that pertained to her interviews of two women who claimed to have information about the shootings. These notes had not been

People v. Colon, 13 N.Y.3d 343 (2009)

918 N.E.2d 936, 890 N.Y.S.2d 424, 2009 N.Y. Slip Op. 08477

disclosed to defense counsel prior to trial. Based on the content of the interview notes, apparently one woman had identified four persons as participants in the shooting: Little Danny, Willie Perez, Moose and Wilbert. The second note contained a slightly

*349 different list of four names obtained from the second woman—Danny, Willie, Moose and Wilbur.[3]

3     Before the murder trial, however, the prosecutor did turn over notes dated January 1990 arising from an interview of another woman who likewise implicated "Little Danny"—a nickname that evidently belonged to someone other than Danny Colon. Defendants were therefore aware of the alleged "Little Danny" lead before trial.

Following the hearing, Supreme Court denied defendants' CPL 440.10 motions to vacate the judgments. The Appellate Division affirmed, finding that any error was harmless (55 A.D.3d 444, 865 N.Y.S.2d 601 [1st Dept.2008] ). A Judge of this Court granted leave to appeal (People v. Colon, 12 N.Y.3d 782, 879 N.Y.S.2d 59, 906 N.E.2d 1093 [2009]; People v. Ortiz, 12 N.Y.3d 786, 879 N.Y.S.2d 63, 906 N.E.2d 1097 [2009] ), and we now reverse.

[1]  [2]  In their role as public officers, prosecutors "must deal fairly with the accused and be candid with the courts" (People v. Steadman, 82 N.Y.2d 1, 7, 603 N.Y.S.2d 382, 623 N.E.2d 509 [1993] ). This duty requires prosecutors not only to disclose exculpatory or impeaching evidence but also to correct the knowingly false or mistaken material testimony of a prosecution witness. Where a prosecutor elicits or fails to correct such inaccurate testimony, reversal and a new trial are necessary unless there is no "reasonable possibility" that the error contributed to the conviction (People v. Pressley, 91 N.Y.2d 825, 827, 666 N.Y.S.2d 555, 689 N.E.2d 525 [1997]; see also Steadman, 82 N.Y.2d at 8–9, 603 N.Y.S.2d 382, 623 N.E.2d 509).

[3]  Here, Vera testified at trial that the only benefit he received for his testimony was his favorable 1990 plea deal. In fact, it was the prosecutor herself who elicited this testimony during Vera's direct examination. But as the Appellate Division observed, the prosecutor's assistance on behalf of Vera's grandparents "constituted an additional benefit to the witness" (55 A.D.3d at 445, 865 N.Y.S.2d 601), even though they did not ultimately move to a **940 ***428 new apartment until two months after the trial. Vera also alleged, in effect, that the prosecutor had no involvement with his 1992 drug case. Yet, the prosecutor personally appeared in that case to convey the initial plea offer and later contacted the narcotics prosecutor regarding Vera's status as a cooperating witness. Hence, the prosecutor failed to correct Vera's misleading testimony and, in addition, compounded these errors by repeating and emphasizing the misinformation during summation.

Unlike the Appellate Division, we believe that there is a reasonable possibility that these errors affected the jury's verdict (see People v. Vilardi, 76 N.Y.2d 67, 77, 556 N.Y.S.2d 518, 555 N.E.2d 915 [1990] ). At trial, only two witnesses connected defendants to the crime—Core and Vera. *350 Core had previously committed perjury and was a self-described drug kingpin and murderer. His veracity was further called into question given that he was facing life imprisonment on both state and federal charges when he agreed to testify against defendants. Vera's testimony was therefore crucial. But the false testimony elicited by the prosecutor regarding the benefits extended may well have impacted the jury's perception of Vera's credibility. By their very nature, benefits conferred on a witness by a prosecutor provide a basis for the jury to question the veracity of a witness on the theory that the witness may be biased in favor of the People. For this reason, it is important that witnesses provide truthful testimony when questioned about the receipt of such benefits, and the People must be vigilant to avoid misleading the court or jury. Rather than correct the inaccurate testimony, the prosecutor here exacerbated the problem during her closing comments. We also concur with the Appellate Division's observation that the prosecutor should have turned over the two March 1990 interview notes.[4] On this record, we conclude that a new trial is warranted.

4     Although Supreme Court, following the CPL 440.10 hearing, ultimately found that neither the police nor the prosecutor intended to benefit Vera by not arresting or prosecuting him in connection with the gun found in his hotel room before the murder trial, we are of the view that this information should have been timely disclosed to the defense.

Accordingly, in each case, the order of the Appellate Division should be reversed, defendant's motion pursuant to CPL 440.10 granted, defendant's judgment of conviction and sentence vacated and a new trial ordered.

Judges CIPARICK, READ, SMITH, PIGOTT and JONES concur; Chief Judge LIPPMAN taking no part.

People v. Colon, 13 N.Y.3d 343 (2009)

918 N.E.2d 936, 890 N.Y.S.2d 424, 2009 N.Y. Slip Op. 08477

In each case: Order reversed, etc.

**Parallel Citations**

13 N.Y.3d 343, 918 N.E.2d 936, 890 N.Y.S.2d 424, 2009 N.Y. Slip Op. 08477

---

**End of Document**                              © 2012 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit B

*Colon v. City of New York, et al.* Bronx Co. Index Number _____

Judicial Findings of Wrongful Withholding of Evidence Favorable
To Defense Where Police Officers Were Not Disciplined

1.  *People v. Cortez*, 149 Misc.2d 886 (Sup. Ct. Kings Co. 1990): Police violated "spirit" of *Brady* by intentionally destroying a tape they were ordered by the court to preserve. The court found that the D.A.'s office shared responsibility and the indictment was dismissed.

2.  *People v. Moss*, 176 A.D.2d 826 (2d Dept. 1991): Conviction reversed for police officer's loss and/or destruction of contemporaneous description of the defendant.

3.  *People v. Clausell*, 182 A.D.2d 132 (2d Dept. 1992): Police failed to disclose buy report with description of suspect that was inconsistent with officer's testimony. New trial ordered for *Brady* violation.

4.  *People v. Nikollaj*, 155 Misc.2d 642 (Sup. Ct. Bronx County 1992): New trial ordered for *Rosario* violations where police failed to turn over numerous inconsistent statements of complainant officers. Court also criticized police for placing defendant in a lineup consisting of Bronx police officers as fillers, despite fact that complainants were also Bronx police officers.

5.  *People v. Dunn*, 185 A.D.2d 54 (1st Dept. 1993): Conviction reversed in part where, among other things, police detective destroyed interview notes.

6.  *People v. Morrow*, 204 A.D.2d 356 (2d Dept. 1994): Conviction reversed where a significant portion of police report was not disclosed.

7.  *People v. White*, 200 A.D.2d 351 (1st Dept. 1994): Conviction reversed where DD5 containing *Brady* and *Rosario* material was not disclosed, and only was discovered through defendant's post-conviction FOIL request to the NYPD and Bronx DA's Office.

8.  *People v. Anderson*, 222 A.D.2d 442 (2d Dept. 1995): Conviction reversed where scratch notes lost or destroyed due to officer's "lack of due care."

9.  *People v. Brogdon*, 213 A.D.2d 418 (2d Dept. 1995): Conviction reversed where notes made by NYPD sergeant were withheld from defendant, and where identification by undercover "cannot be said as a matter of law" to have been "merely confirmatory and not suggestive."

10. *People v. Joseph*, 86 N.Y.2d 565 (1995): Adverse inference instruction appropriate where police deliberately destroyed interview notes.

11.   *People v. White*, 232 A.D.2d 436 (2d Dept. 1996): Conviction reversed due to loss of police officer's memo book through lack of due care, where there was a serious identification issue, and defendant was prejudiced by his inability to cross-examine officer using missing memo book.

12.   *People v. Gallman*, 240 A.D.2d 512 (2d Dept. 1997):  Conviction reversed for failure to disclose notes of police interview with a key witness; officer's typewritten notes were not duplicative equivalent because they contained "variations".

13.   *People v. Jackson*, 237 A.D.2d 179 (1st Dept. 1997): Conviction reversed for *Brady* violation consisting of the withholding by the police of internal affairs reports that contained entries that significantly were at variance with prosecution's evidence at trial and were favorable to defendant.

14.   *People v. Branch*, 175 Misc.2d 933 (Sup. Ct. Kings County 1998): People successfully fought motion to vacate judgment based upon confession of real killer; conviction overturned in 2002 after key prosecution witness recanted and said police paid him for his cooperation.

15.   *People v. Cannon*, 191 Misc.2d 136 (Sup. Ct. Kings Co. 2002): Motion to vacate conviction denied, but Brooklyn D.A.'s office and NYPD warned of future sanctions if the police continue policy of destroying or failing to preserve evidence.

Exhibit C

*Colon v. City of New York, et al.* Bronx Co. Index Number _____

Police Misconduct Lawsuits Settled by New York City For
Substantial Sums Where The Individual Police Officers
Responsible Were Not Disciplined

1. *Hart v. City of New York*, 186 A.D.2d 398 (1st Dept. 1992): Jury finds that police falsely arrested and maliciously prosecuted plaintiff, and awards $550,000 in compensatory and punitive damages. Appellate court upholds that finding, concluding there was "sufficient evidence to support the jury's finding that the arresting officer had knowingly provided false testimony to the Grand Jury resulting in plaintiff's indictment and incarceration." *Id.* at 399.

2. *Tong v. City of New York, et al.*, 95-CV-7965 [S.D.N.Y., settled 10/4/95, $35,000]: Complaint alleged police fabricated evidence against, and maliciously prosecuted, Plaintiff, and that the NYPD failed to train or supervise its officers in those areas. Plaintiff was arrested without probable cause, stripped searched, and falsely accused of driving with a suspended license. One of the traffic violations against the plaintiff was later dismissed.

3. *Dabbah v. City of New York, et al.*, 95-CV-2952 [S.D.N.Y., settled 3/12/96, $35,000]: Complaint alleged police fabricated evidence against, and maliciously prosecuted, Plaintiff. Plaintiff was arrested without probable cause on disorderly conduct charges and police swore to false affidavits converting the criminal complaint to an information. Eight months later, the charges were dismissed on the People's motion.

4. *Boland v. City of New York, et al.*, 93-CV-5058 [E.D.N.Y., settled 8/6/96, $30,000]: Complaint alleged police maliciously prosecuted Plaintiff. Plaintiff was stopped, interrogated, arrested without probable cause, and held in custody for two nights. Supervising police officers failed to order Plaintiff's release and permitted him to be falsely prosecuted.

5. *Kadlub v. City of New York, et al.*, 95-CV-1080 [E.D.N.Y., settled 12/11/96, $34,000]: Complaint alleged police maliciously prosecuted plaintiff and that the NYPD failed to train or supervise its officers in that area. Plaintiff was arrested without probable cause on drug possession and sale charges after he declined a stranger's offer of drugs. The charges against Plaintiff were later dismissed.

6. *Castro v. City of New York, et al.*, 94-CV-5114 [S.D.N.Y., settled 3/18/97, $72,500]: Complaint alleged police maliciously prosecuted plaintiff. Plaintiff was arrested on weapon possession charges without probable cause. The charges were dropped after Plaintiff was held in custody for several hours. The police had refused to release Plaintiff, stating that if the arrest was in error, Plaintiff could "always sue the City,

[because] they got a lot of money."

7. *McCaskill v. City of New York, et al.*, 96-CV-3687 [E.D.N.Y., settled 7/10/97, $100,000]: Complaint alleged police maliciously prosecuted Plaintiff. Plaintiff was arrested for disorderly conduct without probable cause. Police issued a false summons and approximately 6 months later, the charges against Plaintiff were dismissed.

8. *Gurley v. City of New York, et al.,* 95-CV-2422 [E.D.N.Y., settled 8/21/97, $1,7500,000]: Complaint alleged police falsely arrested, maliciously prosecuted, and suppressed *Brady* material from Plaintiff, and that the NYPD routinely ratified such conduct, and was deliberately indifferent to its officers' obligation to preserve and disclose such evidence. Plaintiff was wrongfully incarcerated for over 20 years based on, among other things, police concealment of a supplemental ballistics report from the D.A. and Plaintiff, which would have supported Plaintiff's self defense case at trial.

9. *Gaylock v. City of New York, et al.,* 96-CV-6183 [E.D.N.Y., settled 3/6/98, $90,000]: Complaint alleged police fabricated evidence against, and maliciously prosecuted, Plaintiffs, and that the NYPD failed to train and supervise its officers in those areas. Plaintiffs were arrested without probable cause on weapon charges after police illegally entered their home. The charges were pending for 10 months before being dismissed.

10. *Gordon v. City of New York, et al.*, 97-CV-8035 [S.D.N.Y., settled 11/12/98, $40,000]: Complaint alleged police maliciously prosecuted Plaintiff. Plaintiff was arrested without probable cause based on false allegations in felony complaint by NYPD officers. The charges dismissed by the D.A. three months after Plaintiff's arrest.

11. *Perez v. City of New York, et al.*, 98-CV-2331 [S.D.NY., settled 1/16/99, $15,000]: Complaint alleged police maliciously prosecuted Plaintiff. Plaintiff was arrested without probable cause and the court later dismissed the charges.

12. *Ziehenni v. City of New York, et al.,* 98-CV-3763 [S.D.N.Y., settled 3/5/99, $55,000]: Complaint alleged police fabricated evidence against, and maliciously prosecuted Plaintiff. After Plaintiff disputed a traffic summons and filed a CCRB complaint, police caused false charges to be filed against Plaintiff resulting in his wrongful arrest and incarceration, without probable cause. The charges were ultimately dismissed by the court.

13. *Napoli v. City of New York, et al.*, 97-CV-1255 [E.D.N.Y., settled 4/9/99, $60,000]: Complaint alleged police fabricated evidence against, and maliciously prosecuted Plaintiff, and that the NYPD failed to train and supervise its officers in those areas. Plaintiff was arrested without probable cause on weapon possession and assault charges based on police officers' false testimony before the grand jury. Plaintiff was later acquitted of all charges.

14. *Jefferson v. City of New York, et al.*, 98-CV-1097 [E.D.N.Y., settled 4/14/99, $175,000]:

Complaint alleged police falsely arrested, fabricated evidence against, and maliciously prosecuted Plaintiff, and failed to inform the D.A.'s office of *Brady* material establishing Plaintiff's innocence. Plaintiff, a corrections officer, was arrested on weapon and drug charges without probable cause, and police falsely claimed that those weapons and drugs were recovered from Plaintiff's mother's home. Police failed to inform the D.A. that there was no evidence that could justify the charges or Plaintiff's arrest. The charges were ultimately dismissed by a grand jury.

15.   *Denizard v. City of New York, et al.*, 98-CV-423 [E.D.N.Y., settled 6/4/99, $64,000]: Complaint alleged police maliciously prosecuted Plaintiff. Plaintiff, an auxiliary police officer, was arrested without probable cause for disorderly conduct, and resisting arrest. The charges were later dismissed on People's motion.

16.   *Sweazie v. City of New York, et al.*, 99-CV-419 [E.D.N.Y., settled 10/20/99, $20,000]: Complaint alleged police fabricated evidence against Plaintiff, falsely arrested and maliciously prosecuted him on weapons possession charges, and that the NYPD failed to train and supervise its officers in that area, and failed to follow up on relevant civilian complaints made to IAB and CCRB. Plaintiff was illegally stopped, searched, and arrested without probable cause and accused of throwing a gun to the ground. Police falsely swore in a felony complaint and to the grand jury that Plaintiff said he had been holding the gun for a friend. The grand jury dismissed the charges.

17.   *Daniels v. City of New York, et al.*, 00-CV-1981 [S.D.N.Y., settled 3/15/00, $28,500]: Complaint alleged police arrested Plaintiff without probable cause on weapon charges which were dismissed by the court subsequent to Plaintiff's arrest.

18.   *Almonte v. City of New York, et al.*, 99-CV-519 [E.D.N.Y., settled 7/12/00, $30,000]: Complaint alleged police falsely arrested Plaintiff and that the NYPD failed to train or supervise its officers in that area. Plaintiff was arrested without probable cause on drug charges that were later dismissed.

19.   *Fields v. City of New York, et al.*, 99-CV-8130 [E.D.N.Y., settled 7/28/00, $15,000]: Complaint alleged police maliciously prosecuted Plaintiff and that the NYPD failed to train and supervise its officers in that area. Plaintiff was arrested without probable cause while walking down the street. The court dismissed the charges against the Plaintiff.

20.   *Younger v. City of New York, et al.*, 00-CV-836 [S.D.N.Y., settled 9/1/00, $25,000]: Complaint alleged police fabricated evidence against, and maliciously prosecuted Plaintiff. Plaintiff filed an IAB complaint against police after they threatened her with arrest if she did not provide the whereabouts of her boyfriend, a suspect in several burglaries. After Plaintiff filed the complaint, police arrested her without probable cause. The charges against her were later dismissed.

21.   *Lovell v. City of New York, et al.*, 00-CV-0002 [S.D.N.Y., settled 10/20/00, $40,000]: Complaint alleged that the police fabricated evidence against, and maliciously prosecuted

Plaintiff, and that the NYPD failed to train and supervise its officers in that area. The complaint also referenced numerous civilian complaints and the NYPD's failure to meaningfully discipline its officers who commit such acts. The Plaintiff was arrested without probable cause for turnstile jumping based on false statements made by police in a criminal complaint when in fact, Plaintiff had utilized his metrocard. The case against Plaintiff was later dismissed.

22.    *Cotto v. City of New York, et al.*, 00-CV-1341 [E.D.N.Y., settled 12/01/00, $30,000]: Complaint alleged police maliciously prosecuted Plaintiff. Plaintiff was arrested without probable cause for possessing and selling a controlled substance. The court later dismissed the charges against Plaintiff.

23.    *Coleman v. City of New York, et al.*, 00-CV-2019 [E.D.N.Y., settled 1/2/01, $60,000]: Complaint alleged police falsely arrested and maliciously prosecuted Plaintiffs. Police, without probable cause, arrested Plaintiffs and caused their incarceration for several days. The court later dismissed the charges.

24.    *Crespo v. City of New York, et al.*, 93-CV-8847 [S.D.N.Y., settled 8/29/06, $25,000]: Complaint alleged police fabricated evidence against, and maliciously prosecuted Plaintiff, and that the NYPD "fostered a policy to which perjury and the falsification of documents were methods of securing indictments and convictions of innocent individuals." Plaintiff was arrested without probable cause on weapon charges. The police later swore to a false complaint and gave false testimony before the grand jury.

25.    *Gallo v. New York City Police Department*, 93 CV 2105 [E.D.N.Y., settled 7/5/94, $13,340]: Complaint alleged police falsely arrested and maliciously prosecuted Plaintiff. Plaintiff was arrested robbery charges without probable cause. The charges were later dismissed.

26.    *Gallion v. Detective Pereira, et al.*, 93 CV 5180 [S.D.N.Y., settled 7/18/94, $25,000]: Complaint alleged police falsely arrested and maliciously prosecuted Plaintiff. Plaintiff was arrested for assault without probable cause, and the charges against him were later dismissed.

27.    *Lopez and Ravitz v. City of New York*, 93 CV 6516 [S.D.N.Y., settled 1/2/96, $80,000]: Complaint alleged police falsely arrested and maliciously prosecuted Plaintiffs. After urging police not to arrest others, Plaintiffs were arrested without probable cause, unlawfully strip searched, and issued Desk Appearance tickets.

28.    *Nakajima and Fancis v. Alamo Rent-a-Car, Inc., et al.*, 94 CV 0857 [E.D.N.Y., settled 6/19/95, $51,000]: Complaint alleged police falsely arrested Plaintiffs. Plaintiffs, while driving in a rental car, were arrested without probable cause despite providing police with valid rental agreement.

29.    *Nieves v. City of New York*, 94 CV 1491 [E.D.N.Y., settled 4/25/96, $50,000]: Complaint

alleged police fabricated evidence against, and maliciously prosecuted Plaintiff. Plaintiff, a security officer with the City's Dept. of Business Services, was arrested without probable cause in a baseless drug sweep. Police then concocted a false story to prevent Plaintiff from defending himself at a hearing to revoke his license.

30.  *Shabazz, et al. v. Detective Gerald Shisko, et al.*, 94 CV 0029 [E.D.N.Y., settled 4/13/95, $30,000]: Complaint alleged police falsely imprisoned Plaintiffs. Police entered Plaintiffs' premises without probable cause or a search warrant and imprisoned and searched them.

31.  *Agnew, et al. v. Bratton, et al.*, 94 CV 6508 [S.D.N.Y., settled 7/23/96, $90,000]: Complaint alleged police falsely imprisoned Plaintiffs and that the NYPD failed to train and supervise its officers in that area. Without a warrant or probable cause, the police entered Plaintiffs' home, detained the occupants, and conducted a search.

32.  *Taousse v. City of New York*, 95 CV 7965 [S.D.N.Y., settled 12/4/96, $16,000]: Complaint alleged police fabricated evidence against, and maliciously prosecuted Plaintiff. Plaintiff was falsely arrested without probable cause for violating traffic laws. The charges against him were later dismissed.

33.  *Mahase, et al. v. City of New York*, 96 CV 6105 [E.D.N.Y., settled 6/16/00, $75,000]: Complaint alleged Plaintiff was falsely arrested and imprisoned without probable following a traffic accident. The police held Plaintiff for over thirty hours and then issued a Desk Appearance Ticket which the D.A. promptly moved to dismiss.

34.  *Martinez v. City of New York*, 96 CV 0289 [E.D.N.Y., settled , 4/12/99, $50,000]: Complaint alleged police fabricated evidence, falsely arrested and maliciously prosecuted Plaintiff. The complaint also referenced 21 other instances in which individuals were victims of similar conduct by the police, but the NYPD failed to discipline the officers who committed that misconduct. Plaintiff was assaulted and arrested without probable cause when police entered her apartment with a battering ram looking for her son. The police then falsely charged Plaintiff with assaulting an officer.

35.  *Tomback v. Dear, et al.*, 96 CV 3972 [E.D.N.Y., settled 2/9/98, $20,000]: Complaint alleged police maliciously prosecuted Plaintiff. Plaintiff was arrested without probable cause and the charges were later dismissed by court due to lack of evidence.

36.  *Frantino v. City of New York*, 96 CV 3725 [S.D.N.Y., settled 4/15/97, $50,000]: Complaint alleged police falsely arrested and maliciously prosecuted Plaintiffs. Police arrested Plaintiff without probable cause then issued Desk Appearance Tickets that the D.A.'s office ultimately declined to prosecute.

37.  *Bradley v. P.O. Lisa Reale, et al.*, 97 CV 4076 [E.D.N.Y., settled 10/14/98, $20,000]: Complaint alleged police falsely arrested and maliciously prosecuted Plaintiff. Plaintiff was pulled over and arrested without probable cause based on a warrant issued for a

another person.

38. *Sierzputowski and Sulima v. City of New York*, 97 CV 2687 [E.D.N.Y., settled 11/20/97, $55,000]: Complaint alleged police falsely imprisoned and illegally seized Plaintiffs. Plaintiffs were arrested without probable cause while driving a rental car despite producing documentation to police showing that they had in fact rented the car.

39. *Silver v. City of New York, et al.*, 97 CV 5384 [E.D.N.Y., settled 3/2/99, $40,000]: Complaint alleged police falsely arrested and imprisoned Plaintiff. Plaintiff was arrested without probable cause for child abuse, notwithstanding police officers' knowledge that Social Services had found the abuse allegations unfounded.

40. *Gager v. City of New York*, 97 CV 4718 [S.D.N.Y., settled 6/1/98, $105,000]: Complaint alleged police fabricated evidence against, and maliciously prosecuted, Plaintiff. The sixty-six year old female plaintiff was arrested without probable cause, thrown to the ground and assaulted, and then falsely charged, after making a comment to police about a recent police shooting.

41. *Bernard v. City of New York, et al.*, 98 CV 6068 [E.D.N.Y., settled 3/6/00, $36,000]: Complaint alleged police wrongfully arrested Plaintiff. Following a roadside vehicle inspection, Plaintiff was arrested and his car impounded due to lack of a properly affixed VIN. After the D.A.'s office declined to prosecute, police continued to retain Plaintiff's car.

42. *Dennis v. Leak, et al.*, 98 CV 5355 [E.D.N.Y., settled 5/26/99, $15,000]: Complaint alleged police illegally seized Plaintiff and filed false charges against him. Plaintiff, while walking down the street, was approached by police, assaulted, and arrested without probable cause. Police later fabricated charges that the court ultimately adjourned in contemplation of dismissal.

43. *Golston v. City of New York*, 98 CV 4206 [E.D.N.Y., settled 10/30/00, $25,000]: Complaint alleged police fabricated evidence and maliciously prosecuted Plaintiff. Plaintiff was arrested without probable cause on false criminal charges that were later dismissed.

44. *Deluise v. City of New York, et al.*, 98 CV 4535 [S.D.N.Y., settled 3/17/99, $28,000]: Complaint alleged police falsely imprisoned Plaintiff and violated his Fourth Amendment rights. Plaintiff was arrested without probable cause and assaulted by police.

45. *Lindo v. City of New York*, 98 CV 9066 [S.D.N.Y., settled 11/21/00, $80,000]: Complaint alleged police fabricated evidence against, and maliciously prosecuted, Plaintiff. Plaintiff was arrested without probable cause, assaulted and pepper sprayed. Police then swore to false felony complaint which the D.A.'s office ultimately agreed to dismiss.

46. *Haygood, et al. v. City of New York, et al.*, 99 CV 0026 [S.D.N.Y., settled 11/29/99,

$32,500]: Complaint alleged police maliciously prosecuted plaintiff. Plaintiff was arrested for, among other things, an outstanding warrant for someone with a different NYSID number, and incarcerated for 16 days until police conceded they had the wrong man. Almost a year later, plaintiff was again arrested on those charges and held a month before he was released.

47.    *Udofia, et al. v. City of New York*, 00 CV 4872 [E.D.N.Y., settled 1/4/01, $30,000]: Complaint alleged police maliciously prosecuted Plaintiff. Plaintiff was arrested without probable cause although no complainant pressed charges, and police falsely alleged the it was the D.A. who wanted to pursue the charges. Ultimately, Plaintiff was not prosecuted on the case.

48.    *Davis v. City of New York*, 00 CV 387 [S.D.N.Y., settled 1/19/00, $175,000]: Complaint alleged police maliciously prosecuted plaintiff. Plaintiff was arrested without probable cause and spent four months in jail. During plaintiff's criminal trial, the judge found that Plaintiff's arrest was "illegal and outrageous," that he was arrested solely because of his race, and that the police photographing of plaintiff was unlawful.



# The City of New York

## Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department

# COMMISSION REPORT

**Milton Mollen**
Chair

**Harold Baer, Jr.**
**Herbert Evans**
**Roderick C. Lankler**
**Harold R. Tyler, Jr.**

**Joseph P. Armao**
Chief Counsel

**Leslie U. Cornfeld**
Deputy Chief Counsel

July 7, 1994

## SECTION 4: PERJURY AND FALSIFYING DOCUMENTS

"Oh what a tangled web we weave when
first we practice to deceive."

— Sir Walter Scott

Police perjury and falsification of official records is a serious problem facing the Department and the criminal justice system — largely because it is often a "tangled web" that officers weave to cover for other underlying acts of corruption or wrongdoing. One form of corruption thus breeds another that taints arrests on the streets and undermines the credibility of police in the courtroom. When the police lose their credibility, they significantly hamper their own ability to fight crime and help convict the guilty. A police officer's word is a pillar of our criminal justice system. On the word of a police officer alone a grand jury may indict, a trial jury convict, and a judge pass sentence. The challenge we face in combatting police falsifications, is not only to prevent the underlying wrongdoing that spawns police falsifications but to eliminate the tolerance the Department and the criminal justice system exhibit about police who fail to tell the truth.

Our investigation into this form of corruption focused on a number of manifestations of the problem, including: testimonial perjury, as when an officer testifies falsely under oath before a grand jury or at a court proceeding; documentary perjury, as when an officer swears falsely under oath in an affidavit or criminal complaint; and falsification of police records, as when an officer falsifies the facts and circumstances of an arrest in police reports. We will collectively refer to these various kinds of wrongdoings as "falsification."

In conducting our investigation of police falsification, the Commission sought information from a variety of sources. Commission investigators interviewed scores of former and current police officers and supervisors about falsifications; interviewed a number of prosecutors, defense attorneys, and civilians arrested for various offenses; conducted field investigations of narcotics enforcement units; and studied hundreds of Department arrest records, focusing on those involving narcotics and weapon offenses.

As with other forms of corruption, it is impossible to gauge the full extent of police falsifications. Our investigation indicated, however, that this is probably the most common form of police corruption facing the criminal justice system, particularly in connection with arrests for possession of narcotics and guns. Several officers also told us that the practice of police falsification in connection with such arrests is so common in certain precincts that it has spawned its own word: "testilying."

A large part of the problem is that once officers falsify the basis for an arrest, search, or other action in a Department record — such as an arrest report, complaint report, search warrant application, or evidence voucher — to avoid Departmental or criminal charges, they

36

## SECTION 4:  PERJURY AND FALSIFYING DOCUMENTS

*"Oh what a tangled web we weave when first we practice to deceive."*

-- Sir Walter Scott

Police perjury and falsification of official records is a serious problem facing the Department and the criminal justice system -- largely because it is often a "tangled web" that officers weave to cover for other underlying acts of corruption or wrongdoing.  One form of corruption thus breeds another that taints arrests on the streets and undermines the credibility of police in the courtroom.  When the police lose their credibility, they significantly hamper their own ability to fight crime and help convict the guilty.  A police officer's word is a pillar of our criminal justice system.  On the word of a police officer alone a grand jury may indict, a trial jury convict, and a judge pass sentence.  The challenge we face in combatting police falsifications, is not only to prevent the underlying wrongdoing that spawns police falsifications but to eliminate the tolerance the Department and the criminal justice system exhibit about police who fail to tell the truth.

Our investigation into this form of corruption focused on a number of manifestations of the problem, including:  testimonial perjury, as when an officer testifies falsely under oath before a grand jury or at a court proceeding; documentary perjury, as when an officer swears falsely under oath in an affidavit or criminal complaint; and falsification of police records, as when an officer falsifies the facts and circumstances of an arrest in police reports.  We will collectively refer to these various kinds of wrongdoings as "falsification."

In conducting our investigation of police falsification, the Commission sought information from a variety of sources.  Commission investigators interviewed scores of former and current police officers and supervisors about falsifications; interviewed a number of prosecutors, defense attorneys, and civilians arrested for various offenses; conducted field investigations of narcotics enforcement units; and studied hundreds of Department arrest records, focusing on those involving narcotics and weapon offenses.

As with other forms of corruption, it is impossible to gauge the full extent of police falsifications.  Our investigation indicated, however, that this is probably the most common form of police corruption facing the criminal justice system, particularly in connection with arrests for possession of narcotics and guns.  Several officers also told us that the practice of police falsification in connection with such arrests is so common in certain precincts that it has spawned its own word:  "testilying."

A large part of the problem is that once officers falsify the basis for an arrest, search, or other action in a Department record -- such as an arrest report, complaint report, search warrant application, or evidence voucher -- to avoid Departmental or criminal charges, they

36

must stick to their story even under oath when swearing to a criminal complaint or giving testimony before a trial jury. But officers know that the operation of the criminal justice system itself usually protects them from having to commit testimonial perjury before a grand jury or at trial. The vast majority of charges for narcotics or weapons possession crimes result in pleas without the necessity of grand jury or trial testimony, thus obviating officers' concerns about the risk of detection and possible exposure to criminal charges of perjury.

Unlike other patterns of police corruption, greed is often not the primary motive behind police falsification. While the desire for overtime pay and career advancement sometimes encourage falsification, it typically occurs as a means to conceal other underlying acts of corruption or to conceal illegal steps taken for what officers often perceive as "legitimate" law enforcement ends.

Falsification to conceal corruption was a common practice among many of the corrupt officers cooperating with this Commission, including certain officers arrested in the 30th Precinct case. To explain how and why they were present in a particular premises or came to arrest a particular person, officers manufactured facts. For example, to justify an unlawful raid on a drug den where money or drugs were stolen, a common tale was that the officers entered the location in hot pursuit or on information from an unidentified informant. To justify unlawfully searching and arresting a street dealer from whom officers stole drugs or cash, a common tale was the person dropped a bag and ran as the officers approached.

In a typical example of this "corruption-cover" falsity, one cooperating officer reported how he and another officer illegally stopped a car without probable cause, searched the car without a warrant, and found a hidden car "trap" containing cocaine and a gun. The officers arrested the driver, vouchered the gun, and stole and later sold a portion of the seized cocaine. To conceal their crime, the officers falsified their arrest reports and then stuck to their fabricated story when the District Attorney's Office reviewed the case for prosecution. By one of the officer's own admissions, they concocted a realistic-sounding story: after stopping the car for running a red light, they observed a gun in plain view under the car seat, which led them to find the cocaine. Many acts of corruption, of course, never result in an arrest, and no falsification "cover" is necessary. Concealment is achieved simply by letting the criminal go free -- with eliminating the likelihood of a complaint and conviction.

Falsification can also conceal an officer's use of excessive force. A number of officers told us how they and others would insulate themselves from excessive force complaints simply by adding charges of "resisting arrest" to the arrest report -- a practice rarely questioned by supervisors. In the 30th Precinct case, for example, one officer reported how he and another officer chased and finally caught an individual who had run from his car after a traffic stop. While the officer was holding the individual, another officer struck the defendant in the head with his police radio. The officers then agreed upon a false story

justifying their stop and search of the car and about the circumstances of the defendant's head injury.

Officers also commit falsification to serve what they perceive to be "legitimate" law enforcement ends – and for ends that many honest and corrupt officers alike stubbornly defend as correct. In their view, regardless of the legality of the arrest, the defendant is in fact guilty and ought to be arrested. Officers reported a litany of manufactured tales. For example, when officers unlawfully stop and search a vehicle because they believe it contains drugs or guns, officers will falsely claim in police reports and under oath that the car ran a red light (or committed some other traffic violation) and that they subsequently saw contraband in the car in plain view. To conceal an unlawful search of an individual who officers believe is carrying drugs or a gun, they will falsely assert that they saw a bulge in the person's pocket or saw drugs and money changing hands. To justify unlawfully entering an apartment where officers believe narcotics or cash can be found, they pretend to have information from an unidentified civilian informant or claim they saw the drugs in plain view after responding to the premises on a radio run. To arrest people they suspect are guilty of dealing drugs, they falsely assert that the defendants had drugs in their possession when, in fact, the drugs were found elsewhere where the officers had no lawful right to be.

The Commission also found that police falsification results from efforts to insure that the circumstances of an arrest comply, not only with the Constitution, but with the Department's own regulations. Department regulations, for example, prohibit Street Narcotics Enforcement Units (S.N.E.U.) from entering buildings to make arrests. Consequently, some S.N.E.U. officers falsify arrest papers to make it appear as if an arrest that actually occurred inside a building took place on the street. Admitting the true facts of the arrest could lead to dismissal of the criminal charges and possibly to Departmental charges against the arresting officer. To many officers, this is a perversion of justice. In short, some officers falsify their arrest reports and, if necessary, their testimony to insure that the charges stick and that they are protected.

As with other forms of police corruption, falsifications are most prevalent in high-crime precincts where opportunities for narcotics and gun arrests abound. In such precincts, the prevalence of open criminal activity is high and the utility of an illegal search or arrest is perceived as great. Officers – often correctly – believe that if they search a particular person, or enter an apartment without a warrant, they will find drugs or guns. Frustrated by what they perceive to be unrealistic rules of law and by their own inability to stem the crime in their precincts through legal means, officers take the law into their own hands. And police falsification is the result.

We found that such motivations to falsify are often present in narcotics enforcement units, especially to justify unlawful searches or arrests. The Commission undertook an investigation of the practices of a certain unit of the Narcotics Division where our analysis of police records and intelligence sources indicated that the incidence of falsifications might

run high.  While we cannot disclose the details of our investigation because we have referred the evidence to a prosecutor, the evidence suggests that certain officers in this unit falsified documents and may have committed testimonial perjury to conceal constitutional violations.

Even more troubling, the evidence suggests that the unit's commanding officer not only tolerated, but encouraged, this unlawful practice.

Such "shortcuts" not only violate basic constitutional rights -- they allow police officers, rather than the legislature, to make the law and enforce their own brand of street justice.  They allow officers to abuse their authority for misguided ends -- regardless of how well-intentioned their motive.  Even supposedly well-intended falsification, moreover, has devastating consequences for the criminal justice system and the public.  Rather than insuring that the guilty are convicted, police falsifications often insure the opposite.  Unlawful "shortcuts" at times require lying to a grand jury or to a trial jury -- and such deception is often transparent to jurors and judges.  Many law enforcement officials we interviewed, for example, believe that police falsification has led to a rise in acquittals because juries increasingly suspect and reject police testimony.

There is another devastating consequence to "legitimate-end" rationalizations for police misconduct:  it often fuels other kinds of corruption.  Some corrupt police officers told us that their corrupt activities began from motives they believed to be legitimate.  In the beginning, they unlawfully raided apartments to make drug arrests -- and lied about the facts in police reports.  They quickly realized how easy it was to cross the line and take the law into their own hands with impunity.  Soon they were raiding apartments to steal contraband for personal profit and letting suspects go free.

The Commission also found that an officer's motives for purported legitimate-end falsifications often served as mere pretext for personal gain.  Unlawful arrests, for example, were sometimes conveniently timed to generate overtime pay for the arresting officer who typically took hours beyond his regular tour of duty to process the arrest.

"Collars-for-Dollars" is a practice widely known to officers, police supervisors, and prosecutors alike.  In fact, a confidential report prepared by a prosecutor's office involving a pattern of police falsifications states that of the falsified arrests they investigated, "[a]lmost every arrest generated overtime pay for the officer who lied about observations."  Besides overtime pay, high arrest numbers are often a factor considered for coveted assignments for patrol officers and supervisors alike.

In one precinct we investigated, a cooperating officer told us of a regular pattern of "trading collars."  The purpose of this practice was to accumulate overtime pay for the officers involved.  In this scheme, the police officer who actually arrested the defendant would pass off the arrest to a colleague who was not involved or even present at the time

of the arrest. Trading collars was done to maximize the overtime pay because the regular day off of the officer taking the arrest coincided with the likeliest date for a required court appearance. The officer who took the arrest would get all the details from the actual arresting officer, fill out the arrest papers, interview with the District Attorney, and, if necessary, testify to the circumstances of the arrest. This, despite the fact that the law requires the arresting officer to do this work. Officers perpetrated this scheme with the knowledge, approval, and in the presence of their sergeants. Another scheme to generate overtime was to have several officers and even supervisors state falsely that they recovered evidence incidental to an arrest. In this way, they insured that they would have to appear at the District Attorney's Office or before a grand jury on their day off and thus improperly receive overtime pay.

We initially investigated another possible type of police falsification: falsification not to conceal other unlawful acts, but as another form of corruption-for-profit. For example, officers accepting payoffs or other benefits to get lawful charges dismissed. We found no evidence that this occurs. In fact, we came across only one example of this type of perjury. By his own admission, Bernard Cawley lied before a grand jury to get charges dismissed against a drug dealer he had arrested, in exchange for the dealer's information about profitable drug locations Cawley and his accomplices could raid. That such a practice is rare makes sense. It is easier and safer for a corrupt cop to make a deal with a defendant on the street before an arrest is even made – and well before a vigilant supervisor, the District Attorney's Office, or the courts become involved.

Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them. In testimony before the Commission, Kevin Hembury stated that one of his supervisors joked about how an arrest was manufactured:

> Question:    Now you just said there was a supervisor or a lieutenant who joked about [police falsifications] in your presence?
>
> Hembury:    That's correct, sir.  Scenarios were, were you going to say (a) that you observed what appeared to be a drug transaction; (b) you observed a bulge in defendant's waistband; or (c) you were informed by a male black, unidentified at this time, that at that location there were drug sales.

| Question: | So, in other words, what the lieutenant was telling you is: here's your choice of false predicates for these arrests? |
|---|---|
| Hembury: | That's correct. Pick which one you're going to use. (Tr. 57-58) |

And, as mentioned, the Commission has evidence that at least one supervisor actively encouraged such falsifications to bolster his unit's performance.[3]

What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" -- doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."

Officers and their immediate supervisors are not the only culprits in tolerating falsifications. When officers genuinely believe that nothing is wrong with fabricating the basis of an arrest, a search, or other police action and that civil rights are merely an obstacle to aggressive law enforcement, the Department's top commanders must share the blame. Indeed, we found that for years the Department was content to address allegations of perjury on a case-by-case basis, rather than pursuing the potential for a broader based investigation. For example, supervisors were rarely, if ever, held accountable for the falsifications of their subordinates. We are not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch.

Nor do we know of a single, self-initiated Internal Affairs Division investigation into patterns of police perjury and falsification. The Commission's analysis of Internal Affairs' corruption categories – designed to quantify different kinds of police wrongdoing – revealed no separate category for perjury or falsification of records. Unlike other corruption categories, Internal Affairs over the last decade had no record of the number of falsification allegations brought against officers throughout the Department or in a particular precinct or command. There is no evidence that anyone in the Department's chain of command had focused on eliminating this practice, including past Police Commissioners and Internal

---

[3] The identities of these supervisors cannot be disclosed at this time because their complicity, through encouraging or permitting these practices, is currently under investigation.

Affairs chiefs, who apparently turned a blind eye to unlawful practices that were purportedly committed to fight crime and increase arrest statistics.

Members of the law enforcement community, and particularly defense attorneys, told us that this same tolerance is sometimes exhibited among prosecutors. Indeed, several former and current prosecutors acknowledged — "off the record" — that perjury and falsifications are serious problems in law enforcement that, though not condoned, are ignored. The form this tolerance takes, however, is subtle which makes accountability in this area especially difficult. We have observed that provable cases of testimonial perjury are pursued in instances when the testimony of one eyewitness officer is squarely inconsistent with the testimony and reports of other officers and witnesses. In fact, in June 1993, the Manhattan District Attorney's Office obtained the conviction of a police officer who fabricated gun possession charges after the District Attorney's office noticed clear discrepancies in the officer's testimony.

But the signs of falsification and perjury are usually far more subtle: a story that sounds suspicious to the trained ear; patterns of coincidences that are possible, but highly unlikely; inconsistencies that could be explained, but sound doubtful. In short, the tolerance the criminal justice system exhibits takes the form of a lesser level of scrutiny when it comes to police officers' testimony. Fewer questions are asked; weaker explanations are accepted.

Testimonial perjury cases are often extremely difficult to prove, which may persuade prosecutors to apply their limited resources to what are likely to be more successful areas of prosecution. In one unit-wide investigation, despite significant evidence of widespread falsification of the circumstances surrounding searches and arrests, prosecutors judged that a prosecution could not succeed for a number of reasons, including that "the most difficult aspect of the case is the 'noble' motives of the officers in committing the crimes of perjury and falsifying documents," according to a confidential prosecution report. The report further states that a successful prosecution would be difficult because: "many of the jurors may agree with the police officer's decision to ignore the constitutional niceties of the Fourth Amendment to win the war against drugs" and because "it may be very difficult to generate among the jurors the feelings of outrage necessary to convict a police officer for abusing the system."

We note and commend Robert M. Morgenthau, the District Attorney of New York County and Mary Jo White, the United States Attorney for the Southern District of New York for undertaking a comprehensive review of convictions obtained as the result of testimony provided by police officers recently arrested for corrupt activities.

*　　　　　*　　　　　*

Changing attitudes about police falsification depends largely on the Department. The Department's lack of concern for police falsifications was largely based on an attitude that

42

allowed police officers to even the odds in the fight against crime by letting the police get around legal rules that are perceived to work as protection for criminals rather than the law-abiding public. It is, of course, crucial that police officers and their supervisors have discretion and leeway in carrying out their jobs. But in a democracy, this leeway must be in concert with the law – otherwise we have anarchy. What we found is that those bounds have too often been crossed, without penalty, in the past.

The consequences of this can be devastating. It can mean that defendants are unlawfully arrested and convicted, that inadmissible evidence is admitted at trial, and ultimately the public trust in even the most honest officer is eroded. This erosion of trust causes the public to disbelieve police testimony resulting in the guilty being set free after trial.

But, we are pleased to note, that the Department has begun to recognize these consequences and that change is occurring. The Commission's findings about police falsifications coupled with the evidence of this practice from recent corruption prosecutions have led the current Police Commissioner to begin to strengthen prevention and detection efforts in this area. This is an important factor in inculcating anti-corruption values into police culture. A crucial responsibility of both Internal Affairs and the independent oversight monitor we recommend, will be to insure that these efforts continue -- and that officers of all ranks within the Department are held accountable for telling the truth and upholding the law, regardless of their personal view of what is right or wrong.

43

ELIZABETH HOLTZMAN
COMPTROLLER

EXECUTIVE DEPUTY COMPTROLLER
RHEA KEMBLE DIGNAM

ASSISTANT COMPTROLLER
ELIZABETH SCHROEDER

DEPUTY COMPTROLLER FOR
CLAIMS & ADJUDICATIONS
BARBARA S. MEHLSACK

CHIEF, BUREAU OF
LAW & ADJUSTMENT
MICHAEL AARONSON

DEPUTY CHIEF, BUREAU OF
LAW & ADJUSTMENT
SHARON RILEY

EDITOR
DAVID NEUSTADT

REPORT OF THE OFFICE OF THE COMPTROLLER ON

POLICE DEPARTMENT MONITORING OF LAWSUITS AND

CLAIMS OF POLICE MISCONDUCT

### EXECUTIVE SUMMARY

The number of people bringing claims of police misconduct against the City of New York and the settlements those people are winning from the City have been increasing significantly over the past five fiscal years. From fy 87 through fy 91, the City paid $44 million to resolve such claims. Over the five year period, the number of police misconduct claims filed with the Comptroller's Office increased 53 percent and the average settlement or judgement on police misconduct lawsuits increased 126 percent, from $23,000 to $52,000.

To ascertain what can be done to reduce the City's liability for police misconduct claims, the Comptroller's Office examined the procedures used by the New York City Police Department (NYPD, Department) to respond to claims of misconduct. A thoughtful response to these claims -- including taking appropriate action with respect to police officers involved -- could reduce both the number of claims and the amounts paid by the City.

Report on Police Misconduct                                    2

        Unfortunately, our inquiry has found that until now the NYPD
has been routinely collecting information about and monitoring
only those complaints of police misconduct filed with the Civilian
Complaint Review Board (CCRB). The NYPD has not been routinely
monitoring lawsuits filed in the courts and claims filed with the
Comptroller's Office. This means that the NYPD has not been getting
a complete picture of the problem. Not all of those who file police
misconduct claims and lawsuits against the City of New York also
file complaints with the CCRB. While the total number of complaints
to the CCRB of all types has been declining recently, the number of
claims and lawsuits against the City charging police misconduct has
been increasing; and it is the claims and lawsuits that result in
damages awards and settlements. Thus it is important to include
them in a monitoring system if the goals are to reduce the City's
liability payments and the incidence of police misconduct.

        The Comptroller's Office held discussions with the City's Law
Department and with the NYPD as part of the research for this
report. As a result, the Law Department recently began providing
data on police misconduct lawsuits to the NYPD and the NYPD has
just decided to incorporate the Law Department's data on lawsuits
into its monitoring program. The NYPD is in the process of
determining how best to utilize that data. The Comptroller's Office
also offered to provide NYPD with data on claims and NYPD officials
have agreed to meet with representatives of the Comptroller's
Office to discuss adding the claims data to the program.



Report on Police Misconduct                                    3

The Comptroller's Office recommends that the NYPD:

o       monitor claims and lawsuits involving charges
        of police misconduct in addition to complaints
        filled with the Civilian Complaint Review
        Board and correlate the data from all three
        sources;

o       use the data from claims and lawsuits, as well
        as from civilian complaints, to identify and
        correct problems in training or other procedures
        and policies; and identify individual police
        officers and take appropriate follow-up action,
        including additional training or other assistance.

o       use the information from police misconduct
        cases to improve the functioning of the NYPD,
        reduce claims and save the City money.



Report on Police Misconduct                                    4

<u>CLAIMS OF MISCONDUCT AND PAYMENTS BY THE CITY ARE INCREASING</u>

<u>STEADILY</u>

Lawsuits and claims against New York City for alleged police
misconduct -- and the amount of money paid out by the City when
cases are settled or go to judgment -- have been increasing for
the last five fiscal years.'

(1)  From fy 87 through fy 91 the City paid out a total
     of $44 million in settlements or judgments of police
     misconduct cases.

(2)  Claims alleging misconduct filed with the
     Comptroller's office rose from 977 in fy 87 to 1498
     in fy 91 -- an increase of 53 percent. The average
     annual increase was 13 percent. (See Graph #1).

(3)  Civil actions filed in state and federal courts also
     increased annually, from 527 in fy 87 to 659 in fy
     91 -- an increase of 25 percent. The average annual
     increase was 6 percent. " (See Graph #2).

(4)  The average settlement or judgment per claim went
     from $23,000 in fy 87 to $52,000 in fy 91 -- an
     increase of 126 percent. The average annual
     increase was 32 percent. (See Graph #3).

(5)  The amount paid out by the City on settlements or
     judgments of police misconduct claims increased from
     $6.7 million in fy 87 to $11.6 million in fy 91 --

---

'Total claims and payout for each fiscal year in the five year
period are shown in the graphs at pages following.

"The number of actions filed includes both cases for which
prior notice is provided to the Comptroller's office by filing of
a notice of claim as well as cases alleging violations of federal
civil rights under 42 USC §1983 as to which no prior notice to the
Comptroller's office is required before an action commenced. Such
cases are usually commenced in federal court, although federal
court jurisdiction over Section 1983 claims is not exclusive.

Report on Police Misconduct                              5

an increase of 73 percent. The average annual
increase was 18 percent.* (See graph #4).

(6)  During the period fy 87 to fy 91, total judgments and
claims expenditures for the City rose from $139 million
in fy 87 to $196 million in fy 91 -- an increase of 41
percent. The average annual increase was 10 percent. Thus
the rate of increase in payouts for police misconduct
cases was almost double the rate of increase in payouts
for judgments and claims overall. (See Graphs #5 and #6).

---

*A jury verdict of $76.1 million was entered in this period
and reduced by the trial court to $6.64 million. Because our data
reflect only final determinations and the case is on appeal, that
verdict is not included in our statistics.

Report on Police Misconduct                                    6



Graph 1



Report on Police Misconduct                                    7



Graph 2

CIVIL ACTIONS FILED IN STATE AND FEDERAL
COURTS CHARGING POLICE MISCONDUCT



Report on Police Misconduct                                                8





Report on Police Misconduct                                    9



Graph 4

POLICE MISCONDUCT CLAIMS

TOTAL SETTLEMENTS & JUDGMENTS



Report on Police Misconduct                              10





Report on Police Misconduct                                    11





Report on Police Misconduct                                    12


## INDIVIDUAL POLICE MISCONDUCT CASES INVOLVE SERIOUS CHARGES AND SUBSTANTIAL COSTS.

Individual lawsuits and claims may involve serious charges of police misconduct and result in substantial costs for the City. In one recent case, the City paid $900,000 in settlement of a claim of police brutality. The plaintiff alleged that he was accosted by two officers, struck about the face, head, and scrotum, and incarcerated for 26 hours without medical attention despite his complaints of pain. The record shows that plaintiff had no prior criminal record and all charges against him arising out of the incident were dismissed. Both police officers had multiple prior civilian complaints of alleged brutality filed with the Department, although in most cases the complaints had been withdrawn or the complainants had failed to appear. One officer was the subject of a subsequent unrelated civil action, also charging assault, and both officers were the subject of subsequent unrelated civilian complaints alleging excessive force.

In another case, the City paid $85,000 to settle the claim of a plaintiff who alleged that he was assaulted by several police officers when he came to the verbal defense of a co-worker who was involved in an altercation with the officers. The plaintiff claimed he was hit over the head with night sticks and placed in a detention cell in a semi conscious state without medical attention



Report on Police Misconduct                                    13

for "some time". The record shows that he was incarcerated for five days, although the criminal charges against him were ultimately dismissed. In addition to filing a civil action, plaintiff filed a civilian complaint. The CCRB found that plaintiff's charges of excessive force were substantiated and recommended that disciplinary action be taken, but the Board's findings and recommendation were reversed by the Police Department.

## MONITORING ALL CLAIMS CAN REDUCE POLICE MISCONDUCT AND CITY PAYMENTS.

Police departments can reduce claims of misconduct and related payments by monitoring charges of misconduct and developing appropriate responses to them. Not all charges of misconduct are valid. But by carefully analyzing the data, the Police Department can discover and rectify problems in training or policies, or identify individual officers who need additional training or other assistance or against whom disciplinary action should be taken.

The authors of a recent book on policing have made the point that such data can be effectively utilized in designing police management and training programs to improve police/civilian relations.*

---

*Beyond 911: A New Era for Policing, by Malcolm Sparrow, Mark Moore and David Kennedy, 1990. p. 167. The authors stated that if such information is "fed back into officer training and management, it would be an invaluable aid in narrowing the gap that separates



Report on Police Misconduct                                    14

Until recently the NYPD had no system for automatic monitoring of police officers who had been the subject of civilian complaints. Shortly after the Comptroller's Office began its investigation, the NYPD announced a restructuring of its programs to provide for automatic monitoring of any officer who (a) is found guilty on a civilian complaint by the NYPD; or (b) has accumulated more than four such complaints within a two year period or more than one complaint per year over a four year period, regardless of the ultimate disposition of such complaints. Prior to announcing this new program, the NYPD tolerated a significant number of complaints before taking corrective action. In the Department's own words it would take an "inordinate" number of complaints before an officer was targeted for training.*

<u>POLICE PRACTICE UNTIL NOW HAS BEEN TO MONITOR ONLY CCRB COMPLAINTS.</u>

NYPD's program to control police misconduct has been based on monitoring only complaints filed with the CCRB. The Department believes that these complaints are a good barometer "to assist in

---

police and public."

*Memorandum dated August 13, 1991 from Deputy Commissioner of the Civilian Complaint Investigation Bureau to the Police Commissioner entitled "Investigation by Office of the Comptroller Regarding Scope and Effectiveness of Police Misconduct Programs to Control Incidence of Police Misconduct", p.1; Police Academy Post Entry Level Training Section", p.1; "An analysis of the Reconstituted Civilian Complaint Review Board of The New York City Police Department", p.25.



Report on Police Misconduct                                    15

assessing problems and the need for corrective measures". But complaints filed with the CCRB are not the only barometer and -- looked at alone -- they are not a sufficient barometer.

Under Section 440 of the New York City Charter, the CCRB has the power to "receive, to investigate, to hear and to recommend action upon civilian complaints against members of the police department." The CCRB consists of six public members appointed by the Mayor and six employees of the Police Department appointed by the Police Commissioner. CCRB investigations are conducted by the Civilian Complaint Investigation Bureau (CCIB) of 'the Police Department. Most of CCIB's investigators are police officers.

The most recent data shows that complaints of all types filed with the CCRB have declined slightly, falling four percent from 3,515 in calendar year 1989 to 3,377 in 1990. But, as we've noted, during the same period the number of lawsuits and claims of police misconduct filed in the courts and with the Comptroller's office were on the increase. The number of lawsuits filed increased by 25% from 527 in fy 87 to 659 in fy 91; and the number of claims

---

Fenton v. City of New York, Docket No: 88 Civ. 2651 (EHN) affidavit of Deforrest W. Taylor, Chief of Personnel, NYPD, sworn to July 3, 1990, p. 11.

Civilian complaint data is discussed in a report entitled "Analysis of the Reconstituted Civilian Complaint Review Board" (Feb., 1991) at p. 22, provided to the Comptroller's office by the Department.



Report on Police Misconduct                                16

filed increased by 53% from 977 in fy 87 to 1498 in fy 91.*

As for monitoring and responding to claims and lawsuits, the NYPD reported to the Comptroller's Office that it had relied upon individual Law Department attorneys handling cases to notify it if NYPD policies or procedures are called into question by the facts of a particular case. But there is no policy in the Law Department requiring individual attorneys routinely to review cases and advise the NYPD if there are such problems that need correcting. While individual attorneys may be encouraged to review cases, whether such a review is undertaken in any particular case is a function of the individual attorney's inclination, time and expertise. And when it comes to reviewing individual cases to determine if there are problems concerning individual officers that require NYPD follow-up, in the view of the Law Department that is entirely the responsibility of the Police Department; the Law Department does not advise the Police Department on individual officer follow-up.**

---

*For annual data, see Graphs 1 and 2 at pages 6 and 7 supra.

**The information on Law Department procedures for review of police misconduct cases was provided to the Comptroller's office in a meeting with Law Department representatives on Oct. 3, 1991. As the City's attorney, the Law Department represents the City in civil actions charging police misconduct and may also represent the individual officers charged if the Law Department determines that the officers were acting within the scope of employment and not in violation of any Departmental rules or regulations. This determination is usually made at the commencement of the case, before the parties have proceeded with discovery. The Law Department also will determine whether the City should indemnify the individual officers in the event of a judgment against the officers. The Law Department does not have to make any

Report on Police Misconduct                                    17

Thus, until now there has been no systematic review of lawsuits by either the Law Department or the NYPD and the NYPD has been relying exclusively on data from complaints to the Civilian Complaint Review Board in responding to problems of police misconduct.

PROBLEMS WITH RELYING ONLY ON COMPLAINTS TO THE CCRB AS AN INDEX OF POLICE MISCONDUCT.

Monitoring complaints to the CCRB does not provide a complete picture of police misconduct problems. First of all, it leaves out incidents that may have resulted in claims and/or lawsuits but not complaints to the CCRB. Thus, the NYPD does not have a complete picture of all alleged misconduct.

Second, the decline in civilian complaints may indicate not less police misconduct but less trust of the civilian complaint process. A recent book notes: "Due to growing dissatisfaction with police complaint procedures, a steadily increasing proportion of the public is turning instead to civil litigation."* Critics of the CCRB argue that the Board lacks sufficient authority or

---

determination on indemnification when a case is settled by payment from the City; the majority of cases are resolved by settlement providing for payment only by the City and not providing for any payment to the plaintiff(s) by the officer(s).

Beyond 911. p. 166.

Case 1:12-cv-09205-JMF    Document 1-2    Filed 12/18/12    Page 41 of 50

independence.' CCRB can only recommend, not impose, discipline against an officer. In addition, half of the CCRB consists of Police Department officials and most of the CCIB investigators are police officers.

There is a more important reason for those who are seriously injured or believe they have suffered other damages to pursue litigation -- that is the only way they can get a monetary award. The CCRB can only recommend discipline for police officers -- not compensation for claimants.

Data from claims and lawsuits is readily available to NYPD from the Comptroller's Office and the Law Department. That data, once it is included in NYPD's monitoring system, should be utilized by NYPD to obtain information about misconduct problems.

## CONCLUSION AND RECOMMENDATIONS

In view of the significant sums of money the City has paid in police misconduct cases, the continuing increase in the number of claims and lawsuits alleging police misconduct, and the corrosive effect police misconduct has on police/civilian relations in the City, it is essential that the Police Department monitor and effectively respond to lawsuits and claims as part of its effort to

---

'Statement of Norman Siegel, New York Civil Liberties Union, January 22, 1992.

assess problems and determine the need for corrective measures. In response to our findings, the Law Department and the NYPD have taken a necessary first step in recognizing the need to include data from claims and lawsuits in the NYPD's monitoring program. The following additional steps should be taken by the Department:

- The NYPD should establish a data base which includes notices of claim and civil actions as well as civilian complaints and correlate the data from all three sources.

- The data should be organized by such variables as precinct, commander, type of conduct, characteristics of officers and complainants and any other factors which may be significant in analyzing problems in police/civilian relations.

- The data should be monitored and analyzed on a regular basis to identify the causes of police misconduct.

- The NYPD should use that information to adjust individual officer training and overall policies and procedures to reduce the incidents of police misconduct and City liability for police misconduct cases.

Vincent Gerecitano                                    May 31, 2012

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JABBAR COLLINS,                    )
                                   )
            Plaintiff,             )
                                   )
        vs.                        )  No. 11 CV 00766
                                   )
THE CITY OF NEW YORK;              )
MICHAEL F. VECCHIONE,              )
BRIAN MAHER, STEPHEN               )
BONDOR, SHOLOM TWERSKY,            )
ANTHONY D'ANGELO, MELANIE          )
MARMER, MORGAN J. DENNEHY,)
VIRGINIA C. MODEST, and            )
JODI MANDEL, as employees )
of the Kings County                )
District Attorney's Office)
and Individually, and              )
VINCENT GERECITANO and             )
JOSE R. HERNANDEZ,                 )
Individually and as               )
members of the New York            )
City Police Department,            )
                                   )
            Defendants.            )
-------------------------)

VIDEOTAPED
DEPOSITION OF VINCENT GERECITANO
New York, New York
May 31, 2012


Reported by:
PAMELA J. MAZZELLA
JOB NO. 328079



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway · 19th Floor
New York, NY 10018
www.esquiresolutions.com

Vincent Gerecitano                                    May 31, 2012

12

1           Vincent Gerecitano
2    maybe a one-month course.
3           Q.    Do you still have any of the
4    written materials from that course?
5           A.    No.
6           Q.    And where were you assigned when
7    you became a detective?
8           A.    The same precinct, the 88th
9    Precinct.
10          Q.    And --
11          A.    I had been there, already assigned
12   to the Detective Bureau as a police officer.
13   The promotion came while I was there, so in
14   effect my duties did not change.  I was what
15   they call a white shield detective at the
16   88th Precinct Detective Unit, and then I was
17   promoted.  It had nothing to do with my work
18   though, I just continued working, but now I
19   was a detective.
20          Q.    And how long did you remain
21   assigned as a detective at the 88th Precinct?
22          A.    Until the beginning of 1990.
23          Q.    What happened then?
24          A.    I was transferred to the Brooklyn
25   North Homicide Unit.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

Vincent Gerecitano                                  May 31, 2012

                                                          13

1            Vincent Gerecitano
2       Q.    Had you worked on any homicide
3   cases before that transfer?
4       A.    Yes.
5       Q.    About how many homicide
6   investigations did you work on before that
7   transfer?
8       A.    We're talking from 19 -- I'm just
9   thinking out loud here.  We're talking from
10  approximately 1981, before that transfer, to
11  1990, I would say a minimum of at the
12  precinct level 10 to 15 a year, so over a
13  hundred, not necessarily as a case detective
14  but worked on the case.
15      Q.    And when did you retire from the
16  Police Department?
17      A.    December 31, 1994.
18      Q.    Did you remain assigned to Brooklyn
19  North Homicide from 1990 until your
20  retirement?
21      A.    Yes, sir.
22      Q.    And during that time how many
23  homicide investigations did you work on?
24      A.    That would be a five-year period, a
25  minimum of 25 a year, over a hundred again.



ESQUIRE

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

Vincent Gerecitano                                    May 31, 2012

42

1          Vincent Gerecitano
2    wherever.  In this particular case it is the
3    90 Precinct.
4          Q.    So in this particular case any
5    notes that you took you would have given over
6    to be placed into the folder being kept?
7          A.    In all probability, yes.  Do I
8    remember doing it, no, but that would be a
9    general way of going about it.
10          Once again, also stipulating that
11    trying to take as little notes as possible as
12    the homicide detective for obvious reasons,
13    court, they do not want us to have to go to
14    court.  The case detective seen the exact
15    same thing, it's his case, he goes to court
16    and I move on to the next homicide.
17          Q.    Did you receive any training in
18    what is called the Rosario Rule?
19          A.    Rosario was basically maintaining
20    any notes taken in the course of your
21    investigation.
22          Q.    Well, did you receive any training
23    that any notes taken during the course of an
24    investigation might need to be disclosed to
25    the prosecutor to disclose to the defense?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

43

```
 1            Vincent Gerecitano
 2       A.   Yes.
 3       Q.   I'm sorry?
 4       A.   Yes.
 5       Q.   Did you receive any training in
 6  what is known as the Brady Rule?
 7       A.   The Brady Rule, I don't know what
 8  that is.
 9       Q.   Did you receive any training
10  concerning the vouchering of evidence?
11       A.   I would assume that that was part
12  of the criminal investigation course that all
13  detectives have to take, that there would be
14  vouchering.  And once again, not to keep
15  harping on the same thing, that's the case
16  detective's job, is to voucher anything.
17       Q.   Well, evidence that came into your
18  possession during the course of a homicide
19  investigation, --
20       A.   Uhm-hmm.
21       Q.   -- was it your practice to turn
22  that evidence over to any other individual or
23  office at the Police Department for
24  safe-keeping?
25            MR. LARKIN:   Objection, form.
```



ESQUIRE

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway · 19th Floor
New York, NY 10018
www.esquiresolutions.com

Vincent Gerecitano                              May 31, 2012

309

```
 1          Vincent Gerecitano
 2  could be puking on my desk, what am I going
 3  to say, I'm not going to listen to him?
 4          Q.   Mr. Gerecitano, --
 5          A.   Yes, sir.
 6          Q.   -- did you prepare any document
 7  that contained your observation that Mr.
 8  Oliva was drooling, was very upset, was
 9  crying or was putting his head down?
10          MR. LARKIN:    Form objection.
11      Sorry.
12          A.   None whatsoever.
13          Q.   Did you give that information to
14  the DA's Office when you met with them prior
15  to Mr. Collins' arrest?
16          A.   No.
17          Q.   Did you receive any training from
18  the New York City Police Department
19  concerning any obligation to make a record of
20  that kind of information?
21          MR. LARKIN:    Objection to form.
22          A.   That's on my own.  That's my call.
23  If I feel, if I feel that this man is giving
24  me credible information, then that's the way
25  it is.
```



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway · 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Vincent Gerecitano                                          May 31, 2012

                                                                    310

1          Vincent Gerecitano
2          Now, had I been, had I gone, ever
3    been in a courtroom in this case, which I
4    never have, and you asked me on the stand
5    everything you just asked me, I would have
6    told you the same thing, but it's not going
7    to make me stop putting it down.
8          Q.   Was it consistent with your
9    training by the New York City Police
10   Department that you did not make any record
11   of Mr. Oliva, having been observed by you,
12   drooling, appearing very upset, crying or
13   putting his head down?
14         MR. LARKIN:   Objection to form.
15         A.   It's consistent, it's consistent
16   with anything that I would have ever done.
17   He's a witness, he's telling what he has to
18   do and in the future, if I'm ever on the
19   stand, all I do is tell the truth.  Yes,
20   there was drooling; yes, he put his head
21   down; yes, there was some instances of
22   crying.  he didn't want to be there.  I could
23   understand that.
24         Q.   Was it consistent with your
25   training by the New York City Police



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

311

```
 1          Vincent Gerecitano
 2   Department that you did not make any record
 3   of the observations that you made that
 4   related to the belief that he might be a drug
 5   addict?
 6          MR. LARKIN:    Objection to the
 7      form.
 8      A.    There was no training that I could
 9   think of except I could see somewhere down
10   the road having a conversation with the
11   district attorney saying what the fuck did
12   you put that down for, how do you feel this
13   is relevant, the guy is giving you
14   information and you're knocking him out of
15   the water.  Once again, he is what he is and
16   we'll address that in the future, as simple
17   as that.
18      Q.    Was it consistent with your
19   training with the New York City Police
20   Department taht you did not tell the Brooklyn
21   DA's Office that you would have observed him
22   drooling, appearing very upset, crying and
23   putting his head down?
24          MR. LARKIN:    Form objection.
25      A.    You keep referring to talking to
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com