JOSE HERNANDEZ
JABBAR COLLINS vs. THE CITY OF NEW YORK

July 24, 2012
1

1      UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF NEW YORK
2  -------------------------------------X

   JABBAR COLLINS,
3
                   Plaintiff,
4
                          Civil Action No:
5  VS.                    11-CV-00766

6

   THE CITY OF NEW YORK; MICHAEL F. VECCHIONE,
7  BRIAN MAHER, STEPHEN BONDOR, SHOLOM
   TWERSKY, ANTHONY D'ANGELO, MELANIE
8  MARMER, MORGAN J. DENNEHY, VIRGINIA C.
   MODEST, and JODI MANDEL, as employees
9  of the Kings County District Attorney's
   Office and Individually, and VINCENT
10 GERECITANO and JOSE R. HERNANDEZ,
   Individually and as members of the New York
11 City Police Department,

12                 Defendants.
   -------------------------------------X
13

14

15  VIDEOTAPED DEPOSITION OF JOSE R. HERNANDEZ

16         Tuesday, July 24, 2012

17            New York, New York

18

19

20

21

22

23  Reported By:

24  LINDA J. GREENSTEIN

25  JOB NO. 328873



JOSE HERNANDEZ                                    July 24, 2012
JABBAR COLLINS vs. THE CITY OF NEW YORK                      6

```
 1              JOSE R. HERNANDEZ
 2    Department.  And with me is Arthur Larkin,
 3    also from the New York City Law Department.
 4              JOSE R. HERNANDEZ,
 5    having been first duly sworn, was examined
 6    and testified as follows:
 7    EXAMINATION BY
 8    MR. RUDIN:
 9         Q.    Good morning, Mr. Hernandez.
10         A.    Good morning, sir.
11         Q.    I represent the plaintiff,
12    Jabbar Collins, in a lawsuit that names a
13    number of defendants, including yourself.
14              Are you aware that you've been
15    named as a defendant in the lawsuit?
16         A.    Yes, sir.
17         Q.    And I'm going to today ask you
18    some questions that I believe are relevant
19    to the lawsuit.
20              Do you understand that if I ask
21    you a question that you do not understand,
22    that you may, and in fact, should, ask me
23    to rephrase it?
24         A.    Yes, sir.
25         Q.    Do you understand that if you
```



1              JOSE R. HERNANDEZ

2         A.    Security.

3         Q.    Was that a full-time job?

4         A.    That was a full-time job, yes.

5         Q.    Were you in any union?

6         A.    I don't know if there was a

7    union -- I believe, yes, there was a union.

8         Q.    Do you remember the name of the

9    union?

10        A.    No, I don't.

11        Q.    Were you in the union?

12        A.    I was employed with the security

13   company.  I believe I was in the union.

14        Q.    Well, was your employer the New

15   York Post or was it a private security

16   company?

17        A.    No, it wasn't the Post.  I

18   believe it was IBI Security.

19        Q.    How long were you in that

20   position?

21        A.    Oh, I don't know.  From there, I

22   went to the police department.

23        Q.    So when did you begin with the

24   police department?

25        A.    In '84, January of '84.



1                    JOSE R. HERNANDEZ

2          Q.     When did you retire from the

3     police department?

4          A.     May of 2005.

5          Q.     So you were with the police

6     department a little more than 20 years?

7          A.     21 years.

8          Q.     Was there any period during

9     those 21 years that, for any reason, did

10    not count towards your receiving a pension?

11         A.     No.

12         Q.     You just decided after 21 years

13    that it was time?

14         A.     Right.  I was eligible to retire

15    and I did.

16         Q.     When did you attend the Police

17    Academy?

18         A.     January of '84.

19         Q.     For how long?

20         A.     Approximately six months.  I

21    think it was five months to six months

22    then, time period.

23         Q.     By the way, have you ever been

24    named in any other civil lawsuit?

25         A.     No, sir.



800.211.DEPO (3376)
EsquireSolutions.com

JOSE HERNANDEZ
JABBAR COLLINS vs. THE CITY OF NEW YORK

July 24, 2012
33

```
 1              JOSE R. HERNANDEZ
 2   Mr. Pollack where a supervisor asked you to
 3   do something based on that supervisor's
 4   review of one of your reports?
 5        A.    Not that I recall from this case
 6   here.
 7        Q.    Did you receive any training at
 8   the Police Academy concerning the Brady
 9   rule?
10        A.    I'm sure I did, sir.
11        Q.    Do you recall, as you sit here
12   now, what the Brady rule is?
13        A.    I believe that has to do with --
14   I'm not absolutely sure, it's been some
15   time, so you're going to have to forgive
16   me.
17              With evidence?
18        Q.    I'm asking you.
19        A.    I don't know.  I believe it has
20   to do with evidence and securing that, you
21   know, evidence.
22        Q.    Well, did you receive any
23   training at all while you were at the New
24   York City Police Department concerning the
25   Brady rule?
```

1              JOSE R. HERNANDEZ

2        A.     While at the police department?

3    I'm sure I did, but I just don't recall

4    that.

5        Q.     Did you ever hear of a Supreme

6    Court case called Brady v. Maryland?

7        A.     I can't say that I have.

8        Q.     Did you ever bring any

9    information to the attention of any

10   prosecutor in connection with the

11   prosecution of Mr. Collins that you

12   believed was Brady material?

13       A.     I'm sorry, can you just repeat

14   that question again, sir?

15       Q.     Did you ever bring any

16   information to the attention of any

17   prosecutors in the Jabbar Collins

18   prosecution that you believed was Brady

19   material?

20            MS. KRASNOW:   Objection.

21       A.     I don't remember anything

22   specific that I brought to the DA's office

23   in terms of their attention.

24            In terms of the investigation,

25   whatever I had was turned in.



1                JOSE R. HERNANDEZ

2        Q.      Did you receive any training in

3   addition to what you received at the Police

4   Academy when you became a detective?

5        A.      They have other training courses

6   throughout the years that I attended.

7        Q.      Well, did you receive any

8   training in particular related to being a

9   detective?

10        A.      Yes.

11        Q.      What was that training?

12        A.      I don't recall what their --

13   what the courses were, but there were

14   various other trainings that they had.

15        Q.      Did they take place in any

16   location other than the 90th Precinct?

17        A.      Outside of the 90.  Most of the

18   training was outside of the precinct.

19        Q.      Where?

20        A.      I can't recall where.  Maybe the

21   Police Academy or some other command.

22   Wherever there was space available.

23        Q.      Did you receive any training at

24   the Police Academy or afterwards about how

25   to go about evaluating the credibility of a



1              JOSE R. HERNANDEZ

2    witness?

3         A.    I can't recall if specifically I

4    was trained in terms of that, but I'm sure

5    it was covered.

6         Q.    Well, do you have any

7    recollection of what was covered?

8         A.    No.  No, sir.

9         Q.    Well, did you receive any

10   training at the New York City Police

11   Department concerning whether it was part

12   of your job as a detective to evaluate the

13   credibility of witnesses you interviewed?

14        A.    Again, sir, I can't recall

15   whether that was part of the training or

16   not.

17        Q.    Well, do you recall any training

18   you received about what types of questions

19   to ask a witness in connection with an

20   investigation?

21        A.    I know that I did, but I

22   couldn't tell you when, I couldn't tell you

23   what, because it's been, again, some time.

24        Q.    Well, did you receive any

25   training about whether there were any



1                JOSE R. HERNANDEZ

2    particular factors that you, as a

3    detective, should take into account in

4    evaluating the credibility of a witness?

5            MS. KRASNOW:  Objection.

6        A.    Again, sir, I'm sure that that

7    was something that was covered, but I

8    couldn't tell you when I took that training

9    or what exactly was taught at that time.

10       Q.    Did you receive any training

11   concerning whether or not you should ask

12   questions of a witness in an investigation

13   so that you could determine whether the

14   witness was credible?

15           MS. KRASNOW:  Objection.

16       A.    I know there was training

17   involved in terms of being a detective in

18   terms of asking questions, you know,

19   conducting an interview, taking a

20   statement, recording that statement.

21       Q.    Well, did you receive any

22   training concerning whether or not the

23   consistency of a witness in giving an

24   account of the events in a case was

25   something to take into account in



1              JOSE R. HERNANDEZ

2       Q.    And is that something, if you

3  learned of it, that you would note in a

4  report?

5       A.    Yes, sir.

6       Q.    Now, did you receive any

7  training about whether or not the possible

8  motives of a witness to lie would be

9  something that you would consider in

10  evaluating the credibility of a witness?

11      A.    A possible motive?

12      Q.    Motive to lie.

13      A.    I can't recall whether

14  specifically the police department trained

15  me in terms of looking at that.

16      Q.    Well, did you receive any

17  training about whether or not it might be

18  relevant to the credibility of a witness if

19  the witness was hoping for lenient

20  treatment in connection with the witness'

21  own criminal behavior?

22            MS. KRASNOW:   Objection.

23      A.    I can't say that I received any

24  training in terms of that.

25      Q.    Did you receive any training



```
 1              JOSE R. HERNANDEZ

 2    detective with individuals making

 3    allegations against other individuals,

 4    where you learned that a motivating factor

 5    was a grudge or a bias against the

 6    individual being accused?

 7         A.    No, I can't say that -- you're

 8    asking me again, did I receive training in

 9    regards to that.  I probably did, but I

10    can't recall.

11         Q.    Well, was that something that

12    you would take into account at the time of

13    the Pollack investigation when you were

14    interviewing witnesses?

15         A.    Yes, sir.

16         Q.    Is that something you would note

17    in a report if you learned that

18    information?

19         A.    Yes, sir.

20         Q.    Is that something you would

21    investigate if it occurred to you that it

22    was a possibility?

23         A.    Yes, sir.

24         Q.    Did you receive any training at

25    the police department prior to your
```

1                    JOSE R. HERNANDEZ

2     involvement in the Pollack investigation

3     concerning whether or not the history of a

4     witness in committing criminal acts was

5     something for you to consider in evaluating

6     the witness' credibility?

7          A.    I can't say that I did.  I can't

8     say that I received any training in regards

9     to that.

10         Q.    At the time of your involvement

11    in the Pollack homicide investigation, was

12    the history of a witness committing

13    criminal behavior something that you

14    attempted to find out for the purpose of

15    evaluating the witness' credibility?

16         A.    I don't understand the question,

17    sir.

18         Q.    At the time of your involvement

19    in the Pollack homicide investigation, was

20    finding out the criminal history of a

21    witness something that you attempted to do

22    in order to evaluate the witness'

23    credibility?

24              MS. KRASNOW:  Objection.

25         A.    Yes, sir.



JOSE HERNANDEZ                                      July 24, 2012
JABBAR COLLINS vs. THE CITY OF NEW YORK                      44

```
 1              JOSE R. HERNANDEZ
 2       Q.    And if you learned that the
 3   witness had a history of committing
 4   criminal acts, is that something you would
 5   record in a DD5?
 6            MS. KRASNOW:   Objection.
 7       A.    I would record it.
 8       Q.    Did you receive any training at
 9   the police department about the
10   significance to evaluating a witness'
11   credibility of the witness' involvement in
12   using drugs?
13       A.    I can't say I received any
14   training in regards to a witness using
15   drugs.
16       Q.    Well, did you receive any
17   training at the police department prior to
18   your involvement in the Pollack
19   investigation of whether or not it was
20   significant in evaluating a witness'
21   credibility to learn that the witness was a
22   drug addict?
23       A.    Whether I received training in
24   regards to that?  I can't say that I did,
25   sir.
```



1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
3  ------------------------------------------X
   ZAHER ZAHREY,
4
                                    Plaintiff,
5  **ORIGINAL**        -against-

6  THE CITY OF NEW YORK; THE COUNTY OF KINGS,
7  HOWARD SAFIR, as Commissioner of the New York
   City Police Department; CHARLES HYNES, as
8  District Attorney, Kings County; ROBERT
   BOYCE, KELLY WIRTH, MICHAEL McWILLIAMS,
9  MICHAEL WELSOME and JOHN DOES 1-3, as members
   of the New York City Police Department and
10 individually; THERESA CORRIGAN, CHARLES GURIA
   and DENNIS HAWKINS, as employees of the
11 District Attorney's Office of Kings County
   and individually, and MARTIN E. COFFEY,
12
                                    Defendants.
13 ------------------------------------------X

14                       110 East 59th Street
                         New York, New York
15
                         December 14, 2000
16                       12:10 p.m.

17

18        EXAMINATION BEFORE TRIAL of THE

19  CITY OF NEW YORK, one of the Defendants

20  herein, by PAUL AMUNDSON, taken by the

21  Plaintiff, pursuant to Notice.

22

23                  ARISTA COURT REPORTING CO.
                     192 Lexington Avenue
24                        Suite 802
                    New York, New York 10016
25                     (212) 684-6100

2

2 A P P E A R A N C E S :

3

4 JOEL B. RUDIN, ESQ.
 Attorney for Plaintiff
5    110 East 59th Street
    New York, New York  10022
6

7

  MICHAEL D. HESS, ESQ.
8 Corporation Counsel
    100 Church Street
9    New York, New York  10007
  BY: PAUL ARONSON, ESQ.,
10    Assistant Corporation Counsel

11

12 UNITED STATES DEPARTMENT OF JUSTICE
  UNITED STATES ATTORNEY'S OFFICE
13 SOUTHERN DISTRICT OF NEW YORK
  Attorneys for the Witness
14    100 Church Street
    New York, New York 10007
15 BY: DAVID S. JONES, ESQ.
    Assistant United States Attorney

16

17

18

19

20

21

22

23

24

25

3

## STIPULATIONS

2

3

4

5        IT IS HEREBY STIPULATED AND

6    AGREED by and between the attorneys for the

7    respective parties hereto that the sealing,

8    filing and certification of the transcript of

9    the within examination before trial be, and

10   the same hereby are waived.

11

12        IT IS FURTHER STIPULATED AND

13   AGREED that said transcript may be signed and

14   sworn to before any Notary Public or

15   Commissioner of Deeds with the same force and

16   effect as if signed and sworn to before an

17   officer of this Court;

18

19        IT IS FURTHER STIPULATED AND

20   AGREED that all objections, except as to the

21   form of the questions, are reserved to the

22   time of the trial.

23

24

25

ARISTA COURT REPORTING CO.   (212) 684-6100

4

2          P A U L    A M U N D S O N, having been duly

3                          sworn by a Notary Public within

4                          and for the State of New York,

5                          and having stated his business

6                          address as One Police Plaza,

7                          New York, New York 10038,

8                          was examined and testified

9                          under oath as follows:

10     EXAMINATION BY MR. RUDIN:

11          Q     Inspector, my name is Joel Rudin

12     and I represent the Plaintiff in this civil

13     damage action, Zaher Zahrey.

14          A     Right.

15          Q     I am going to ask you a series

16     of questions that I believe are relevant to

17     the issues in the lawsuit.  If I ask you a

18     question that you do not understand or that

19     you would like me to clarify, do you

20     understand that you may and, in fact, should

21     ask me to either rephrase or to clarify the

22     question?

23          A     Yes.

24          Q     If you provide an answer that

25     upon reflection you believe is incomplete or

ARISTA COURT REPORTING CO.  (212) 684-6100

5

```
 1                      P. Amundson
 2     inaccurate in some way, do you understand
 3     that you may and, in fact, should correct
 4     your answer?
 5              A      I understand.
 6              Q      Is there any reason why you are
 7     not able to give your best recollection of
 8     the events relating to the Zahrey case this
 9     morning?
10              A      No.
11              Q      Have you had the opportunity to
12     prepare for your deposition today with your
13     attorney, Mr. Aronson?
14              A      I have spoken to him once, which
15     was Tuesday?
16                   MR. ARONSON:   Tuesday.
17              A      Tuesday.
18              Q      For about what period of time?
19              A      Maybe two hours, tops.  Yeah,
20     about two hours.
21              Q      Before you met with him, did you
22     review any documents?
23              A      Before?
24              Q      Yes.
25              A      No.
```

6

```
 1                      P. Amundson
 2           Q     Did you review any documents
 3    while you met with him?
 4           A     Yes, I did.
 5           Q     Do you remember the types of
 6    documents that you reviewed?
 7           A     There was some work sheets that
 8    I reviewed, there was a deposition by Deputy
 9    Inspector Welsome, I read through that, and
10    there were depositions from Sergeant Wirth,
11    and I briefly looked at that.
12           Q     What is your present position
13    with the New York City Police Department?
14           A     I'm an inspector in the
15    detective bureau, I'm the executive officer
16    of Queens detectives.
17           Q     Which is easier for you, because
18    I want to go through your history at the
19    police department, is to go backwards or
20    start at the back and go forwards?
21           A     If I can look at a note, I can
22    give you my history --
23           Q     Fine.
24           A     -- is that okay?
25           Q     Yes.
```

```
 1                    P. Amundson
 2          A     I was a police officer, I was
 3     appointed in actually February 4th of '74, I
 4     worked as a police officer in the 112th
 5     Precinct in Queens for, I guess it was, less
 6     than a year, and the rest of my time was
 7     spent in the 44th Precinct in the Bronx, that
 8     was up until June 23rd of '82. At that time,
 9     I was promoted to sergeant on July 24, '82,
10     the gap in the date is because you go to what
11     they call a BMOC course, a training course,
12     and then you're actually promoted, and I was
13     assigned to the 9th Precinct. I was there
14     until November 14th of '82, and then I was
15     transferred to the 6th Precinct on November
16     15th of '82, and I stayed there until October
17     20th of '86. During that period of time, I
18     was promoted to lieutenant. In the rank of
19     lieutenant, I went to narcotics from October
20     21, '86 until June 15th of '89 as a
21     lieutenant, I was then promoted to captain on
22     June 16th of '89 and I went to Midtown South
23     Precinct and I was assigned there until 12/19
24     of '90. I then went as a captain to Brooklyn
25     North TNT from 12/20/90 to 6/1/92. I then
```

8

```
1                    P. Amundson
2       went as a captain to Queens TNT from 6/2/92
3       to 5/31/93.  At that time, I was transferred
4       to the 40th Precinct as a commanding officer,
5       40 is in the Bronx, that was from 6/1/93 to
6       3/26/95.  During my tenure in the 40th
7       Precinct, I was promoted to deputy
8       inspector.  On 3/27/95 until 7/14/96 I was
9       assigned to Internal Affairs, I was the
10      commanding officer of the Brooklyn/Staten
11      Island office.  On 7/15 of '96, I was
12      transferred to the detective bureau as the
13      commanding officer of the fugitive
14      enforcement division, which was a division
15      that actually did not exist at the time that
16      I actually established and set it up, and I
17      stayed there until 5/4 of '98, to May 4th
18      of '98.  On May 4th of '98, I was transferred
19      as a deputy inspector to my present position
20      in Queens detectives, and I have been
21      promoted since then to full inspector.
22            Q      While you were assigned to
23      Brooklyn North TNT, did you have occasion to
24      meet Detective Zahrey?
25            A      Yes.
```

1                    P. Amundson

2    as of May 2, 1996 that the United States

3    Attorney's office was being asked to take

4    over the case of Detective Zahrey?

5         A    I don't know that.

6         Q    Did you receive any training

7    once you were assigned to the Internal

8    Affairs Bureau about practices or procedures

9    at that bureau?

10             MR. JONES:  Objection to form.

11        A    Are you talking about formal

12   training, like to go to a course?

13        Q    Yes.

14        A    No.

15        Q    Did you receive any informal

16   training?

17        A    Could you clarify "informal"?

18        Q    Rather than have me categorize

19   it like that, did you receive any of what you

20   would consider to be training in any form

21   while you were assigned to Internal Affairs?

22        A    Formal training as to going to a

23   course?  No.

24        Q    Any other type of training?

25        A    I don't know of any other type

ARISTA COURT REPORTING CO.  (212) 684-6100

1                    P. Amundson

2     of training other than going to a course or,

3     you know...

4          Q     You asked about informal

5     training, so I am --

6          A     I didn't know what you meant by

7     "informal" training.

8          Q     I am asking whether or not you

9     got any training other than formal training.

10         A     I didn't get any formal

11    training, I didn't go to any courses while I

12    was at Internal Affairs.

13         Q     Have you ever heard of a case

14    called Brady against Maryland?

15         A     No.

16         Q     Have you ever heard of something

17    called Brady material?

18         A     Yes.

19         Q     What is your understanding of

20    what Brady material is?

21         A     I can't recall.

22         Q     Did you ever receive any

23    training at any time at the police department

24    about the subject of Brady material?

25         A     It doesn't ring a bell.

1

<pre>
 1

 2              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 3              - - - - - - - - - - - - - - - - - - - - - - -x
                ZAHER ZAHREY,
 4
                                    Plaintiff,
 5
                        - against -
 6
                THE CITY OF NEW YORK; THE COUNTY OF
 7              KINGS, HOWARD SAFIR, as Commissioner of
                the New York City Police Department;
 8              CHARLES HYNES, as District Attorney, Kings
                County; ROBERT BOYCE, KELLY WIRTH, MICHAEL
 9              WELSOME and JOHN DOES 1-3, as members of
                the New York City Police Department and
10              individually; THERESA CORRIGAN, CHARLES
                GURIA and DENNIS HAWKINS, as employees of
11              the District Attorney's Office of Kings
                County and individually, and MARTIN E.
12              COFFEY,

13                                  Defendants.
                - - - - - - - - - - - - - - - - - - - - - - -x
14
                                    598 Madison Avenue
15                                  New York, New York

16                                  June 7, 1999
                                    10:00 a.m.
17

18                   EXAMINATION BEFORE TRIAL of

19              KELLY H. WIRTH, s/h/a KELLY WIRTH, one of

20              the Defendants herein, taken by the

21              Plaintiff, pursuant to Order.

22
                             ARISTA COURT REPORTING CO.
23                             192 Lexington Avenue
                                   Suite 802
24                          New York, New York   10016
                               (212) 684-6100
25

                ARISTA COURT REPORTING, CO.    (212) 654-6100
</pre>

2

```
 1

 2        A P P E A R A N C E S:

 3
          JOEL B. RUBIN, ESQ.
 4        Attorney for Plaintiff
                  598 Madison Avenue
 5                New York, New York 10022

 6

 7        MICHAEL D. HESS
          Corporation Counsel
 8                100 Church Street
                  New York, New York 10007
 9
          BY:   PAUL ARONSON, ESQ.
10                Assistant Corporation Counsel

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

ARISTA COURT REPORTING, CO.    (212) 654-6100

```
 1                         Wirth
 2              K E L L Y   H.   W I R T H, having been
 3                      first duly sworn by a Notary Public
 4                      within and for the State of New
 5                      York, stated his business address
 6                      as 300 Gold Street, Brooklyn, New
 7                      York, was examined and testified
 8                      under oath as follows:
 9
10                      (Multiple documents are marked
11                   Plaintiff's Exhibits 1 through 19 for
12                   identification, as of this date.)
13
14       EXAMINATION BY MR. RUBIN:
15              Q      What is your name?
16              A      Kelly H. Wirth.
17              Q      What is your business address?
18              A      It is 300 Gold Street, Brooklyn,
19       New York.
20              Q      Mr. Wirth, my name is Joel Rubin.
21       I am representing the plaintiff in this civil
22       damage action, Zaher Zahery.
23                      The purpose of this deposition is
24       for me to ask you a series of questions
25       designed to illicit information relevant to the
             ARISTA COURT REPORTING, CO.    (212) 654-6100
```

5

```
 1                          Wirth
 2      lawsuit; do you understand that?
 3              A     Yes, I do.
 4              Q     If I ask you a question that you
 5      do not understand, do you understand that you
 6      have the right, and, in fact, should ask me to
 7      clarify the question so that you do understand
 8      it?
 9              A     Yes, I do.
10              Q     If you give an answer, and upon
11      reflection you realize it is incomplete or
12      inaccurate, do you understand that you have a
13      right and, in fact, that you have to correct or
14      complete your answer?
15              A     Yes, I do.
16              Q     Is there any reason why you are
17      not able to answer the questions I am going to
18      you ask you today to the best of your ability?
19              A     There is no reason.
20              Q     Is there any medical reason or any
21      other reason?
22              A     No.
23              Q     Mr. Wirth, you are employed by the
24      New York Police Department; is that correct?
25              A     That is correct, yes.
```

ARISTA COURT REPORTING, CO.    (212) 654-6100

6

```
 1                          Wirth
 2              Q      What is your present position?
 3              A      Sergeant in cold case one.
 4              Q      How long have you been in that
 5    position?
 6              A      Two years.
 7              Q      Do you remember the approximate
 8    date that you were transferred to that
 9    position?
10              A      It was -- I think it was June 4,
11    1997.
12              Q      Before that where were you
13    employed?
14              A      I was assigned to the Internal
15    Affairs Bureau.
16              Q      How long were you with the I.A.B.?
17              A      From May of 1995 until June 4,
18    1997.
19              Q      Do you know why you were
20    transferred?
21              A      That's just a routine procedure
22    that they do every two years in Internal
23    Affairs, and you move on to another assignment.
24              Q      Where were you before Internal
25    Affairs?
```

ARISTA COURT REPORTING, CO.    (212) 654-6100

```
1                        Wirth
2           A       Internal patrol supervisor in the
3    40th Precinct from February of 1993 to May of
4    1995.  My duties up there were to supervise
5    patrol people.  Also, I was the assistant
6    integrity patrol officer, with the
7    responsibility of monitoring approximately 250
8    police officers.
9           Q       In the 40th Precinct?
10          A       Yes.
11          Q       How long did you hold the position
12   of assistant integrity patrol officer?
13          A       About 18 months.
14          Q       Where were you before the 40th
15   Precinct?
16          A       I was a detective, second grade in
17   the Chief of Detective's Office.
18          Q       Do you remember from what --
19          A       From 1987 to 1993.
20          Q       Chief of detective's for the city
21   or for a bureau?
22          A       For the city.
23          Q       What did you do in that position?
24          A       My position was to investigate
25   misconduct and corruption of detectives.
```

8

1                        Wirth

2            Q      What were your day-to-day

3     responsibilities in that position?

4            A      What do you mean, sir?

5            Q      Were you involved in some manner

6     in specific investigations of particular

7     detectives?

8            A      Yes.

9            Q      Were you a supervisor of those

10    investigations or were you handling them

11    yourself?

12           A      I wasn't a supervisor on those

13    investigations.

14           Q      You were actually handling

15    specific investigations in the field?

16           A      I would work with a supervisor,

17    and then we would investigate the matter

18    involved.

19           Q      Were any of the detectives that

20    you were involved in investigating between 1987

21    and 1993 actually dismissed from the police

22    force?

23           A      Yes.

24           Q      About how many?

25           A      I really cannot approximate.  But,

26

1                          Wirth

2            Q      Was there any relation between the

3      Zahrey investigation and the Franky Alvarez

4      investigation?

5            A      The one witness that we had in the

6      Zahrey investigation, Ralph Bencebi.

7            Q      Ralph Bencebi provided information

8      about Franky Alvarez?

9            A      Yes.

10           Q      Did you receive any training at

11     I.A.B. concerning how to evaluate information

12     provided by a confidential source regarding

13     prior criminal activity?

14           A      From I.A.B.?

15           Q      Yes.

16           A      No.

17           Q      Did you receive any training at

18     the police department prior to your term at

19     I.A.B. concerning how to evaluate information

20     about prior criminal activity provided by a

21     confidential source?

22           A      There might have been one segment

23     when I was in the O.C.C.B., public morals

24     division, that dealt with informant.

25           Q      What year would that have been?

ARISTA COURT REPORTING, CO.    (212) 654-6100

1                          Wirth

2             A      In 1986.

3             Q      In 1986?

4             A      That is correct.

5             Q      What was the nature of the

6      training that you received in that one segment?

7             A      I don't recall.

8             Q      Was that training at some sort of

9      formal course?

10            A      Yes.  When you go into the

11     organized crime control bureau, it covers three

12     aspects of investigations.  It's auto crime,

13     narcotics and public morals.  I was assigned to

14     the public morals division.

15                   There is a three- or four-day

16     course when you first enter, and they explain

17     the procedures in O.C.C.B., and I do recall

18     there was one small segment that dealt with

19     informants.

20            Q      What do you mean by a "small

21     segment"?

22            A      It might have been a couple hours.

23            Q      Did you receive any training

24     materials during the course of that small

25     segment or training?

ARISTA COURT REPORTING, CO.    (212) 654-6100

28

|   |   |   |
|---|---|---|
| 1 |   | Wirth |
| 2 | A | There might have been some |
| 3 | paperwork. |   |
| 4 | Q | Do you still have it? |
| 5 | A | I do not have that paper work. |
| 6 | Q | Did you have it at the time that |
| 7 | you went to I.A.B.? |   |
| 8 | A | No. |
| 9 | Q | Did you have any written materials |
| 10 | at the time from when you went to I.A.B. |   |
| 11 | concerning departmental rules, regulations or |   |
| 12 | policies for dealing with and evaluating |   |
| 13 | confidential source of information? |   |
| 14 | A | Not that I recall. |
| 15 | Q | Other than what you have just told |
| 16 | us about this training you have had at |   |
| 17 | O.C.C.B., public morals division, have you |   |
| 18 | received any training during your employment of |   |
| 19 | the New York City Police Department how to |   |
| 20 | evaluate confidential sources of prior or |   |
| 21 | historical information regarding criminal |   |
| 22 | activity? |   |
| 23 | A | I don't recall any other training. |
| 24 | MR. ARONSON:  When you say |   |
| 25 | "training," are you saying formal |   |

ARISTA COURT REPORTING, CO.   (212) 654-6100

```
 1                         Wirth

 2           training courses or are you including

 3           other kinds of training?

 4                Q      That question dealt with formal

 5      training or sources.

 6                A      Correct.

 7                Q      Your answer is?

 8                A      I don't recall any other training.

 9                Q      Do you recall any other training

10      or anything else you would consider training

11      besides formal courses?

12                A      It would be life style training in

13      the job.  While you're working, you're working

14      with an experienced person.

15                Q      You would learn from watching

16      others deal with confidential sources of

17      information, how to deal with them?

18                A      You would watch them and see how

19      it's done.

20                Q      Was is your understanding that

21      they received the same type of training that

22      you did?

23                A      I really don't know.  I couldn't

24      answer that.

25                Q      In the course of the investigation
```

ARISTA COURT REPORTING, CO.    (212) 654-6100

```
1                        Wirth
2      of Detective Zahrey, would it be fair to say
3      that you and other detectives subpoenaed
4      various records regarding his financial
5      situation?
6           A     Yes, subpoenas were issued
7      regarding his financial records.
8           Q     Would it be fair to say that you
9      were trying to determine, among others things,
10     whether he had any income that might have
11     resulted from criminal activity?
12          A     I don't understand exactly what
13     you mean by "income."
14          Q     Were you investigating, among
15     other things, whether or not he had received
16     any moneys that resulted from some form of
17     illegal activity?
18          A     Yes.
19          Q     Would it be fair to state that in
20     your experience as a detective investigating
21     possible police corruption, you have, from time
22     to time, investigated the financial background
23     of the police officers you were investigating
24     to see whether they may have received moneys
25     improperly from some form of criminal activity?
```

1                          Wirth

2          A      That's like a long drawn out

3     question.  Could you just shorten it up?

4          Q      You did not understand the

5     question?

6          A      If I investigate other members of

7     the service and obtained their financial

8     record?

9          Q      Yes.

10         A      Yes.

11         Q      What were the reasons that you

12    obtained financial type information regarding

13    officers you were investigating?  The range of

14    reasons.  I am not asking you about any

15    particular case, but in general.

16         A      To ascertain where certain moneys

17    they were receiving and how they were receiving

18    it.

19         Q      To ascertain whether or not they

20    received moneys that they should not have been

21    receiving?

22         A      Yes.

23         Q      To ascertain whether or not they

24    received moneys from criminal activity?

25         A      Well, to ascertain if they were

ARISTA COURT REPORTING, CO.    (212) 654-6100

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
ZAHER ZAHREY,                                    :

                            Plaintiff,           :

            -against-                            :

THE CITY OF NEW YORK; THE COUNTY OF KINGS;       :
HOWARD SAFIR, as Commissioner of the New
York City Police Department; CHARLES HYNES,      :
as District Attorney, Kings County; ROBERT
BOYCE, KELLY WIRTH, MICHAEL McWILLIAMS,
MICHAEL WELSOME and JOHN DOES 1-3, as
members of the New York City Police              :
Department and individually; THERESA
CORRIGAN, CHARLES GURIA and DENNIS HAWKINS,      :
as employees of the District Attorney's
Office of Kings County and individually;         :
and MARTIN E. COFFEY,
                                                 :
                            Defendants.
------------------------------------------x

                    598 Madison Avenue
                    New York, New York

                    October 5, 1999
                    11:00 a.m.


        EXAMINATION BEFORE TRIAL of ROBERT

BOYCE, one of the Defendants herein, taken by

the Plaintiff, pursuant to Notice.


                ARISTA COURT REPORTING CO.
                   192 Lexington Avenue
                       Suite 802
                New York, New York  10016
                     (212) 684-6100

```
 1                                                          2

 2          A P P E A R A N C E S :

 3

 4          JOEL B. RUDIN, ESQ.
            Attorney for Plaintiff
 5               598 Madison Avenue
                 New York, New York  10022
 6

 7

            MICHAEL D. HESS, ESQ. .
 8          Corporation Counsel
                 100 Church Street       .
 9               New York, New York  10007
            BY:    PAUL ARONSON, ESQ.
10               Assistant Corporation Counsel

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                              Boyce                        4

 2     R O B E R T      B O Y C E,   one of the

 3                  Defendants herein, business address 1000

 4                  Sutter Avenue, Brooklyn, New York 11201,

 5                  after having been first duly sworn by a

 6                  Notary Public of the State of New York,

 7                  testified as follows:

 8     EXAMINATION BY MR. RUDIN:

 9                  Q      State your name for the record,

10     please.

11                  A      Robert Boyce.

12                  Q      State your address for the

13     record, please.

14                  A      1000 Sutter Avenue, Brooklyn, New

15     York 11201.

16                  Q      Captain Boyce, my name is Joel

17     Rudin.  I represent the plaintiff in this

18     civil damage action, Detective Zaher Zahrey.

19     I am going to be asking you a series of

20     questions today that relate to issues in the

21     lawsuit.  Do you understand that?

22                  A      Yes, I do.

23                  Q      Do you understand that if I ask a

24     question that you do not understand or would

25     like to have clarified, you may and, in fact,
```

Boyce                                    19

1

2      training was, the substance of what you

3      understood you were supposed to do?

4              A      Put down whatever the complainant

5      had told us, the facts of the case, the basic

6      facts of the case, and to transcribe them onto

7      a complaint report.

8              Q      Had you received any training

9      concerning what kind of information to put

10     down when you spoke to other witnesses about a

11     particular complaint?

12             A      As I said, the Police Academy.

13             Q      What was that training?  What was

14     the substance of what you understood you were

15     supposed to do?

16             A      To put down the facts of the

17     crime, any details, fill out the description

18     of the perpetrators, put down the basic facts

19     of the crime.

20             Q      Anything else?

21             A      Put the times, the complainant's

22     name, address, things of that nature.  That's

23     what you put in; any property that was taken.

24             Q      Prior to your transfer to IAB,

25     had you received any training within the

ARISTA COURT REPORTING CO.   (212) 684-6100

```
 1                          Boyce                    20

 2          Police Department concerning your obligations

 3          under Brady v. Maryland (phonetic)?

 4               A      No.

 5               Q      Did you have --

 6               A      Excuse me.  Can you explain what

 7          Brady v. Maryland is?

 8               Q      Have you ever heard of Brady v.

 9          Maryland before?

10               A      Not distinctly.

11               Q      What is your understanding?

12               A      Evidence decision.

13               Q      I am asking you for your

14          understanding.

15               A      Well, that's all I know.

16               Q      Prior to your transfer to IAB,

17          had you ever received any training within the

18          Police Department concerning the obligation of

19          a police officer during the course of an

20          investigation to record information favorable

21          to the suspect, to show that the suspect may

22          not have committed the crime?

23               A      Can you say that again.

24               MR. RUDIN:  Can you read that

25               back, please.
```

ARISTA COURT REPORTING CO.   (212) 684-6100

```
 1                          Boyce                    21
 2                 (Whereupon, at this time, the
 3            requested question was read by the
 4            reporter.)
 5            A      No.
 6            Q      Do you understand the Rosario
 7       Rule (phonetic)?
 8            A      Yes.
 9            Q      What is your understanding of the
10       Rosario Rule?
11            A      Any notes that are taken during
12       the course of an investigation, any written
13       documents have to be turned over to defense
14       counsel.
15            Q      When did you become aware of the
16       Rosario Rule?
17            A      I can't tell you that.  I don't
18       remember the year.
19            Q      Were you aware of it as of the
20       time you were transferred to IAB?
21            A      Yes.
22            Q      Was there any training at the
23       Police Department concerning that a police
24       officer should not record certain information
25       in his reports because of the awareness that
```

```
 1                          Boyce                    22

 2      those reports have to be turned over to

 3      defense counsel?

 4              A       Was there training to that?

 5              Q       Yes.

 6              A       No.

 7              Q       Did you have any understanding,

 8      based on practices that you were aware of at

 9      the Police Department, to not record certain

10      information in police reports because of your

11      awareness that at a later date they might have

12      to be turned over to defense counsel?

13              A       No.

14              Q       After you were transferred to

15      IAB, did you receive any additional training

16      of any kind?

17              A       Yes.

18              Q       What was that training?

19              A       Internal investigator's course.

20              Q       Did you take that with other

21      police officers?

22              A       Yes.

23              Q       When did you take that course?

24              A       I don't recall the dates.

25              Q       Did you take that course before
```

```
                              Boyce                    30
1
2          Q      What was your understanding as to
3     how detailed these work sheets were supposed
4     to be?
5          A      My training was to state the sum
6     and substance of any investigative step or
7     interview that may have transpired.
8          Q      Did you receive any training at
9     IAB concerning your obligation, if any, to
10    record information in work sheets that tended
11    to show that the suspect under investigation
12    was not guilty of the matter being
13    investigated?
14         A      No.
15         Q      Did you receive any training at
16    IAB concerning the obligation, if any, to
17    record in work sheets the fact that a witness
18    making accusations against an officer has
19    given inconsistent versions of a story over a
20    period of time?
21         A      Can you repeat that.
22             MR. RUDIN:  Can you read it back.
23             (Whereupon, at this time, the
24         requested question was read by the
25         reporter.)
```

<pre>
 1                            Boyce                        31

 2            A      No.

 3            Q      Prior to your transfer to IAB,

 4      had you received any training at the New York

 5      City Police Department concerning how to

 6      question cooperating witnesses or informants

 7      providing information against or concerning

 8      criminal suspects?

 9            A      The training that I received is

10      on the job.

11            Q      What was that training?

12            A      Just that we take street sources

13      or something of that nature and use that

14      information to aid in the investigation or any

15      arrest that we may have.

16            Q      How were you supposed to obtain

17      the information from the street source?

18            A      Any contact we may have had.

19            Q      How were you supposed to elicit

20      information from the source?

21            A      Elicit through an interview.

22            Q      Did you receive any training

23      about how to conduct that interview?

24            A      Prior to IAB?

25            Q      Yes.
</pre>

1                           Boyce                        32

2            A       Through OCCB.

3            Q       What was that training?

4            A       It was a two-week training

5      course.

6            Q       What was the substance of your

7      training concerning how to question

8      informants?

9            A       I don't really recall exactly

10     what the training was.

11           Q       Do you have anything that might

12     refresh your recollection about what training

13     you received?

14           A       No.

15           Q       Did you receive any training at

16     IAB concerning how to question informants?

17           A       Yes.  I believe it was in the

18     basic management course -- well, questions

19     dealing with confidential informants.

20           Q       What was your training at IAB

21     about how to question confidential informants?

22           A       Dealing with them, how to

23     register, whether they were paid informants or

24     informants that were giving evidence for court

25     consideration, things of that nature.

```
 1                          Boyce                    33

 2            Q      Did you receive any training at

 3      IAB, whether on-the-job or more formally,

 4      concerning how to question informants giving

 5      evidence for court consideration?

 6            A      I received training for it, but

 7      the specifics of the training, I don't recall.

 8            Q      Where did you receive that

 9      training?

10            A      IAB and OCCB.

11            Q      When you received the training at

12      OCCB and questioned informants who were

13      seeking court consideration, did you receive

14      any written materials to refer to?

15            A      I don't recall.

16            Q      At IAB, did you receive any

17      written materials regarding questioning of

18      informants seeking court consideration?

19            A      I don't recall that either.

20            MR. RUDIN:  I would ask that the

21            City produce any training materials at

22            IAB or OCCB during the period that

23            Captain Boyce was trained, concerning

24            the questioning of informants who were

25            seeking court consideration.
```

ARISTA COURT REPORTING CO.  (212) 684-6100

Boyce                                    34

1
2      MR. ARONSON:  I think in your
3   discovery you requested certain training
4   materials.  I think we have objected to
5   certain IAB materials, and then we
6   provided other materials, so I will take
7   your request under advisement.
8      MR. RUDIN:  I do not believe you
9   provided any IAB materials, and that
10  will be an issue that we will have to
11  address.  I know we are not going to
12  settle it now.
13     Q     Did you receive any training
14  anywhere while you have been employed at the
15  Police Department concerning how to evaluate
16  the truthfulness of information obtained by
17  someone who was seeking court consideration?
18     A     As I stated, in those two
19  courses, that's my recollection.  Any training
20  I received was from IAB and OCCB.
21     Q     What was the training that you
22  received from OCCB concerning how to evaluate
23  the truthfulness of an informant seeking court
24  consideration?
25     A     I don't recall exactly what the

ARISTA COURT REPORTING CO.   (212) 684-6100

1                              Boyce                    35

2    training was.

3              Q      Do you recall generally what the

4    training was?

5              A      Just, as I stated before, signing

6    up, dealing with informants, paying them,

7    court consideration, things of that nature.

8              Q      Did you receive any further

9    training about how to go about evaluating

10   whether such a person was given information

11   that was truthful or not truthful?

12             A      I don't recall that.

13             Q      Did you receive any training at

14   IAB concerning how to go about evaluating

15   whether or not an informant seeking court

16   consideration is giving information that was

17   truthful or not truthful?

18             A      I don't recall the specifics of

19   the training.

20             Q      Do you recall in general what the

21   training was?

22             A      Not really, no, just that we --

23   it was touched on, but I don't recall the

24   specifics of it, of the training.

25             Q      Whatever it was, it did not make

```
 1                          Boyce                    36

 2         much of an impression?

 3              A      That's not true.

 4              Q      What I am trying to get at is

 5         what your understanding was during the period

 6         that you were conducting the Zahrey

 7         investigation of how you were supposed to go

 8         about evaluating the credibility of someone

 9         like Sidney Quick, who was seeking court

10         consideration in exchange for his information?

11              A      I don't recollect, so I can't

12         answer that question, sir.

13              Q      If you had the course material

14         that you were provided at IAB, would that

15         possibly refresh your recollection?

16              A      I don't know, because I don't

17         recall the handouts or any material that may

18         have been given.  I don't remember.

19              Q      If you were given handouts on

20         that subject, do you think those handouts

21         might refresh your recollection about what

22         training you were given concerning how to

23         evaluate the truthfulness of informants given

24         court consideration?

25                     MR. ARONSON:  Can you run that by
```

1                                                               1

2      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
3      - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

4      ZAHER ZAHREY,

5                          Plaintiff,

6                     - against -

7      THE CITY OF NEW YORK; THE COUNTY OF KINGS;
       HOWARD SAFIR, as Commissioner of the New
8      York City Police Department;  CHARLES HYNES,
       as District Attorney, Kings County;  ROBERT
9      BOYCE, KELLY WIRTH, MICHAEL McWILLIAMS, MICHAEL
       WELSOME and JOHN DOES, 1-3, as members of the
10     New York City Police Department and
       individually; THERESA CORRIGAN, CHARLES
11     GURIA and DENNIS HAWKINS, as employees of the
       District Attorney's Office of Kings County and
12     individually; and MARTIN E. COFFEY,

13                          Defendants.

14     - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                          110 East 59th Street
15                        New York, New York, 10022

16                        September 27, 2000
                          10:30 a.m.
17

18

19          EXAMINATION BEFORE TRIAL of MICHAEL
       McWILLIAMS, one of the Defendants herein,
20     taken pursuant to notice.

21

22               ARISTA REPORTING, INC.
                 192 Lexington Avenue
23                   Suite 802
             New York, New York 10016
24               (212) 684-6100

25

```
1                                                                    2

2      APPEARANCES:

3

4           JOEL B. RUDIN, ESQ.
                 Attorney for the Plaintiff
5                110 East 59th Street
                 New York, New York, 10022
6

7

           MICHAEL D. HESS, ESQ.
8      Corporation Counsel
                 Attorney for the Defendants
9                100 Church Street
                 New York, New York, 10007
10

       BY:  PAUL ARONSON, ESQ.
11               Assistant Corporation Counsel

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1

2

3                          STIPULATIONS

4

5            IT IS HEREBY STIPULATED AND AGREED by

6    and between the attorneys for the respective

7    parties herein that the filing, sealing and

8    certification of the within deposition be

9    waived.  That such deposition may be signed

10   and sworn to before any officer authorized to

11   administer an oath with the same force and

12   effect as if signed and sworn to before the

13   officer before whom said deposition was taken.

14           IT IS FURTHER STIPULATED AND AGREED that the

15   filing all objections except as to form are

16   reserved for the time of trial.

17

18

19

20

21

22

23

24

25

1                                                          4

2    M I C H A E L   M C W I L L I A M S,

3         The witness herein, having first been duly

4    sworn by Caryle Schillay, a Notary Public in and

5    for the State of New York, was examined and

6    testified as follows:

7    EXAMINATION BY MR. RUDIN:

8         Q     Please state your name for the record.

9         A     Sgt. Michael J. McWilliams.  Badge

10   number 300, precinct 75.

11        Q     Mr. McWilliams, my name is Joel Rudin.

12   I represent the plaintiff in this civil action

13   seeking damages for an alleged violation of his

14   rights.

15             I am going to be asking you a number of

16   questions that I believe are relevant to the

17   issues in the lawsuit.

18             If I ask you a question you do not

19   understand, or if you would like me to clarify, do

20   you understand you have the right to ask me to

21   restate or clarify the question?

22        A     Yes.

23        Q     If you provide the answer and upon

24   reflection you think it is incomplete or in some

25   manner inaccurate or misleading, do you understand

```
1                        M. McWilliams                    5

2     you have the right to correct or supplement your

3     answer?

4          A     Yes.

5          Q     Is Mr. Aronson, sitting here to your

6     left, representing you at this deposition?

7               MR. ARONSON:  I am representing Mr.

8          McWilliams.

9          Q     You understand you are named as a

10    Defendant in this lawsuit?

11         A     Yes.

12         Q     Are you presently employed by the New

13    York City Police Department?

14         A     Yes.

15         Q     What is your present assignment?

16         A     75th.

17         Q     75th precinct --

18         A     75th precinct detective squad.

19         Q     And what is your rank?

20         A     Sgt. Mc Williams.

21         Q     When did you first become a member of

22    the New York City Police Department?

23         A     1/26/82.

24         Q     Did you attend college before that?

25         A     No, I did not.
```

```
 1                          M. McWilliams                    6

 2          Q       Are you a high school graduate?

 3          A       No.

 4          Q       How far did you get in school?

 5          A       11th grade.

 6          Q       Where did you attend school?

 7          A       Long Island.

 8          Q       Did you get any high school equivalency

 9    degree after you became a member of the police

10    department?

11          A       Prior to becoming a member of the

12    police department.

13          Q       GED?

14          A       Yes.

15          Q       Where did you get the GED?

16          A       I don't recall.

17          Q       Did that involve going to some school

18    or studying at home or something else?

19          A       I don't recall.

20          Q       Were you ever in the military?

21          A       No.

22          Q       How old were you when you became a

23    member of the police department in 1982?

24          A       Do math or --

25          Q       I guess if you know your date of birth.
```

1                          M. McWilliams                    28

2    course of a criminal investigation?

3         A     I don't recall.

4         Q     Was there any procedure that you were

5    aware of while you were at IAB for vouching tape

6    recordings made during the course of a criminal

7    investigation?

8         A     None I was aware of.

9         Q     Had you ever participated in a criminal

10   investigation prior to March of 1995 in which a

11   tape recording was made?

12        A     I don't know.

13        Q     You have no recollection of that now?

14        A     I don't recall one.

15        Q     Did you receive any training at

16   Internal Affairs at this investigatory course that

17   you were describing regarding the employment of

18   Brady v. Maryland?

19             MR. ARONSON:  Objection to form.

20        Q     Answer that question.

21        A     I don't know what Brady v. Maryland is.

22        Q     Have you ever heard of anything called

23   the Brady disclosure ruling or the Brady rule?

24             MR. ARONSON:  Objection to form.

25             Answer If you can.

M. McWilliams                    29

1

2      A      I don't know.

3      Q      Have you ever received any training at

4   the police department, whether at this Internal

5   Affairs investigator's course or otherwise

6   concerning the obligation, if any, for the

7   prosecution to turn over evidence to the defense

8   that's favorable to the defense in a criminal

9   prosecution?

10     A      Repeat that.

11            (Whereupon, the requested section

12        was read back by this reporter.)

13            MR. ARONSON:  Objection to form.

14     A      None that I am aware of.

15     Q      Have you ever received any training

16   while you were employed at the police department

17   concerning the obligation, if any, of a police

18   officer or detective involved in a criminal

19   investigation to bring to the attention of a

20   prosecutor evidence that is favorable to the

21   suspect?

22            MR. ARONSON:  Objection to form, but go

23        ahead and answer.

24     A      I don't know what you are asking.

25     Q      What don't you understand about the

M. McWilliams                    35

2  training as to how to interrogate a person who was

3  believed to have been criminally involved in the

4  matter under investigation?

5      Q       Repeat that.

6              (Whereupon, the requested section was read

7       back by this reporter.)

8       MR. ARONSON:  Objection to form.

9              Are you referring to quote unquote a

10      suspect?

11      MR. RUDIN:  I think the questions is

12      clear.  Was he given any training at IAB

13      about how to question the person who was

14      believed to have been criminally involved in

15      the matter under investigation.

16      MR. ARONSON:  I still object to the

17      form.  Answer it if you can.

18      A       I don't recall.

19      Q       As of March 16, 1995 what

20  understanding, if any, did you have about how to

21  go about questioning or interrogating a witness

22  who had been criminally involved in the matter

23  that you were investigating?

24      MR. ARONSON:  Objection to form.

25      Answer it if you can.

```
1                          M. McWilliams                 36

2        A      What's understanding?

3        Q      What was your belief as to how to go

4   about questioning such a witness?

5        A      Speak to them.

6        Q      Anything more specific than that?

7        A      No.

8        Q      Did you have any training at the New

9   York City Police Department prior to March 16,

10  1995 about whether or not you should make a

11  written record of information coming to your

12  attention during a criminal investigation that was

13  favorable to the person under investigation?

14              MR. ARONSON:   Objection to form.

15       A      To a person under investigation?

16       Q      Yes.

17       A      Yes.

18       Q      What was that training?

19       A      I believe it was Rosario.

20       Q      What was your understanding as of March

21  16, 1995 about what Rosario means?

22       A      That all information written will be

23  turned over.

24       Q      My question is a little bit different.

25              Did you have any training as of March
```

M. McWilliams                    37

1    16, 1995 about whether or not a police officer

2    involved in a criminal investigation had an

3    obligation to create a written record of

4    information coming to his attention that tended to

5    favor the person under investigation?

6

7         I'm not asking about whether or not

8    information already written had to be disclosed,

9    but whether or not you had an obligation to make a

10   written record of such an investigation?

11        MR. ARONSON:  Objection to form.

12        Did you understand the question?

13        THE WITNESS:  No, not really.

14   Q    Did you have any training at the police

15   department as of March 16, 1995 as to whether or

16   not a police officer involved in a criminal

17   investigation had an obligation to make a written

18   record of information coming to his attention that

19   was favorable to a suspect who was under

20   investigation?

21        MR. ARONSON:  Objection to form.

22        You can answer.

23   A    I don't know.  I don't recall.

24   Q    Had you received any training prior to

25   March 16, 1995 concerning whether or not a police

M. McWilliams                    38

1   officer involved in a criminal investigation had

2   any obligation to bring to the attention of the

3   prosecutor, also in the investigation, information

4   favorable to the suspect under investigation?

5          Q      Had I received any training?

6          Q      Yes.

7          A      I don't recall.

8          Q      Did you personally do anything to

9   arrange or to set up the interview with Mr. Quik

10  at Sing Sing on March 16, 1995?

11         A      No.

12         Q      To your understanding was that done by

13  Mr. Boyce?

14         A      I don't know who did it.

15         Q      Before the time that you met with Mr.

16  Quik on March 16, 1995, did you learn whether or

17  not Mr. Quik previously had been interviewed by

18  Mr. Boyce?

19         A      I believe he was.

20         Q      Did you believe that based on

21  information you were told by Mr. Boyce?

22         A      Yes.

23         Q      Did Mr. Boyce prior to the meeting with

24  Mr. Quik on March 16, 1995, tell you anything at

# COPY OF TRANSCRIPT

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

MARCOS POVENTUD,

                    Plaintiff,

            -against-

CITY OF NEW YORK; ROBERT T. JOHNSON, as
District Attorney, Bronx County; DANIEL TOOHEY,
"FRANKIE" ROSADO, CHRISTOPHER DOLAN, KENNETH
UMLAUFT, Individually and as Members of the New
York City Police Department,

                    Defendants.
- - - - - - - - - - - - - - - - - - x

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
- - - - - - - - - - - - - - - - - - x

ROBERT MALDONADO,

                    Plaintiff,

            -against-

CITY OF NEW YORK; ROBERT T. JOHNSON, as
District Attorney, Bronx County; DANIEL TOOHEY,
"FRANKIE" ROSADO, CHRISTOPHER DOLAN, KENNETH
UMLAUFT,

                    Defendants.

- - - - - - - - - - - - - - - - - - x

                    100 Lafayette Street
                    New York, New York

**DANIEL TOOHEY**

                    August 11, 2008
                    10:10 a.m.

                         LEX#68775



# REPORTING SERVICE, INC.

Professional Reporting Since 1980

Offices throughout New York and New Jersey • Toll Free 800-608-6085

1                                                        2

2              DEPOSITION of DANIEL TOOHEY, a Defendant

3       in the above-entitled action, held at the above

4       time and place, pursuant to Order, taken before

5       Shannon Carson, a shorthand reporter and Notary

6       Public within and for the State of New York.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1

2     A p p e a r a n c e s:

3

4         ROMANO & KUAN, PLLC
              Attorneys for Plaintiff
              MARCOS POVENTUD
5             100 Lafayette Street, Suite 401
              New York, New York 10013
6         BY:  JULIA P. KUAN, ESQ.

7

8         ROMANO & KUAN, PLLC
              Attorneys for Plaintiff
9             ROBERT MALDONADO
              100 Lafayette Street, Suite 401
10            New York, New York 10013
          BY:  ANTHONY CECUTTI, ESQ.

11

12

13        OFFICE OF CORPORATION COUNSEL
          NEW YORK CITY LAW DEPARTMENT
              Attorneys for Defendants in POVENTUD
14            CITY OF NEW YORK; ROBERT T.
              JOHNSON, as District Attorney,
15            Bronx County; DANIEL TOOHEY,
              "FRANKIE" ROSADO, CHRISTOPHER
16            DOLAN, KENNETH UMLAUFT,
              Individually and as Members of the
17            New York City Police Department
              100 Church Street
18            New York, New York 10007
          BY:  RACHEL SELIGMAN-WEISS, ESQ.
19            LINDA DONAHUE, ESQ.

20

21

22

23

24

25

```
 1                        D. Toohey                    30
 2         A      West Point United States Military
 3    Academy.
 4         Q      What is your position there?
 5         A      I am a victim advocate and an
 6    educator.
 7         Q      Are you working at West Point
 8    full-time?
 9         A      Yes.
10         Q      When did you begin working there?
11         A      It was the very -- the end of May
12    of last year, 2007.
13         Q      Are you currently still employed
14    by the NYPD?
15         A      No.
16                     MS. SELIGMAN-WEISS:  Object
17                to the form.
18         A      No.
19         Q      Are you retired from the NYPD?
20         A      Yes.
21         Q      When did you retire?
22         A      I retired July of 2005.
23         Q      What was your rank in the NYPD at
24    the time of your retirement?
25         A      Detective.
```

```
 1                   D. Toohey                31

 2        Q      When were you promoted to

 3   detective?

 4                   MS. SELIGMAN-WEISS:   Object

 5                   to the form.

 6        A      I want to say September,

 7   approximately, 1998.

 8                   MS. SELIGMAN-WEISS:   There's

 9                   no question pending.  I'd like to

10                   speak to the witness.

11                   (Whereupon, the witness and

12                   his attorney left the room and a

13                   brief recess was held at this

14                   time.)

15        Q      What benefits did you receive as a

16   detective for the NYPD that you did not

17   receive as a police officer?

18                   MS. SELIGMAN-WEISS:   Object

19                   to the form.

20        A      Clarify what you mean by benefits?

21        Q      What benefit did you receive, such

22   as higher pay, job security, et cetera, that

23   you received as a detective that you did not

24   receive as a police officer?

25                   MS. SELIGMAN-WEISS:   Object
```

```
 1                        D. Toohey              145
 2          A     If that was my main purpose of
 3    going there, yeah.
 4          Q     If the witness was unable to view
 5    a photo array because they were too ill or
 6    injured, would you ever indicate in a DD5 that
 7    it was a negative ID?
 8                    MS. SELIGMAN-WEISS:  Object
 9              to the form.
10          A     Me personally?  No.
11          Q     Why not?
12          A     Because they didn't look at it to
13    make an ID, it was never shown to them.  There
14    was no negative; it was just other
15    circumstances, they couldn't look at it.
16          Q     Do you know what Brady material
17    is?
18          A     I've heard the term.  But I've
19    been away too long, I don't remember it.
20          Q     It's only been three years since
21    you've been away from the NYPD.
22          A     (No verbal response.)
23          Q     While you were on the force, do
24    you remember the term Brady material?
25          A     I remember the term; but like I
```

```
 1                    D. Toohey                146
 2   said, I don't know what it is.
 3        Q     Were you trained on what Brady
 4   material is while you were at the NYPD?
 5        A     I don't believe so.
 6        Q     Were you, have you ever heard of
 7   the phrase exculpatory evidence?
 8        A     I've heard of the phrase, yes.
 9        Q     Do you know what that is?
10        A     No.
11        Q     Were you ever trained while at the
12   NYPD on what's exculpatory evidence?
13                  MS. SELIGMAN-WEISS:  Object
14              to form.
15        A     I don't believe so, I don't
16   recall.
17        Q     Do you know what is considered
18   evidence that's favorable to an accused?
19                  MS. SELIGMAN-WEISS:  Object
20              to form.
21        A     No.
22                  MS. KUAN:  Would you mark
23              this, please?
24                  (Whereupon, photocopy of ID
25              card front and back with the name
```